Document Number   Case Number
05-C-0180-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
02/07/2006 03:05:15 PM CST

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

---

TRENTON SCHEIBE,

        Plaintiff,

v.

        Case No.  05-C-180-C

NATIONAL BOARD OF MEDICAL EXAMINERS,

        Defendant.

---

## DEFENDANT NATIONAL BOARD OF MEDICAL EXAMINERS'
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Submitted by:

Thomas R. Crone
State Bar No. 1017265
Michael P. Gallagher
State Bar. No. 1047771
Melli, Walker, Pease & Ruhly, S.C.
Ten East Doty, Suite 900
P.O. Box 1664
Madison, WI 53701-1664
(608) 257-5812

Attorneys for Defendant
National Board of Bar Examiners

January 12, 2006

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.     SUMMARY JUDGMENT STANDARD. ....................................................................... 3

II.    SCHEIBE DOES NOT HAVE A DISABILITY WITHIN THE MEANING OF
THE ADA. ............................................................................................................... 4

     A.    An Individual Is Only Disabled With Respect To Reading Under The ADA
If The Individual's Impairment Constitutes A Limitation That Is Substantial
Or Considerable When Compared To The Reading Most People Do In Their
Daily Lives ............................................................................................................. 5

     B    Scheibe Is Not Substantially Limited Within The Meaning Of The ADA .............. 11

III.   THERE IS NO CURRENT CASE OR CONTROVERSY FOR THE COURT TO
DECIDE, AND IN ANY EVENT NBME DID NOT VIOLATE THE ADA WHEN
IT DECLINED TO EXTEND ACCOMMODATIONS TO SCHEIBE FOR STEPS 1
AND 2 OF THE USMLE. ........................................................................................ 16

     A.    There Is No Present Case Or Controversy For The Court To Decide .................... 17

     B.    NBME Did Not Violate The ADA When It Declined To Extend Scheibe
Accommodations For Steps 1 And 2 Of The USMLE ............................................ 20

CONCLUSION ................................................................................................................... 25

# INTRODUCTION

This is an action for injunctive relief under Title III of the Americans with Disabilities Act ("ADA") filed by Trenton J. Scheibe, M.D. ("Scheibe").[1]  Scheibe contends he has a reading disability.  Scheibe seeks an accommodation of double the standard test taking time for taking the various parts ("Steps") of the United States Medical Licensing Examination ("USMLE"), which tests are sponsored, in part, by Defendant National Board of Medical Examiners ("NBME").

NBME is a private non-profit corporation which, together with the Federation of State Medical Boards, developed the USMLE. [Defendant National Board of Medical Examiners' Proposed Findings of Fact ("FOF") ¶¶ 6-7]  The USMLE consists of three Steps; successful completion of each Step is a prerequisite of obtaining licensure as a physician in all 50 states. [FOF ¶¶ 10-13]  The USMLE is an integral part of each state's effort to ensure that only competent and qualified individuals are in fact licensed to practice medicine. [FOF ¶¶ 7-8]

Part of NBME's responsibility with regard to Steps 1 and 2 is to evaluate and act upon requests for test accommodations under Title III of the ADA from applicants claiming to have a disability. [FOF ¶ 17]

Dr. Scheibe is a 37 year old male with both a law degree and a medical degree. [FOF ¶¶ 2 & 5]  Scheibe graduated sixth in his class of 281 students from Marshfield, Wisconsin High School in 1987 where he was the News Editor for his school newspaper during his sophomore, junior and senior years. [FOF ¶ 3]  Scheibe graduated *cum laude* from Marquette University in 1991. [FOF ¶ 4]  In 1994, Scheibe received his law degree (J.D.) from the University of Texas at

---

[1] Scheibe originally sought to recover compensatory and punitive damages.  By Order dated May 10, 2005, the Court advised Scheibe that such remedies were not available under Title III of the ADA.  The Court reaffirmed that holding in its May 31, 2005 Order.

Houston. [FOF ¶ 5]  In August 2002, Scheibe received his medical degree (M.D.) from the University of Texas at Houston Medical School. [Id.]  Scheibe has achieved this academic success without receiving any accommodations on the basis of alleged disability except for one exam in his final year of medical school.[2]

In January 2003, Scheibe first requested accommodations from NBME, asking that he be allowed double the standard time in which to complete Steps 1 and 2 of the USMLE. [FOF ¶¶ 24-25][3] The request was based upon a report from David Lachar, Ph.D. (The "Lachar Report"), and was reviewed at the request of NBME by Samuel Ortiz, Ph.D. [FOF ¶¶ 29 & 39][4] Dr. Ortiz concluded that the materials submitted did not support a finding that Scheibe was substantially limited in a major life activity. [FOF ¶ 43]  Based on Dr. Ortiz's report and NBME's own review of the documentation, the request was denied. [FOF ¶ 44]

In January 2004, Scheibe passed Step 1, without any accommodations. [FOF ¶ 45]

In October 2004, Scheibe again requested double time in which to take Step 2, submitting a report from Fred Theye, Ph.D. (the "Theye Report") in support. [FOF ¶¶ 46, 47]  The request was reviewed at the request of NBME by Steven Zecker, Ph.D. [FOF ¶ 71][5] Dr. Zecker likewise concluded that Scheibe's documentation did not support the requested accommodations. [FOF

---

[2] The first time Scheibe requested or received any accommodations was in March 2002 while in his last year of Medical School, when the University of Texas at Houston Medical School gave Scheibe extended time to take the standardized test for the Internal Medicine clerkship. [FOF ¶¶ 28 & 30]  He apparently received accommodations on only this one medical school exam. [Id.]  As discussed in more detail, infra, all of Scheibe's "reading scores" on diagnostic tests and on standardized tests throughout his academic career place him in the average to superior range.

[3] Prior to requesting any accommodations, Scheibe had taken Step 1 twice and Step 2 once without passing. [FOF ¶ 24]

[4] Dr. Ortiz is a Clinical Psychologist and Associate Professor of Psychology in the Department of Psychology at St. John's University in New York.  He is an expert in the field of learning disabilities. [FOF ¶ 85]

[5] Dr. Zecker is a Clinical Psychologist and Associate Professor of Communication Sciences and Disorders and Director of Doctoral Studies in the Department of Communication Sciences and Disorders, Program in Learning Disabilities, at Northwestern University in Evanston, Illinois.  Dr. Zecker is an expert in the field of learning disabilities. [FOF ¶ 86]

¶ 75] On the basis of Dr. Zecker's report and its own review, NBME denied the request. [FOF ¶ 76]

Scheibe passed Step 2 on February 8, 2005, without any accommodations. [FOF ¶ 77]

The instant action was commenced on May 10, 2005. [FOF ¶ 78]

To date, Scheibe has not registered to take Step 3, the only portion of the USMLE remaining for him to take. [See FOF ¶¶ 82-83]

For the reasons stated, <u>infra</u>, Scheibe does not have a disability within the meaning of the ADA. Therefore, NBME did not violate the ADA when it declined to extend accommodations to Scheibe for Steps 1 and 2 of the USMLE, which Steps Scheibe passed without any accommodations. Alternatively, Scheibe does not state a current case or controversy.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD.

Rule 56 mandates summary judgment where, as here, the record shows that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). No longer a "disfavored procedural shortcut," summary judgment is now recognized as "an integral part of the Federal Rules as a whole which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex</u>, 477 U.S. at 327, citing Fed. R. Civ. P. 1.

The party moving for summary judgment bears the initial burden of showing there are no material facts in dispute, and that judgment should be entered in its favor. <u>Hannon v. Turnage</u>, 892 F.2d 653, 656 (7th Cir.), <u>cert. denied</u>, 498 U.S. 821 (1990). The movant can satisfy this burden by pointing to the adverse party's failure to introduce evidence sufficient to support each essential element of the cause of action alleged. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986); Celotex, 477 U.S. at 323-24. Stated positively, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is therefore appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250. In this case, Scheibe bears the burden of proof on the essential elements of his claim. See Contreras v. Suncast Corp., 237 F.3d 756, 763 (7th Cir. 2001) ("It was Contreras's burden on summary judgment to show that he could come up with evidence to show he could meet his ultimate burden of showing an ADA recognized disability"). The record in its entirety shows that Scheibe cannot meet his burden.

In deciding whether to grant summary judgment, the Court must draw inferences in a light favorable to the nonmovant. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "However, [courts] are not required to draw every conceivable inference from the record – only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

The undisputed facts show that Scheibe does not have a disability under the standards set by the ADA. Alternatively, the Court lacks Article III jurisdiction because there is no current case or controversy. NBME is entitled to summary judgment.

## II.    SCHEIBE DOES NOT HAVE A DISABILITY WITHIN THE MEANING OF THE ADA.

There is no genuine issue of material fact about whether Scheibe is substantially limited with respect to reading within the meaning of the ADA. He is not, and NBME is entitled to

summary judgment on that basis.[6]  Scheibe has had a stellar academic career, including

consistent success on timed standardized exams. [FOF ¶¶ 3-5 & 50-62]  Moreover, Scheibe's

performance on a broad spectrum of cognitive and academic indicators, including those for

reading fluency, speed and comprehension, as recorded in the Lachar and Theye Reports upon

which Scheibe bases his claim, places Scheibe in the average to well above average range when

compared with others of the same age from the general population. [FOF ¶¶ 33-38, 40-43, 63-64,

72-75 & 87-97][7]

A.   **An Individual Is Only Disabled With Respect To Reading Under The ADA If The Individual's Impairment Constitutes A Limitation That Is Substantial Or Considerable When Compared To The Reading Most People Do In Their Daily Lives.**

Scheibe's claim arises under Title III of the ADA, which provides:

Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189.  To qualify as an individual with a disability within the meaning of the ADA,

the person must have "a physical or mental impairment that substantially limits one or more of

the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

---

[6] NBME disputes that Scheibe has any impairment at all.  As discussed, infra, the Lachar Report and the Theye Report both diagnosed Scheibe with a reading impairment based on what was characterized as a discrepancy between Scheibe's reading ability and Scheibe's overall intelligence and other abilities. [FOF ¶¶ 31 & 63] Consistent with the opinions expressed by Dr. Ortiz and Dr. Zecker, NBME's position is that such a diagnosis cannot properly be based on a perceived discrepancy in abilities, especially when all of those abilities are measured to be in the average range or higher, and that there is no evidence in the Lachar and Theye Reports indicating Scheibe has any kind of underlying cognitive impairment or dysfunction. [FOF ¶¶40-43, 72-75 & 87-97].

[7] The Lachar Report and the Theye Report both recorded Scheibe's scores using age based norms, i.e. scores that compared Scheibe to the average person of the same age in the general population. [FOF ¶¶ 67 & 70] The reporting of age based norms is required by NBME for the results of all tests submitted in support of a claimed learning or reading disability.  Age based norms more closely approximate the average person in the general population than do grade based norms. Grade based norms are inappropriate for purposes of the ADA because the results compare to persons who have achieved the same or similar educational level as the examinee.  [FOF ¶ 69]

The ADA's definition of disability is "to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002). See also EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 801 (7th Cir. 2005) ("[T]his admonition to remain faithful to the strict statutory requirements of the ADA applies with equal force to all claims under the Act.")

For an individual attempting to prove disability for purposes of the ADA, it is "insufficient . . . to merely submit evidence of a medical diagnosis of an impairment." Toyota, 534 U.S. at 198. "Merely having an impairment does not make one disabled for purposes of the ADA." Id. at 195. Instead, the determination of whether a claimed impairment is a substantial limitation depends upon application of the following standard: "**whether the limitation is substantial or considerable in light of what most people do in their daily lives**, and whether the impairment's effect is permanent or long term." Sears, Roebuck, 417 F.3d at 801 (emphasis added).

The Seventh Circuit's analysis is fully in accord with the regulations promulgated by the Department of Justice ("DOJ") interpreting Title III of the ADA and that of the EEOC interpreting Title I of the ADA.

The DOJ regulations state that an individual is substantially limited "when the individual's important life activities are restricted as to the condition, manner, or duration under which they can be performed **in comparison to most people**." 28 C.F.R. pt. 36, App. B (emphasis added). The EEOC states that for most purposes, "substantially limits" means either "[u]nable to perform a major life activity that the average person in the general population can perform," or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as **compared to the condition, manner,**

6

**or duration under which the average person in the general population can perform that same major life activity.**" 29 C.F.R. § 1630.2(j)(i), (ii) (emphasis added).

In construing the term "substantially limits" for purposes of evaluating Scheibe's claim that he is disabled with respect to reading under 42 U.S.C. § 12189, the court must, therefore, consider that claim in reference to the reading abilities of most people or the average person in the general population, not in comparison to how Scheibe's performance on timed standardized exams may compare to his other intellectual measures of success. See Gonzales v. National Board of Medical Examiners, 225 F.3d 620, 629 (6th Cir. 2000); Price v. National Board of Medical Examiners, 966 F. Supp. 419 (S.D.W.Va. 1997).

In Wong v. Regents of the University of California, 410 F.3d 1052 (9th Cir. 2005), the Ninth Circuit Court of Appeals, in upholding a grant of summary judgment in favor of the University, applied the substantial limitation standard to a claim of disability with respect to the activities of learning and reading. Wong alleged that the University of California violated Title II of the ADA, 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act when it denied his request for accommodations and dismissed him from medical school for failure to meet academic requirements. Id. at 1055. Regarding Wong's academic career, the court found that Wong had succeeded as a college undergraduate, received a Masters degree in cellular/ molecular biology and had succeeded without accommodations during his first two years of medical school, with a grade average slightly above a "B." Id. at 1056-57.

Wong was later diagnosed with a learning disability and requested an accommodation of extended time off before each of his clerkships in order to complete the required reading. Wong eventually made a request for an eight-week reading period, which was denied, and he subsequently dismissed for failing to meet the school's academic standards. Id. at 1057-58.

Wong filed suit, and the district court granted summary judgment for the University, holding there was no genuine issue regarding whether Wong was substantially limited in a major life activity. Id. at 1059.

On appeal, the Ninth Circuit initially noted, "[i]t is plain that having an impairment does not necessarily mean that a person is 'disabled' for purposes of the Acts." Id. at 1061. Concerning Wong's claim of disability with respect to learning, the court held:

> The relevant question for determining whether Wong is "disabled" under the Acts was not whether he might be able to prove to a trier of fact that his learning impairment makes it impossible for him to keep up with a rigorous medical school curriculum. It was whether his impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people. The level of academic success Wong achieved during the first two years of medical school, without any special accommodation provided to him by the school, made that proposition implausible. His record was to the contrary.

Id. at 1065-66.

With respect to reading, the court held that "the relationship between reading and academic success is sufficiently close to make [the argument that Wong has a reading disability despite demonstrated academic achievement without accommodation] a difficult one to maintain." Id. at 1067. Further, the court held:

> In essence, it was argued that Wong read slowly [at an eighth grade level under time constraints], especially when compared to his own reading comprehension ability without time limits, or to others in his academic peer group. He did not, however, present evidence to the district court or argue to us that he was substantially limited in his ability to read for purposes of daily living, or as compared to what is important in the daily life of most people. That is the appropriate standard. . . . In this case, Wong has not established that he was unable to read newspapers, government forms, street signs, or the like.

Id. at 1066-67.

A similar analysis was applied by the Sixth Circuit in Gonzales, supra. In Gonzales, the Sixth Circuit held that an otherwise successful medical student was not disabled with respect to

reading where the evidence showed he had achieved academic success without accommodations and could read at least as well as the average person.

Gonzales had sought a preliminary injunction requiring that the NBME provide him with extended time for Step 1 of the USMLE. Gonzales, 225 F.3d at 624-25. The district court denied the injunction, finding there was no likelihood of success on the merits because Gonzales did not establish that he was disabled under the ADA. Id. at 625. Gonzales appealed, arguing, inter alia, that the district court erred in holding that he was not disabled. Id. The Sixth Circuit affirmed.

The Sixth Circuit observed that on a battery of tests administered for purposes of diagnosing a reading or learning disability, Gonzales had performed in the average range or higher. Id. at 628-30. The court further found that:

> In high school, Plaintiff qualified for advanced placement classes and graduated with a grade point average of 4.3/5.0. He had no formal accommodations for learning disabilities during high school. Plaintiff scored 1050, an average score, on the SAT. He took the test without accommodations. Plaintiff earned a grade point average of 3.15/4.0 at Davis where he majored in physiology. He had accommodations during his third and fourth years at UCD. He took the MCAT twice without accommodations, improving his score on his second attempt by using skills suggested by counselors at Davis. His second MCAT score was high enough that the UMMS admitted him to its program.

Id. at 630.

On these facts, the court held: "In short, Gonzales's impairment simply does not meet the DOJ's definition of 'substantially limits,' because he can read as well as the average person." Id. at 629. Furthermore, based on his academic history, the court held that Gonzales was "not a member of the severely disadvantaged group Congress envisioned when it enacted the ADA." Id. at 630.

The Sixth Circuit further explained its holding by noting that "the ADA addresses impairments that limit an individual, not in a trivial or even moderate manner, but in a major way, to a considerable amount, or to a large degree. Under this standard, Gonzales is clearly not disabled under the ADA." Id. at 627 n.12.[8]

Likewise in Price, supra, the United States District Court for the Southern District of West Virginia found that three medical students seeking accommodations on the USMLE for claimed reading disorders were not disabled within the meaning of the ADA. None of the plaintiffs "exhibited a pattern of substantial academic difficulties," and each had a history of relative academic success without any accommodations. Price, 966 F. Supp. at 423-24.

Even though the plaintiffs had been diagnosed with learning or reading impairments,[9] the court held:

> . . . First, each of the students has a history of significant scholastic achievement reflecting a complete absence of any substantial limitation on learning ability. Second, this record of superior performance is corroborated by

---

[8] Gonzales had testified in the district court proceeding that he felt "compelled to sign credit card receipts blindly because reading them would take him so long that it would make other customers angry, and that one of his attorneys had to read to him line by line the complaint they prepared on his behalf in the present case so that he could understand it." Gonzales, 225 F.3d at 627 n.13. However, the appellate court said: "we think Gonzales's verbal representation of his impairment is inconsistent with his success on the SAT and MCAT. Both tests are timed, and Gonzales took these exams without accommodation." Id.

[9] The plaintiffs' experts in Price had testified that they believed the plaintiffs were disabled because each of them apparently exhibited a discrepancy between ability and achievement. Price, 966 F. Supp. at 427 n.5. The court gave the following example to illustrate that such a discrepancy cannot by itself establish disability within the meaning of the ADA:

> Student A has average intellectual capability and an impairment (dyslexia) that limits his ability to learn so that he can only learn as well as ten percent of the population. His ability to learn is substantially impaired because it is limited in comparison to most people. Therefore, Student A has a disability for purposes of the ADA. By contrast, Student B has superior intellectual capability, but her impairment (dyslexia) limits her ability so that she can learn as well as the average person. . . . Student B's impairment does not substantially limit the major life function of learning, because it does not restrict her ability to learn as compared with most people. Therefore, Student B is not a person with a disability for purposes of the ADA.

Id. at 427.

standardized test scores measuring cognitive ability and performance. Finally, there is a complete lack of evidence suggesting that plaintiffs cannot learn at least as well as the average person. That is, these students do not suffer from an impairment which substantially limits the life activity of learning in comparison with most people.

Id. at 427-28.

**B.     Scheibe Is Not Substantially Limited Within The Meaning Of The ADA.**

Similar to the plaintiffs in Wong, Gonzales and Price, Scheibe's claim of a reading

disability is undermined both by objective diagnostic evidence and by Scheibe's long history

of academic success, including success on standardized exams.

The mere diagnosis of a reading disorder does not establish the existence of a disability

under the ADA standard.  Williams 534 U.S. at 195, 198.  In both the Lachar and Theye Reports,

the asserted diagnosis was based on an apparent discrepancy between Scheibe's reading ability

and his overall intelligence and other abilities. [FOF ¶¶ 31 & 63][10]  However, neither Dr. Lachar

nor Dr. Theye found Scheibe's reading ability to be below average compared to the average

person of the same age in the general population. [Id.] [11]  Instead, as was the case in Gonzales,

---

[10] As discussed in footnote 6, supra, the diagnosis of a learning or reading disability cannot be founded on an apparent discrepancy in abilities.  As Dr. Ortiz observes, "the practice [of discrepancy analysis] has been thoroughly discredited in the literature and . . . its use as an indicator of learning disability [is] wholly unwarranted." [FOF 41] Discrepancy between abilities is the rule, not the exception, and having a reading ability that ranges from average to high average cannot support the diagnosis of a disability merely because some of the individuals' other abilities are even higher relative to the individual's ability to read. [FOF 42]

[11] As noted by Dr. Ortiz, commenting on the Lachar Report:

> [A]n examination of all of the individual's scores on the achievement tests administered to Mr. Scheibe reveal that not a single score falls outside the normal or average range of functioning compared to other people of the same age in the general population. . . . [Scheibe's performance on the tests administered for the Lachar Report] indicates functioning that is at the very least "average" to well above average and occasionally superior.  **There is simply no reasonable way that it could be construed that there is evidence of a significant interference with academic achievement or activities of daily living that require reading skills.  Indeed, the report is clear in that Mr. Scheibe's difficulties are quite narrowly defined in that he "has difficulty with timed exams" and "he does poorly on timed standardized tests." Learning disabilities, by definition are not constrained to limited, unique, or such idiosyncratic situational problems.**

continued

all of the tests administered to Scheibe by Dr. Lachar and Dr. Theye, including tests for reading

fluency and speed and for reading comprehension, demonstrate results that place Scheibe's

performance in the average range or higher. [FOF ¶ 38, 64 & 89][12] According to Dr. Ortiz,

"[t]he only reasonable conclusion that can be drawn from these data patterns is that Mr. Scheibe

is a competent, normal, average reader with abilities that range from average to high average and

occasionally superior." [FOF ¶ 42]

---

[FOF ¶ 40 (emphasis added)]

[12] Commenting on the Theye Report, Dr. Zecker observed in part:

> Dr. Theye did administer six reading-related tests from the Woodcock-Johnson Psychoeducational Battery-3rd Edition and the Wechsler Individual Achievement Test-2 (WIAT-2). **I note from Dr. Theye's report that all of these measures (which assessed word identification, reading rate and fluency and comprehension) yielded scores that placed Dr. Scheibe in the Average range or higher.** Dr. Theye states that the WJ-III Reading Fluency score (a percentile of 54, which corresponds to a standard score of 102) is "remarkable' in comparison to Dr. Scheibe's other, higher, scores. **Again, this score is somewhat lower (although not significantly so) than Dr. Scheibe's word identification and comprehension scores, but it is Average and as such cannot be taken as evidence for a disability that causes a significant functional impairment in comparison to others of the same age from the general population.**

[FOF ¶ 74 (emphasis added)]

Scheibe's lowest score on any of the tests administered by Drs. Lachar and Theye was on the Nelson-Denny Reading Test. [FOF ¶ 90] The Lachar Report nevertheless still placed Scheibe's score on the Reading Rate portion of the Nelson-Denny within the "Low Average" range. [FOF ¶ 37] Also on the Nelson-Denny, Scheibe's vocabulary score was reported by Dr. Lachar as being in the "High Average Range," and his Comprehension score was reported as being in the "Average Range." [Id.]

As both Dr. Zecker and Dr. Ortiz observe, even a "Low Average" score nevertheless falls within the average range. [FOF ¶ 91] Scheibe's score on the Reading Rate portion of the Nelson-Denny was in the 21st percentile. [FOF ¶ 92] The generally accepted "average range" encompasses a range extending from approximately the 16th percentile to the 84th percentile. [Id.]

Additionally, the Reading Rate portion of the Nelson-Denny is obtained by merely asking the examinee to report how many words he or she has read during a single 60-second interval. [FOF ¶ 93] The Nelson-Denny has a low reliability rating and cannot be considered a diagnostic test. [FOF ¶ 94]

The Weschler Individual Achievement Test-Second Addition ("WIAT-II") and Woodcock Johnson Test of Academic Achievement-Third Edition ("WJ-III") are more reliable indicators of reading ability than the Nelson-Denny. [FOF ¶ 95] When Dr. Lachar and Dr. Theye administered the WIAT-II and WJ-III, all of Scheibe's scores on reading-related tests, including tests for reading speed, fluency and comprehension, were recorded in the average to high average range. [FOF 96-97]

12

Learning disabilities frequently manifest themselves in the form of academic difficulties at an early age and are usually first diagnosed in infancy, childhood or adolescence. [FOF ¶ 49] However, Scheibe has had a long and successful academic career from elementary school forward, without having been evaluated for learning disabilities and, with only one exception at the end of medical school, without accommodations.  Scheibe received A's and B's throughout elementary school and did not receive a grade lower than A- in high school. [FOF ¶ 50] He achieved his success in high school, graduating sixth in a class of 281 students, while participating in numerous extracurricular activities, including being the News Editor for his high school newspaper. [FOF ¶¶ 3, 61]  In high school, Scheibe received several scholarships, including a Marquette University Scholarship, the Marshfield Student Council Scholarship, the Marshfield Journalism Scholarship, and he received the President's Academic Fitness Award and consistently made the Honor Roll. [FOF ¶ 62]

On standardized tests in elementary school and junior high, Scheibe consistently scored above average to superior in Total Reading, a composite of all reading areas, and Reading Comprehension, a task that requires the reading of lengthy passages and answering content-related questions about those passages. [FOF ¶¶ 51-52]  In high school, Scheibe's reading related scores (without any accommodations) on the Stanford Test of Academic Skills, which is one of a variety of timed group tests given to students to assess academic skill development, were again above average to superior compared to students nationally. [FOF ¶¶ 53-54 & 60]

When Scheibe took the ACT as a junior in high school, his highest score on the ACT, 97th percentile compared to college bound seniors nationally, was on the English section of the exam, which is the section measuring reading acquisition and skill development. [FOF ¶ 58] Scheibe's scores on the PSAT and the SAT were all above average compared to test takers

nationally. [FOF ¶¶ 57 & 59]  Scheibe's scores on these exams are significant not only because Scheibe achieved his success on these tests without accommodations, but also because the ACT, PSAT and SAT are timed exams that require extensive reading of passages and questions, even on the math sections, which assess more than simple math computation skills. [FOF ¶ 56]

After high school, Scheibe enjoyed continued academic success without accommodations.  He graduated *cum laude*, with a 3.53 GPA from Marquette University in 1991 where he was an accounting major. [FOF ¶¶ 4 & 50]  He then started law school at Marquette, where he was an A/B student and finished as a B/C student at the University of Texas at Houston, completing his J.D. in the usual three years. [FOF ¶¶ 5 & 50]  Unlike the plaintiff in Wong, indeed unlike the average person in the general population, Scheibe was more than able to keep up in medical school.  He received his M.D. from the University of Texas at Houston in August of 2002, achieving a passing grade or higher in the vast majority of his medical school courses. [FOF ¶¶ 5 & 50]

Scheibe's scores without accommodations on the LSAT, GMAT and MCAT were described by Dr. Lachar as being "not excellent but good enough to get him into a program of study." [FOF ¶ 32][13]  Scheibe has passed both Steps 1 and 2 of the USMLE without accommodations. [FOF ¶¶ 45, 77]

---

[13] It should be noted that Dr. Lachar's description of Scheibe's performance on the ACT and SAT was similar: "[A]lthough his ACT and SAT scores were not excellent, they were good enough to get him into a university." [FOF ¶ 32]  Scheibe's scores on the ACT, percentile rankings compared to college bound test-takers nationally of 97, 92, 79, 81 and 92, might well be described as "excellent." [FOF ¶ 58]  Scheibe's SAT scores in his junior and senior years may not have been excellent, but they were certainly more than merely good enough to get into just any school. [FOF ¶ 59]  Therefore, while the actual scores have not been provided for Scheibe's scores on the LSAT, GMAT and MCAT, it is certainly possible that Dr. Lachar understated the matter when he described them as merely "good enough to get into a program of study."  What is known is that Scheibe took all of these tests without accommodations and was admitted to law school and medical school based on his performance on the tests.

The term "substantially limits" must be interpreted strictly to create a demanding standard for qualifying as disabled under the ADA. Williams, 534 U.S. at 198. There is no evidence, and indeed Scheibe has not even alleged, that his ability to read is substantially limited compared to the reading that most people do in their daily lives. Sears, Roebuck, 417 F.3d at 801-02; Wong, 410 F.3d at 1065-66, 1067; Gonzales, 225 F.3d at 627 n.12.

The relevant question is not whether Scheibe experiences difficulty with timed standardized exams or the USMLE in particular. The relevant question is whether Scheibe can offer sufficient evidence to show that he has an impairment which substantially limits his ability to read "as a whole, for purposes of daily living, as compared to most people." Wong, 410 F.3d at 1065; Sears, Roebuck, 417 F.3d at 801-02. Scheibe has not alleged that he is unable to or is significantly limited in his ability to "read newspapers, government forms, street signs, or the like." Wong, 410 at 1067. Even if he were to allege that kind of limitation, his long history of academic success without any accommodations, especially on timed standardized exams requiring extensive reading such as the PSAT, ACT, SAT, LSAT, GMAT, MCAT and also the USMLE, would be so inconsistent with such an assertion as to make it highly improbable, if not completely implausible. See Gonzales, 225 F.3d at 627 n.13; Wong 410 F.3d at 1065-67. [14]

---

[14] The most Scheibe has actually said is that he has difficulty with standardized exams, and in particular, the USMLE. In his Personal Statement, submitted in support of his second request for test accommodations on Step 2 of the USMLE, Scheibe stated in part:

> When I started taking standardized tests in grade school at the end of the academic year, I vividly remember not completing the tests. I especially had difficulty with parts of the exam which entailed reading long passages and answering content related questions about the passage, for example, deciding what an appropriate title of the passage would be.
>
> **\*\*\*\*\*\*\*\*\***
> **I believe my educational and test taking history in conjunction with the professional testing I have undertaken, clearly show that I suffer from a significant impairment when confronted with standardized exams with severe time constraints and information presented in a vignette format requiring significant amounts of reading. Though I am intelligent and well educated, my disorder is clearly exposed when confronted by the USMLE, and therefore, is a**
>
> continued

Scheibe's own experts found that he can read at least as well as the average person of the same age in the general population. [FOF ¶¶ 31, 34, 36-38, 63-64, 89-97] On this record, there is not even a colorable issue as to whether Scheibe's reading ability is substantially limited within the meaning of the ADA. It is not.

## III. THERE IS NO CURRENT CASE OR CONTROVERSY FOR THE COURT TO DECIDE, AND IN ANY EVENT NBME DID NOT VIOLATE THE ADA WHEN IT DECLINED TO EXTEND ACCOMMODATIONS TO SCHEIBE FOR STEPS 1 AND 2 OF THE USMLE.

In his Complaint, Scheibe alleged that the NBME was negligent in denying his request for test accommodations on Steps 1 and 2 of the USMLE and asked for compensatory and punitive damages. [FOF ¶ 78] By Order dated May 10, 2005, the Court held that while Scheibe's

---

> major limitation in my professional advancement.
>
> **********
>           Without accommodation, the time constraints and the individual question length on the USMLE Step 2 is an impossible hurdle for me to overcome.

[FOF ¶ 48 (emphasis added)]

Clearly the time constraints and individual question length on Step 2 were not an "impossible hurdle" for Scheibe to overcome, as he passed Step 2 on February 8, 2005 without the benefit of or need for any test accommodations [FOF ¶ 77].

Even if Scheibe had not passed Steps 1 and 2 already, Scheibe's claim still falls far short of what is required to establish a substantial limitation under the ADA. Wong, 410 F.3d at 1065 (inability to keep up with rigorous medical school curriculum does not mean a plaintiff is disabled within the meaning of the ADA).

Finally, while Scheibe may believe he is learning disabled, and recall having had difficulty completing standardized tests, his actual performance runs counter to that belief. Scheibe's scores for Total Reading and Reading Comprehension from elementary school onward were consistently better, sometimes much better, than at least 70% of test takers nationally. [FOF ¶¶ 51-54 & 60] As Dr. Ortiz observes:

> Scheibe may indeed believe that he suffers from a significant reading impairment. Personal statements are often subject to an extreme form of confirmatory bias. This occurs where an individual looks at data with a pre-conceived notion and tends to see patterns in the data that support the notion while simultaneously discounting, ignoring or refuting data that are contrary to the notion. The process is often subconscious, not a deliberate attempt to distort the facts, but the effect is powerful. Confirmatory bias is clearly evident in Mr. Scheibe's statements in his personal statement regarding his recollection of difficulty with standardized tests, especially parts requiring extensive reading. A simple review of the tests he took tells a very different story.

[FOF ¶ 88]

16

claims may be cognizable under Title III, only injunctive relief is therefore available. [FOF ¶ 79] In later correspondence to the Court, Scheibe continued to seek compensatory damages, and he asked for a judgment against NBME "to charge [NBME] with the duty to recognize [Scheibe's] past and future claims for accommodation under the ADA." [FOF ¶ 80]  By Order dated May 31, 2005, the Court reiterated that only injunctive relief is available. [FOF ¶ 81]

As discussed, supra, Scheibe has passed both Steps 1 and 2 of the USMLE without any accommodations being afforded to him.  There is therefore no case or controversy cognizable under Title III of the ADA for Scheibe's claims with respect to Steps 1 and 2.  And as noted, supra, Scheibe has not registered to take Step 3.

In any event, NBME did not violate the ADA when it denied Scheibe accommodations for Steps 1 and 2.  That action was required pursuant to NBME's duty to the public in light of the information provided by Scheibe in support of his requests for test accommodations.

## A.   There Is No Present Case Or Controversy For The Court To Decide.

As an alternative to its argument on the merits that Scheibe does not have a disability within the meaning of the ADA, NBME observes that the Court lacks Article III jurisdiction because there is no current case or controversy.

With respect to remedies, Title III of the ADA provides in relevant part:

> The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter . . . .

42 U.S.C. § 12188(a)(1).  42 U.S.C. § 2000a-3(a) provides:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a-2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved . . . .

17

Therefore, "[a] private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages." Powell v. National Board of Medical Examiners, 364 F. 3d 79, 86 (1st Cir. 2004).

A plaintiff seeking to invoke the jurisdiction of the federal courts must satisfy the requirement imposed by Article III of the U.S. Constitution by alleging an actual case or controversy. City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); Sierakowski v. Ryan, 223 F.3d 440, 442-43 (7th Cir. 2000). To state a case or controversy, a plaintiff must demonstrate the existence of three elements: (1) that he has suffered an injury in fact, (2) that his injury was caused by the defendant's conduct, and (3) that his injury is capable of being redressed by a favorable ruling from the court. Hoepfl v. Barlow, 906 F. Supp. 317, 320 (E.D. Va. 1995) (in the context of a claim for injunctive relief under Title III of the ADA); Sierakowski, 223 F.3d at 442-43. A plaintiff seeking prospective injunctive relief must establish "a significant likelihood and immediacy of sustaining some direct injury." Sierakowski, 223 F.3d at 443. The threat of future injury must be "real and immediate." Lyon, 461 U.S. at 102.

A private citizen does not have standing to sue for alleged past violations of Title III of the ADA. See, e.g., Hoepfl, 906 f. Supp. at 320-324. Additionally, "a plaintiff who cannot demonstrate a likelihood that she will ever again suffer discrimination at the hands of a defendant, even one who has discriminated against her in the past, does not have standing to obtain an injunction under the ADA." Id. at 323.

Prior to filing the Complaint, Scheibe had already passed Steps 1 and 2 of the USMLE without accommodations. [FOF ¶¶ 45 & 77] Under the ADA's plain language, Scheibe, cannot obtain relief for NBME's past denials of test accommodations for Steps 1 and 2. Scheibe is not a "person who is being subjected to discrimination," and only injunctive relief is potentially

available to Scheibe for any alleged violation of Title III.  Therefore, Scheibe's claims with respect to Steps 1 and 2 of the USMLE do not state a live case or controversy for the Court to decide.

Similarly, with respect to Step 3, Scheibe is not a "person who is being subjected to discrimination," and he states no live case or controversy.

The only component of the USMLE remaining for Scheibe to take is Step 3. [FOF ¶ 82] There is no evidence and Scheibe has not alleged that Scheibe is currently eligible for Step 3, has applied to a state medical board ("SMB") or the Federation of State Medical Boards ("FSMB") to sit for Step 3 or has requested any accommodations for Step 3. [FOF ¶ 83]  Each state has its own requirements which must be met to establish a registrant's eligibility to sit for Step 3. [FOF ¶ 15]  Whether Scheibe is eligible to take Step 3 will depend entirely upon whether he can meet the requirements of the particular SMB, if any, to which he applies for licensure as a physician. [FOF ¶¶ 15 & 83]

With respect to Step 3, it is the responsibility of the particular SMB sponsoring a registrant for Step 3 to ensure that persons with disabilities receive reasonable accommodations under the ADA when they take Step 3, unless the SMB has formally authorized the FSMB to act on the state's behalf. [FOF ¶ 18]  Registrants requesting accommodations for Step 3 must submit a request to the SMB (or the FSMB if appropriate) for such accommodations, which refers the request to NBME for review and processing. [FOF ¶ 19] After review by its experts, NBME issues a recommendation regarding the request for accommodations. [Id.] The SMB (or FSMB) makes the decision whether or not to grant accommodations for Step 3. [Id.] The SMB (or FSMB) may accept or reject the recommendation of the NBME in whole or part.

Therefore, Scheibe has not stated a case or controversy under Title III of the ADA with respect to Step 3 of the USMLE.  There is no significant likelihood and immediacy of sustaining some direct injury that is fairly traceable to NBME.  See Sierakowski, 223 F.3d at 443.  Scheibe has not demonstrated any "real and immediate" threat of future harm due to any conduct on the part of NBME. Lyon, 461 U.S. at 102.  Scheibe has not alleged that he is eligible to take Step 3 or that he has received the sponsorship of an SMB for Step 3, and NBME will not be the decision maker if he ultimately does become eligible for Step 3 and requests test accommodations.  In short, even if NBME had discriminated against Scheibe in the past, which it did not, Scheibe cannot demonstrate a likelihood that he will ever again be discriminated against by NBME and so does not have standing for injunctive relief under the ADA. Hoepfl, 906 f. Supp. at 323.

Finally, even if the Court were to issue an injunction requiring that NBME grant Scheibe accommodations for Step 3, the order could not redress Scheibe's claim of future injury because on Step 3, NBME does not have the authority to grant accommodations.  While NBME does make a recommendation to the SMB (or FSMB) concerning an individual's request for test accommodations on Step 3, the SMB (or FSMB) may choose to follow that recommendation or not. [FOF ¶ 19]

**B.      NBME Did Not Violate The ADA When It Declined To Extend Scheibe Accommodations For Steps 1 And 2 Of The USMLE.**

NBME does not dispute its obligation pursuant to Title III of the ADA to offer reasonable accommodations to persons with disabilities applying to sit for Steps 1 or 2 of the USMLE. However, NBME also has a serious responsibility to the public to ensure that only those individuals who have a bona fide disability under the ADA receive such accommodations. As the court said in Price, supra:

      The ADA is not designed "to allow individuals to advance to professional positions through a back door.  Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door."  If a court [or the NBME] were to grant testing accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door [,] . . . so undermining the integrity of the USMLE . . . .

966 F. Supp. at 421-22 (internal citation omitted).

      The USMLE is an integral component of each state's effort to ensure that only competent and qualified individuals are licensed to practice medicine, and all fifty states rely on the USMLE to distinguish those individuals who are qualified to enter the profession from those who are not qualified to become physicians. [FOF ¶ 8]  The NBME takes its role as the testing organization for medical licensure seriously. [FOF ¶ 9]  Maintaining the integrity of the testing process is a critical part of the NBME's obligation to protect the health of the public. [Id.]

      NBME's Disability Services Office has established procedures for handling requests for accommodations under the ADA. [FOF ¶¶ 20-23]  The purpose of providing reasonable and appropriate accommodations for Steps 1 or 2 of the USMLE is to afford registrants with disabilities equal, not preferential, access to the examination process. [FOF ¶¶ 16-17] The public thus should have the benefit of the skills of qualified physicians who may be disabled, but should not be subject to treatment by unqualified physicians. [FOF ¶ 17]

      In declining to grant Scheibe the test accommodations he requested, NBME carefully and properly discharged its responsibilities under the ADA. [FOF ¶¶ 16-17, 44 & 76]  Based on the reports of its experts and all of the available information, NBME concluded that Scheibe did not have a disability under the ADA. [FOF ¶¶ 44 & 76]  To the contrary, all of the evidence indicated that Scheibe's reading ability was average or better when compared to others of the same age from the general population.

Scheibe first requested test accommodations for Steps 1 and 2 of the USMLE in January 2003, at which time, he asked to be given double the standard time on the exams based on a claimed reading disorder. [FOF ¶ 24-25][15]

Scheibe's initial request for accommodations included the Lachar Report, discussed supra. [FOF ¶ 29]. Scheibe had no prior history of evaluations for learning disabilities before his evaluation by Cynthia Gonzalez and Dr. Lachar in 2001, and he did not request, nor did he receive, any accommodations on standardized tests or otherwise until close to the end of his medical school career. [FOF ¶¶ 28 & 30]

On all of the tests administered by Dr. Lachar, Scheibe scored in the average range or higher. [FOF ¶¶ 31-38, 89, 91 & 96]

Disability Services received Scheibe's request for accommodations and referred the request and supporting documentation to Dr. Ortiz, for his recommendation as to the claimed reading disorder. [FOF ¶ 39]  Based upon his review of the Lachar Report, Dr. Ortiz provided a detailed report to Disability Services dated February 4, 2003, which concluded that a diagnosis of learning disability could not be supported and recommended that the request for accommodations should be denied. [FOF ¶¶ 40-43; See also page 11, note 11, supra]

---

[15] Scheibe did not submit any personal statement in support of his first request for accommodations, even though the Questionnaire he submitted instructed him to do so:

> In order to document your need for accommodation as completely as possible, please attach, in addition to professional documentation, a personal statement describing your disability and its impact on you daily life and educational functioning.  Do not confine your comments to standardized test performance;  rather discuss your overall functioning.

[FOF ¶ 26]

Moreover, although the NBME's website advises registrants seeking accommodations on Steps 1 or 2 of the USMLE that relevant historical information regarding the individual's academic history should be submitted to support a request for test accommodations, Scheibe also did not submit any academic records with his first request for test accommodations. [FOF ¶ 27]

Based upon the report of Dr. Ortiz and its own internal review, NBME sent a letter to Scheibe dated March 24, 2003, which informed Scheibe that NBME would not provide the requested accommodations and set forth the reasons for that decision. [FOF ¶ 44]  In accordance with the opinion and recommendation of Dr. Ortiz, the NBME concluded that the documentation provided did not demonstrate any cognitive or academic deficits that substantially limited Scheibe's ability to read or learn. [Id.]  Instead, the documentation showed that Scheibe's performance on a range of cognitive and academic tasks was in the range of average to well above average. [Id.]

As noted, <u>supra</u>, Scheibe passed Step 1 of the USMLE on January 29, 2004, without any accommodations.

In October of 2004, Scheibe submitted another Request for Test Accommodations to NBME, requesting an accommodation of double testing time for Step 2 of the USMLE based again on a claimed reading disorder. [FOF ¶ 46]  In support of his second request, Scheibe submitted in relevant part, the following additional materials: the Theye Report; a Personal Statement dated October 19, 2004; and academic transcripts and standardized test results spanning most of Scheibe's academic career. [FOF ¶ 47][16]

On all of the tests administered to Scheibe by Dr. Theye, including those for Reading Comprehension, Reading Fluency and Reading Speed, Scheibe again scored in the average range or higher. [FOF ¶ 63-64, 89 & 97]

---

[16] In response to inquiries from Disability Services, Scheibe submitted other additional materials clarifying that the Lachar and Theye Reports recorded the results of the tests administered to Scheibe as compared to the average person of the same age in the general population. [FOF ¶¶ 66-68 & 70]

Disability Services referred Scheibe's second request for accommodations and all of the supporting documentation submitted by Scheibe, including the Lachar Report, to Dr. Zecker, for his review and recommendation as to the claimed reading disorder. [FOF ¶ 71]

Dr. Zecker provided a detailed report to Disability Services dated January 19, 2005, which, like Dr. Ortiz, concluded that the diagnosis of learning disability could not be supported. [FOF ¶¶ 72-75; See also page 12, note 12, supra]

NBME sent a letter to Scheibe dated January 24, 2005 informing Scheibe that NBME would not grant the requested accommodations on Step 2 of the USMLE. [FOF ¶ 76]  In accordance with the findings and recommendation of Dr. Zecker, and based on its own review, the NBME concluded that the documentation provided did not demonstrate that he was substantially limited in a major life activity. [Id.]  The documentation instead indicated at least average performance on a range of cognitive and academic tasks including reading and did not show any deficits that substantially limited the ability to read. [Id.] Scheibe passed Step 2 of the USMLE on February 8, 2005, again without accommodations. [FOF 77]

For both of Scheibe's requests for test accommodations, the NBME's decision not to extend the requested accommodations was in accordance with the findings and recommendations of a qualified expert in the field of learning disabilities. [FOF ¶¶ 85-86]  Additionally, all of the information provided by Scheibe indicated that Scheibe's reading ability was average or better compared to others of the same age in the general population.  NBME's decision not to provide Scheibe with the requested test accommodations was supported by all of the evidence, which established that Scheibe was not disabled with respect to reading for purposes of the ADA.

## CONCLUSION

Scheibe does not have a reading disability within the meaning of the ADA. NBME acted properly when it denied Scheibe's requests for test accommodations on Steps 1 and 2 of the USMLE. As Scheibe is only allowed injunctive relief under Title III of the ADA, he does not state a case or controversy with respect to Steps 1 and 2 of the USMLE. He has passed both of those exams without any accommodations. He states no case or controversy with respect to Step 3. For the reasons stated above, NBME requests that the Court dismiss Scheibe's Complaint in its entirety.

Dated this _12th_ day of January, 2006.

_____

Thomas R. Crone
State Bar No. 1017265
Michael P. Gallagher
State Bar No. 1047771
Melli, Walker, Pease & Ruhly, S.C.
Ten East Doty, Suite 900
P.O. Box 1664
Madison, WI  53701-1664
(608) 257-4812

Attorneys for Defendant
National Board of Medical Examiners