Document Number   Case Number
05-C-0180-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
02/07/2006 03:05:15 PM CST

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

TRENTON SCHEIBE,

          Plaintiff,

v.                                          Case No.  05-C-180-C

NATIONAL BOARD OF MEDICAL EXAMINERS,

          Defendant.

## DEFENDANT NATIONAL BOARD OF MEDICAL EXAMINERS
## PROPOSED FINDINGS OF FACT

Defendant National Board of Medical Examiners ("NBME") requests that the Court make the following findings of fact with respect to Defendant's motion for summary judgment in this matter:

1. Plaintiff Trenton J. Scheibe ("Scheibe") was an adult resident of Marshfield, Wisconsin when this action was commenced. [Complaint ¶ A].

2. Scheibe is a 37 year old male, whose date of birth is December 19, 1968. [Affidavit of Joseph Abram Doane ("Doane Aff.") ¶ 16, Exh. 1 (Questionnaire for USMLE Step 1 and 2 Applicants Requesting Test Accommodations)]

3. Scheibe graduated 6th in a class of 281 students from Marshfield High School in 1987 where he was News Editor of the school newspaper during his sophomore, junior and senior years. [Doane Aff. ¶ 27, Exh. 10, p. 6 (Scheibe's academic transcripts)]

4. In 1991, Scheibe graduated *cum laude* from Marquette University, where he majored in accounting. [Doane Aff. ¶ 27, Exh. 10, pp. 8-9]

5.      Scheibe received his law degree (J.D.) from the University of Texas at Houston in 1994, and he received his medical degree (M.D.) from the University of Texas at Houston Medical School in August of 2002. [Doane Aff. ¶ 27, Exh. 10, pp. 10-15; Complaint ¶ B, p. 3]

6.      Defendant National Board of Medical Examiners ("NBME") is a non-profit corporation with its principal office located in Philadelphia, Pennsylvania. [Doane Aff. ¶ 3]

7.      NBME, together with the Federation of State Medical Boards ("FSMB"), has created the United States Medical Licensing Examination ("USMLE"). The USMLE is an examination, the results of which are used by individual state medical licensing authorities to assess the qualifications of candidates for medical licensure. [Doane Aff. ¶ 3]

8.      The USMLE is an integral component of each state's effort to ensure that only competent and qualified individuals are licensed to practice medicine. All fifty states rely on the USMLE to distinguish those individuals who are qualified to enter the profession from those who are not qualified to become physicians. [Doane Aff. ¶ 4]

9.      The NBME takes its role as the testing organization for medical licensure seriously. Maintaining the integrity of the testing process is a critical part of the NBME's obligation to protect the public safety. [Doane Aff. ¶ 4]

10.     There are three phases of the USMLE, known as "Steps." Passage of all three Steps is accepted by all U.S. medical licensing authorities to satisfy the examination requirements for licensure as a physician. [Doane Aff. ¶ 5]

11.     Step 1 assesses whether an examinee can understand and apply important concepts of the sciences basic to the practice of medicine. Step 1 is generally taken at the end of the second year of medical school. [Doane Aff. ¶ 5]

12.     Step 2 Clinical Knowledge (CK) assesses an examinee's ability to apply medical knowledge, skills and understanding of clinical science(s) essential for the provision of patient care under supervision. Step 2 CK is generally taken during the student's fourth year of medical school. [Doane Aff. ¶ 5]

13.     Step 3 assesses whether an examinee can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine. Step 3 is often taken after receipt of a medical degree, usually during or after the first year of residency training. [Doane Aff. ¶ 5]

14.     Steps 1 and 2 CK are offered year-round at test centers operated around the world by Thomson Prometric ("Prometric"), the test-delivery vendor for the USMLE. [Doane Aff. ¶ 6]  Step 3 is administered by Prometric at one or more facilities located throughout the United States and its territories. [Doane Aff. ¶ 7]

15.     To be eligible for Step 3, an individual seeking to register for the exam (a "registrant") must have obtained an MD or DO degree and must have passed both Steps 1 and 2 of the USMLE. Additionally, to be eligible for Step 3, a registrant must first meet the requirements for taking Step 3 set by the state medical board ("SMB") to which he or she is applying for licensure as a physician, such as the completion of any postgraduate training requirements.  Each state has its own requirements which registrants must meet to be eligible to sit for Step 3. [Doane Aff. ¶ 7]

16.     The NBME is responsible for ensuring that the USMLE is administered under standard conditions to ensure the integrity of the scores and to protect the public's interest in the medical licensure process.  For this reason, the NBME is responsible for ensuring that no examinee or group of examinees receives an unfair advantage in the administration of the examination(s). [Doane Aff. ¶ 8]

17.     With respect to Steps 1 and 2 of the USMLE, it is also the responsibility of the NBME to ensure that persons with disabilities as defined by the Americans with Disabilities Act ("ADA") receive reasonable accommodations when they take Steps 1 and 2 of the USMLE. The purpose of providing reasonable and appropriate accommodations is to afford registrants with disabilities equal, not preferential, access to the examination process.  The public thus should have the benefit of the skills of qualified physicians who may be disabled, but should not be subject to treatment by unqualified physicians. [Doane Aff. ¶ 9]

18.     With respect to Step 3, it is the responsibility of the particular SMB sponsoring the registrant to sit for Step 3 to ensure that persons with disabilities receive reasonable accommodations under the ADA when they take Step 3, unless the SMB has formally authorized the FSMB to act on the state's behalf. [Doane Aff. ¶ 10]

19.     Registrants requesting accommodations for Step 3 must submit a request to the SMB (or the FSMB if appropriate) for such accommodation(s), which refers the request to NBME for review and processing.  After review by its experts, NBME issues a recommendation regarding the request for accommodation.  The SMB (or FSMB) makes the decision whether or not to grant any requested accommodation for Step 3.  The SMB (or FSMB) may accept or reject the recommendation of the NBME in whole or part. [Doane Aff. ¶ 10]

20.     The NBME website provides detailed instructions and guidelines for registrants to follow when applying for accommodations. Registrants who believe they are disabled and seek reasonable accommodations for Step 1 or 2 are required to provide to NMBE evidence of significant impairment relative to USMLE including but not limited to, information regarding the nature of their disability, the impact of the impairment on their daily lives and tasks relevant to USMLE, the type of accommodation sought and history of prior accommodations, if any.  In

addition, registrants are required to provide to NBME documentation from qualified professionals and others describing the disability and explaining the appropriateness of the type of accommodations requested.  [Doane Aff. ¶ 11]

21.     The Disability Services staff of the NBME ("Disability Services") reviews and processes requests for test accommodations for the USMLE. [Doane Aff. ¶ 12]

22.     Upon receipt of the required information from the registrant for a requested test accommodation(s), NBME may consult with outside experts with expertise in the diagnosis and treatment of the particular condition described by the registrant, to assist NBME in determining whether the documentation submitted by the examinee supports the finding of a disability as defined by the ADA, or whether additional information is needed to make a decision. [Doane Aff. ¶ 13]

23.     The expert(s) conducts a thorough review of each assigned case and prepares a detailed written report with recommendations to the NBME as to whether the documentation supports a finding that the examinee is significantly impaired in a major life activity relevant to the USMLE.  Based on the review and recommendation of its experts and on internal review NBME either grants or denies the request for accommodations on Step 1 or 2, or requests additional information. [Doane Aff. ¶ 14]

24.     Scheibe first requested a test accommodation for the USMLE in January 2003. [Doane Aff. ¶ 15]  Prior to requesting any accommodation, Scheibe had taken Step 1 twice and Step 2 once without passing. [Complaint ¶ B, p. 3]

25.     In a Questionnaire for USMLE Step 1 and 2 Applicants Requesting Test Accommodations dated January 6, 2003, Scheibe indicated he was requesting accommodations for

Steps 1 and 2 of the USMLE based on a claimed reading disorder. The accommodation requested was "double testing time." [Doane Aff. ¶ 16, Exh. 1]

     26.     The Questionnaire completed by Scheibe stated at paragraph 10:

> In order to document your need for accommodation as completely as possible, please attach, in addition to professional documentation, a personal statement describing your disability and its impact on your daily life and educational functioning. Do not confine your comments to standardized test performance; rather discuss your overall functioning.

[Doane Aff. ¶ 16, Exh. 1] Scheibe did not submit any personal statement in support of his first request for accommodation. [Doane Aff. ¶ 17]

     27.     The NBME's website advises registrants seeking an accommodation on Steps 1 or 2 of the USMLE that relevant historical information regarding the individual's academic history should be submitted to support a request for test accommodation. Scheibe did not submit any school records verifying learning problems. [Doane Aff. ¶ 17]

     28.     Scheibe's January 6, 2003 request for accommodation included a Certification of Prior Test Accommodations dated January 6, 2003, indicating that Scheibe had first received an accommodation of extended testing time from the University of Texas at Houston Medical School in March of 2002. [Doane Aff. ¶ 18, Exh. 2] Specifically, the University gave Scheibe extended time to take the standardized test for the Internal Medicine clerkship, the passage of which was required for Scheibe to graduate from medical school. [Complaint ¶ B, p. 3]

     29.     Scheibe's January 6, 2003 request for accommodation also included a Psychological Assessment conducted by Cynthia Gonzalez, M.A., on September 21, 2001 and October 5, 2001 and signed by David Lachar, Ph.D. (the "Lachar Report") [Doane Aff. ¶ 19, Exh. 3].

30.     Scheibe had no prior history of evaluations for learning disabilities prior to his 2001 evaluation, and he did not request nor receive any accommodations on standardized tests or otherwise prior to March 2002. [See Doane Aff. ¶ 16, Exh. 1; Doane Aff. ¶ 26, Exh. 9]

31.     The Lachar Report asserted that Scheibe had a reading disorder. [Doane Aff. ¶ 19, Exh. 3, p. 4]  Dr. Lachar's conclusions were based on what he characterized as an apparent discrepancy between Scheibe's reading abilities and his overall intelligence and other abilities. [Doane Aff. ¶ 19, Exh. 3, pp. 2-4]  Dr. Lachar did not find that Scheibe's reading ability is below average compared to the average person of the same age in the general population. [See Doane Aff. ¶ 19, Exh. 3]  Notwithstanding his diagnosis of a reading disorder, Dr. Lachar did not find that Scheibe suffers from an impairment that substantially limits him in a major life activity. [See id.]

32.     Despite asserting that Scheibe had a reading disorder, the Lachar Report noted:

> . . . [A]lthough his ACT and SAT scores were not excellent, they were good enough to get him into a university.  On the SAT, his verbal subtest score of 490 (55th %tile) was significantly lower than his mathematics score of 620 (75th %tile). He reported similar test results for the LSAT, GMAT, and MCAT in which scores were not excellent but good enough to get him into a program of study.

[Doane Aff. ¶ 19, Exh. 3, p. 1]

33.     The Lachar Report stated that Scheibe was administered the following tests during his 2001 evaluation:

> Wechsler Adult Intelligence-Third Edition
> Woodcock Johnson-III Test of Achievement
> California Verbal Learning Test
> Wechsler Memory Scale-Revised: Logical Memory and Visual Reproduction
> Nelson-Denny Reading Test
> Wisconsin Card Sorting Test
> Personality Assessment Inventory

[Doane Aff. ¶ 19, Exh. 3, p. 2]

34.     According to the Lachar Report, on the Wechsler Adult Intelligence-Third Edition ("WAIS-III"), Scheibe's Verbal IQ placed him in the "High Average Range, 81st %tile", his Performance IQ placed him in the "Superior Range, 95th %tile" and his Full Scale IQ placed him in the "High Average Range, 90th %tile." Scheibe's "Verbal Comprehension" was recorded as "High Average Range, 83rd %tile," his "Perceptual Organization" was recorded as "Superior Range, 96th %tile," his "Processing Speed" was recorded as "Superior Range, 96th %tile" and his "Working Memory" was recorded as "High Average Range, 90th %tile." [Doane Aff. ¶ 19, Exh. 3, p. 2]

35.     With respect to memory, the Lachar Report recorded that Scheibe's memory abilities on a number of indicators ranged from the "Average Range" to the "Very Superior Range." [Doane Aff. ¶ 19, Exh. 3, p. 3]

36.     On the Woodcock Johnson Test of Academic Achievement ("WJ-III"), Dr. Lachar described Scheibe's scores in Basic Reading and Oral Language as being in the "Average Range" and Scheibe's Broad Math score as being in the "Superior Range." [Doane Aff. ¶ 19, Exh. 3, p. 3]

37.     On the Nelson-Denny Reading Test ("Nelson-Denny" or "NDRT"), Dr. Lachar described Scheibe's vocabulary score as being in the "High Average Range," his Comprehension score as being in the "Average Range" and his Reading Speed score as being in the "Low Average Range." [Doane Aff. ¶ 19, Exh. 3, pp. 3-4]

38.     As reported by Scheibe's own expert, Dr. Lachar, none of Scheibe's scores on the tests administered was below average, and many were high average or better. [See Doane Aff. ¶ 19, Exh. 3]

39.     Disability Services received Scheibe's request for accommodation and referred the request and supporting documentation to Samuel O. Ortiz, Ph.D. for his recommendation as to the

claimed reading disorder. [Doane Aff. ¶¶ 20 & 21, Exh. 4 (January 14, 2003 letter from NBME to Scheibe verifying receipt of his accommodation request)]

40.     Based upon his review of the Lachar Report, Dr. Ortiz provided a report to Disability Services dated February 4, 2003. [Doane Aff. ¶ 21, Exh. 5; Affidavit of Samuel O. Ortiz ("Ortiz Aff.") ¶ 2, Exh. 2] Dr. Ortiz initially observed that:

> It is stated that "the disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills." **Yet, an examination of all of the individual's scores on the achievement tests administered to Mr. Scheibe reveal that not a single score falls outside the normal or average range of functioning compared to other people of the same age in the general population.** Indeed, his lowest score was on the Nelson-Denny reading rate where he obtained a standard score of 88 (21st percentile rank). Given that the Nelson-Denny is at best, a screening instrument not a diagnostic test (because of its inherent unreliability; coefficient = .68), a score of 88 is hardly noteworthy, let alone indicative of any type of significant interference with reading. Moreover, Mr. Scheibe's other scores, including those for all areas related to reading, ranged from a "low" 97 (48th percentile rank) to a high of 129 (97th percentile rank). This indicates functioning that is at the very least "average" to well above average and occasionally superior. There is simply no reasonable way that it could be construed that there is evidence of a significant interference with academic achievement or activities of daily living that require reading skills. Indeed, the report is clear in that Mr. Scheibe's difficulties are quite narrowly defined in that he "has difficulty with timed exams" and "he does poorly on timed standardized tests." Learning disabilities, by definition are not constrained to limited, unique, or such idiosyncratic situational problems.

[Doane Aff. ¶ 21, Exh. 5, p. 2 (emphasis added)]

41.     In noting that the Lachar Report's conclusion of a learning disability was based solely on an apparent discrepancy between Scheibe's reading ability and his overall intelligence and other abilities, Dr. Ortiz stated: "The fact remains that the practice [of discrepancy analysis] has been thoroughly discredited in the literature and that its use as an indicator of learning disability [is] wholly unwarranted." [Doane Aff. ¶ 21, Exh. 5, p. 3]

42.     Dr. Ortiz's report further stated in relevant part that:

There is a tendency [in the Lachar Report] to look at "relative" differences rather than normative differences which leads to numerous interpretive errors. For example, it is stated that Mr. Scheibe "demonstrated a relative weakness in immediate auditory attention." This claim is based on a scaled score of 10 for Digit Span (50th percentile rank). Not only does Digit Span not measure auditory attention, it is also well within the average range. To call it a weakness, even a "relative" weakness simply because it is lower than some of his other abilities is wrong. From a normative perspective, being at the exact middle of the average range simply cannot be construed as a weakness or dysfunction of any kind. Such a characterization is counter to the very definition of average or normal. In addition, there is no scientific reason why an individual's abilities should all be equally well developed. Rather, the data indicate that 97% of the general population has some type of difference between one ability and another. It is the rare exception who has evenly developed abilities. Such "scatter" and differences, even significant differences in abilities, is the norm, not the exception and not suggestive of dysfunction.

**********

…It was reported that Mr. Scheibe's scores on oral language and basic reading skills were lower than his scores on math tests.  Again, there appears to be a tendency to view this as abnormal when in fact, it is quite normal that an individual may be better at math than at reading.  We often call these people mathematicians, not learning disabled.

The [Lachar Report] seems to imply that he read "very slowly" because his general abilities were higher. It should be noted that his reading rate score of 88 (21st percentile rank) places Mr. Scheibe squarely within the average range. There is no reason to believe or expect that his reading rate should be equivalent to, let alone commensurate with his "general abilities." Nonetheless, such performance is well within the average range and does not imply dysfunction of any kind. Moreover, if reading speed were indeed a problem for Mr. Scheibe, it would most likely be reflected in tests of cognitive processing speed. Yet, his Processing Speed Index from the WAIS-III, a reliable indicator of processing speed, was 119 (90th percentile rank) and in the high average range of functioning. According to the report, this indicates "superior abilities in processing and organizing perceptual information, and performing mental operations quickly." If Mr. Scheibe is indeed a slow reader, it is apparently due to factors other than his underlying cognitive skills and most assuredly not the result of any type of learning disability.

**********

. . . [T]he "weakness" [in reading decoding] that is being referenced [on page 3 of the Lachar Report] involves standard scores of no less than 97 (48th percentile

10

rank). Performance that is as good or better than nearly half of all people in the general population seems a poor foundation for describing it as a "weakness." . . . The only reasonable conclusion that can be drawn from these data patterns is that Mr. Scheibe is a competent, normal, average reader with abilities that range from average to high average and occasionally superior.

[Doane Aff. ¶ 21, Exh. 5, pp. 3-4]

    43.      Dr. Ortiz's report concluded with the following observations:

. . . [T]here are several important findings that are evident in the submitted documentation: a) no evidence of any type of cognitive impairment or dysfunction of any kind is seen in any of the data contained in the evaluation; b) no evidence of any type of impairment or dysfunction in academic skills or knowledge is found in the data contained in the evaluation; c) there is no clear or documented history of difficulties in the development and acquisition of academic skills in the formative and even later years of schooling; d) there is a consistent and impressive record of academic achievement and school-related success including performance on timed tests involving reading (e.g., SAT, MCAT, LSAT) even without the benefit of any type of accommodation; and e) there is no indication in the submitted documentation that Mr. Scheibe has any impairment or dysfunction (significant, mild, or otherwise) that affects his ability to adequately and successfully complete any daily activities that may involve reading.

All of Mr. Scheibe's scores (both cognitive and academic) are well within normal limits and the fact that some of his abilities are very well developed while one of them is "merely" average does not support a diagnosis of learning disability. In the final analysis, the most reasonable conclusion that can be made from the available data and documentation is that Mr. Scheibe is a competent and capable learner who is currently performing in a manner that is comparable to and sometimes better than that of his same age peers in the general population. There is simply no evidence here that his recent (within the last two years) and apparently unique and specific inability to do well on standardized tests under timed conditions is something that could be reasonably construed as a disability. It is more likely that other factors are responsible for his apparent problems in this very circumscribed area of functioning.

Therefore, based on the data available in this case, I am of the opinion that a diagnosis of learning disability cannot be supported. There is no evidence of intrinsic cognitive dysfunction and no evidence of any type of academic dysfunction. At times and under certain circumstances Mr. Scheibe may read slowly, but he is not an impaired reader. As such, in the absence of any additional evidence or data to support his claim, it is my opinion that Mr. Scheibe's request for accommodations are not justified and should therefore be denied.

[Doane Aff. ¶ 21, Exh. 5, pp. 4-5]

44.     Based on the report of Dr. Ortiz and its own review NBME sent a letter to Scheibe dated March 24, 2003, which informed Scheibe that NBME was unable to provide the requested accommodation and set forth the reasons for that decision. In accordance with the opinion and recommendation of Dr. Ortiz, the NBME concluded that the documentation provided did not demonstrate any cognitive or academic deficits that substantially limited Scheibe's ability to read or learn.  Rather, the documentation showed Scheibe's performance on a range of cognitive and academic tasks was in the range of average to well above average. [Doane Aff. ¶¶ 14 & 22, Exh. 6]

45.     Scheibe passed Step 1 of the USMLE on January 29, 2004, without any accommodation. [Doane Aff. ¶ 23]

46.     In October of 2004, Scheibe submitted another request for test accommodation to NBME, requesting an accommodation of double testing time for Step 2 CK of the USMLE based again on a claimed reading disorder. [Doane Aff. ¶ 24, Exh. 7]

47.     In support of his second request, Scheibe initially submitted the following additional materials: a Neuropsychology Report dated August 25, 2004 and signed by Fred W. Theye, Ph.D. (the "Theye Report") [Doane Aff. ¶ 25, Exh. 8]; a Personal Statement dated October 19, 2004 [Doane Aff. ¶ 26, Exh. 9]; and academic transcripts and standardized test results spanning most of Scheibe's academic career. [Doane Aff. ¶ 27, Exh. 10]

48.     Scheibe's Personal Statement asserted in part:

> When I started taking standardized tests in grade school at the end of the academic year, I vividly remember not completing the tests.  I especially had difficulty with parts of the exam which entailed reading long passages and answering content related questions about the passage, for example, deciding what an appropriate title of the passage would be.
>
> **********
> I believe my educational and test taking history in conjunction with the professional testing I have undertaken, clearly show that I suffer from a significant impairment when confronted with standardized exams with severe time constraints

and information presented in a vignette format requiring significant amounts of reading. Though I am intelligent and well educated, my disorder is clearly exposed when confronted by the USMLE, and therefore, is a major limitation in my professional advancement.

**********
        Without accommodation, the time constraints and the individual question length on the USMLE Step 2 is an impossible hurdle for me to overcome.

[Doane Aff. ¶ 26, Exh. 9, pp. 1 & 3]

49.     Learning disabilities frequently manifest themselves in the form of academic difficulties at an early age and are usually first diagnosed in infancy, childhood or adolescence. [Affidavit of Steven G. Zecker, Ph.D. ("Zecker Aff.") ¶ 3, Exh. 3, p. 2; Ortiz Aff. ¶ 3, Exh, 3, p. 1, number 2]

50.     Scheibe's academic transcripts record the following: Scheibe received A's and B's throughout elementary school; he did not receive a grade lower than A- in high school; as an undergraduate at Marquette, Scheibe graduated with a GPA of 3.53; he successfully completed law school, starting at Marquette where he was an A/B student, and finishing at the University of Texas at Houston where he was a B/C student; he successfully completed medical school, receiving a passing grade or higher in the vast majority of his medical school courses. [Doane Aff. ¶ 27, Exh. 10]

51.     Scheibe's Total Reading scores from first through seventh grade reveal that he consistently scored as well or much better than approximately seventy percent of all test takers nationally. National percentile ranks for first through seventh grade were: 72nd, 82nd, 66th, 92nd, 86th, 84th and 84th. [Doane Aff. ¶ 27, Exh. 10, pp. 1-3] Total Reading is a composite of all reading areas. [Ortiz Aff. ¶ 3, Exh. 3, p. 8, number 21]

52.     Scheibe's Reading Comprehension scores from first through seventh grade show that he consistently scored as well or much better than seventy percent of all test takers nationally. His

Reading Comprehension national percentile ranks for first through seventh grade were: 70th, 82nd 66th, 90th, 78th, 78th and 92nd. [Doane Aff. ¶ 27, Exh. 10, pp. 1-3]   Reading Comprehension is a task that requires the reading of lengthy passages and answering content-related questions about those passages. [Ortiz Aff. ¶ 5]

53.     In ninth grade, Scheibe's national percentile ranks on the Stanford Test of Academic Skills were in relevant part: Reading Comprehension, 83rd percentile; Reading Vocabulary, 83rd percentile; Spelling, 77th percentile; English, 93rd percentile; Reading, 85th percentile; and Total English, 90th percentile. [Doane Aff. ¶ 27, Exh. 10, p. 4]

54.     The Stanford Test of Academic Skills is one of a variety of timed group tests given to students to assess academic skill development. [Ortiz Aff. ¶ 3, Exh. 3, p. 6, number 15]  The 50th percentile rank represents the mean or average of all individuals who took the test. [Id.] Scheibe's test scores consistently ranked him well above average [Doane Aff. ¶ 27, Exh 10, p. 4]

55.     When Scheibe was a junior in high school, he took the ACT, PSAT and SAT. [Doane Aff. ¶ 27, Exh. 10, p. 4]

56.     The ACT, PSAT and SAT are timed exams that require extensive reading of passages and questions, even on the math sections because those sections assess more than simple math computation skills. [Ortiz Aff. ¶ 5]

57.     Scheibe's percentile rank for the verbal section of the PSAT was 72nd percentile, and his percentile rank for the math section was 75th percentile. [Doane Aff. ¶ 27, Exh. 10, p. 4]

58.     On the ACT, and as a junior in high school, Scheibe's percentile ranks as compared to "college bound" test-takers were: 97th, 92nd, 79th, 81st and 92nd. [Doane Aff. ¶ 27, Exh. 10, p. 4] Scheibe's score on the ACT placing him in the 97th percentile compared to "college bound" test-

takers was on the English section of the ACT, which is a section "related to reading acquisition and skill development." [Id.; Ortiz Aff. ¶ 3, Exh. 3, p. 8, number 21]

59.     When Scheibe took the SAT as a junior in high school, he scored 490 (55th percentile) on the verbal section and 620 (75th percentile) on the math section. [Doane Aff. ¶ 27, Exh. 10, p. 4; Doane Aff. ¶ 19, Exh. 3, p. 1] As a senior, Scheibe scored 490 on the verbal section of the SAT and 680 on the math section. [Doane Aff. ¶ 27, Exh. 10, p. 4]

60.     As a junior in high school, Scheibe's reading-related national percentile ranks on the Stanford Test of Academic Skills were: Reading Comprehension, 70th percentile; Reading Vocabulary, 78th percentile; Spelling, 71st percentile; English, 91st percentile; Reading, 79th percentile; Total English, 79th percentile. [Doane Aff. ¶ 27, Exh. 10, p. 4]

61.     In high school, Scheibe was involved in the following extracurricular activities with accompanying Special Honors: Baseball (9th grade); Basketball (all four years); Football, Tiger Award (all four years); Track (10th through 12th grade); Class Officer, President (10th grade); Newspaper, News Editor (10th through 12th); Scouting, Eagle Scout and Regional Leadership Awards (9th through 11th); Explorers (9th and 10th); Math Club (11th and 12th); NH Society, Services Coordinator (11th and 12th); School Forest (9th); Student Council, Treasurer (all four years); Solos (11th); Ensembles, First in State (11th); Employment (9th and 10th); and Hockey, Most Valuable Player (9th). [Doane Aff. ¶ 27, Exh. 10, p. 7]

62.     In high school, Scheibe received at least the following additional honors and awards: Marquette University Scholarship; Marshfield Student Council Scholarship; Marshfield Journalism Scholarship; President's Academic Fitness Award; Honor Roll (seven semesters). [Doane Aff. ¶ 27, Exh. 10, p. 7]

15

63.     The Theye Report relied in part on the Lachar Report and concluded that an apparent discrepancy between Scheibe's reading ability and overall intelligence and other abilities indicated the existence of a reading disability. [Doane Aff. ¶ 25, Exh. 8]  Dr. Theye did not find that Scheibe's reading ability is below average compared to the average person of the same age in the general population. [See id.]  Notwithstanding his diagnosis of a reading disorder, Dr. Theye did not find that Scheibe suffers from an impairment that substantially limits him in a major life activity. [See id.]

64.     As reported by Scheibe's own expert, Dr. Theye, none of Scheibe's scores on the tests administered was below average, and many were high average or better. [See Doane Aff. ¶ 25, Exh. 8]

65.     By letter dated October 27, 2004, Disability Services informed Scheibe that it was in receipt of his second request for test accommodations on Step 2 CK of the USMLE. [Doane Aff. ¶ 28, Exh. 11]

66.     By letter dated November 10, 2004, Disability Services requested that Scheibe have Dr. Theye provide age-based standard scores for all WJ-III academic achievement tests and subtests administered during Scheibe's August 2004 evaluation. [Doane Aff. ¶ 29, Exh. 12]

67.     Scheibe forwarded to Disability Services a letter from Dr. Theye dated November 23, 2004 reporting age-based standard scores for the WJ-III. [Doane Aff. ¶ 30, Exh. 13]

68.     By letter dated December 7, 2004, Disability Services requested that Dr. Lachar provide scaled scores from the Nelson-Denny Reading Test administered during Scheibe's 2001 assessment. The letter also informed Scheibe that all scores from the academic achievement tests for the 2001 evaluation should be reported using age norms. [Doane Aff. ¶ 31, Exh. 14]

69.     The reporting of age based norms is required by NBME for the results of all tests submitted in support of a claimed learning or reading disability.  Age based norms more closely approximate the average person in the general population than do grade based norms. Grade based norms are inappropriate for purposes of the ADA because the results compare to persons who have achieved the same or similar educational level as the examinee.  [Doane Aff. ¶ 31]

70.     On December 14, 2004 and December 23, 2004 respectively, Disability Services received a hard copy of an e-mail from Dr. Lachar to Scheibe and then a letter from Dr. Lachar to Disability Services, both of which indicated in relevant part that the scores on the tests administered to Scheibe for the Lachar Report were reported using age based norms. [Doane Aff. ¶¶ 32 & 33, Exhs. 15 & 16]

71.     Disability Services referred Scheibe's second request for accommodation and all of the supporting documentation submitted by Scheibe, including the Lachar Report, to Steven G. Zecker, Ph.D. for his review and recommendation as to the claimed reading disorder. [Doane Aff. ¶ 34]

72.     Dr. Zecker provided a review to Disability Services dated January 18, 2005, which initially noted that "Dr. Scheibe was a highly successful student throughout his early academic career." [Doane Aff. ¶ 34, Exh. 17, p. 3; Zecker Aff. ¶ 2, Exh. 2]

73.     In reviewing the Lachar Report, Dr. Zecker stated that:

Dr. Lachar's evaluation of Dr. Scheibe's mental ability (using the Wechsler Adult Intelligence Scale-III (WAIS-III) indicated that his Verbal IQ score (113) placed him in the High Average range, while his Performance (nonverbal) abilities were higher (124) and fell within the Superior range.  Dr. Scheibe's overall mental ability fell at the upper end of the High Average range (119), a score that is identical to one obtained on the Otis-Lennon intelligence test when Dr. Scheibe was in sixth grade (according to his elementary school transcript).  All index scores on the WAIS-III were in the High Average to Superior range.  Dr. Lachar's testing further indicated that Dr. Scheibe was performing in the Average level or higher in all tests measuring memory functioning and in the Average to Superior range on a number of

tests assessing reading and mathematical skills. According to Dr. Lachar's report, Dr. Scheibe did score poorly on one measure of reading, the Nelson-Denny Reading Test. On this measure, Dr. Scheibe's vocabulary was determined to be High Average, his comprehension Average, and reading rate Low Average. Dr. Lachar appears to rely heavily on Dr. Scheibe's low reading rate score in providing Dr. Scheibe with the diagnosis of Reading Disorder. Unfortunately, the reading rate score from the Nelson-Denny is problematic; it is obtained by simply asking the examinee to report how many words he has read during a single 60-second interval. It tends to not be a reliable measure and a number of studies have questioned its validity as a measure of reading speed. The use of the Nelson-Denny in the diagnostic setting is discouraged by many professionals. Moreover, the reliance on a single score to provide a diagnosis is a practice that may lead to errors in diagnostic decision making. I note from the score summary sheet provided by Dr. Lachar that all other tests of reading administered (from the Woodcock-Johnson Psychoeducational Battery-3rd Edition: WJ-III) yielded scores in the Average range or higher. Importantly, Dr. Scheibe's score on the WJ-III's Reading Fluency measure, a different (and more technically sound) measure of reading speed and fluency, fell at the lower limits of the High Average range (standard score of 100). **In my opinion, these results are not consistent with the diagnosis of Reading Disorder using the DSM-IV criteria. All other scores reported by Dr. Lachar in his report fall within the Average range or higher, with many at least one standard deviation above average. In conclusion, Dr. Lachar's testing did not provide evidence to support Dr. Scheibe's claim that he had significant learning disabilities that would qualify him for accommodations under the Americans with Disabilities Act (ADA).**

[Doane Aff. ¶ 34, Exh. 17, pp. 3-4 (emphasis added)]

74.     Dr. Zecker further concluded that:

In Dr. Scheibe's most recent evaluation, completed by Dr. Theye in August 2004, the results again led to the diagnosis of Reading Disorder. In reviewing Dr. Theye's report, I note that much of his discussion is not of current test results, but rather his interpretation of Dr. Lachar's results as well as those obtained on standardized tests while Dr. Scheibe was an elementary school student. Dr. Theye carefully discusses a number of these latter scores, which he states are indicative of a learning disability. . . . [A]ll of Dr. Theye's discussion of these scores focuses on relative weaknesses and discrepancies among scores and not the degree of impairment relative to average functioning individuals. For example, in the seventh grade, Dr. Scheibe received a 'total reading' standard score on the Stanford Achievement Test that placed him at the 84th percentile, a result that puts him solidly within the High Average range. He obtained a 'total math' score on this same test that placed him the Very Superior range (at the 99th percentile). Dr. Theye appears to use this difference in test scores to support the diagnosis of a reading disorder; that is, because Dr. Scheibe scored substantially lower on the total reading score than the total math score, he must therefore have had a reading disorder, according to Dr.

Theye's thinking.  However, Dr. Theye is not considering the fact that the reading score is solidly above average, and that such a score cannot be taken as indicative of a disability.  It does appear that Dr. Scheibe's math skills were stronger than his reading skills at that time, but such variability across scores is commonplace among children and adults and is not by itself indicative of a disability in any way.  My review of all of the standardized test scores shows that all showed that Dr. Scheibe had at least average achievement, regardless of the grade in which the testing was completed or the subject being tested.  This is also not a result that is supportive of a diagnosis of a learning disability.  Dr. Theye did administer six reading-related tests from the Woodcock-Johnson Psychoeducational Battery-3rd Edition and the Wechsler Individual Achievement Test-2(WIAT-2).  **I note from Dr. Theye's report that all of these measures (which assessed word identification, reading rate and fluency and comprehension) yielded scores that placed Dr. Scheibe in the Average range or higher.  Dr. Theye states that the WJ-III Reading Fluency score (a percentile of 54, which corresponds to a standard score of 102) is "remarkable' in comparison to Dr. Scheibe's other, higher, scores.  Again, this score is somewhat lower (although not significantly so) than Dr. Scheibe's word identification and comprehension scores, but it is Average and as such cannot be taken as evidence for a disability that causes a significant functional impairment in comparison to others of the same age from the general population.**

[Doane Aff. ¶ 34, Exh. 17, pp. 4-5 (emphasis added)]

75.     Based on his review of the materials submitted by Scheibe to NBME, Dr. Zecker concluded that there was no evidence of a significant limitation in reading or leaning in comparison to others of the same age from the general population and that an accommodation of double-time on the USMLE was therefore unwarranted. [Doane Aff. ¶ 34, Exh. 17, pp. 4-5]

76.     NBME sent a letter to Scheibe dated January 24, 2005 informing Scheibe that NBME would not to grant the requested accommodation on Step 2 of the USMLE. In accordance with the findings and recommendation of Dr. Zecker, and based on its own review, the NBME concluded that the documentation provided did not demonstrate that Scheibe was substantially limited in a major life activity.  The documentation instead showed at least average performance on a range of cognitive and academic tasks including reading and did not show any deficits that substantially limited the ability to read. [Doane Aff. ¶¶ 14 & 35, Exh. 18]

77.     Scheibe passed Step 2 of the USMLE on February 8, 2005, without any accommodation. [Doane Aff. ¶ 36]

78.     On May 10, 2005, the Complaint in this matter was filed with the Court. [Complaint] Scheibe alleged that he had a reading disorder and that the NBME was negligent in denying his January 2003 request for accommodation on Steps 1 and 2 of the USMLE and requested compensatory and punitive damages. [Id.] Scheibe did not specifically claim that his alleged reading disorder limited him in any activities other than the taking of timed standardized exams. [See id.] Scheibe did not specifically claim that his alleged reading disorder limited him in any way in terms of his daily life. [See id.]

79.     On May 10, 2005, the Court issued an Order granting Scheibe's request to proceed in forma pauperis. [May 10, 2005 Order of the Court] The Court also construed the Complaint as alleging a disability that impairs Scheibe's ability to read. [Id.] In its May 10, 2005 Order, the Court further noted that the allegations contained in the Complaint are cognizable under Title III of the ADA, clarified that monetary relief is not available to a private litigant under Title III of the ADA and directed Scheibe to inform the Court whether he intended to proceed on a claim for injunctive relief only. [Id.]

80.     On May 24, 2005, Scheibe responded to the Court's May 10, 2005 Order and stated:

> Petitioner passed Step 1 on January 29, 2004 and passed Step 2 on February 8, 2005. Therefore, this injunctive relief request is specifically to charge the Respondent with the duty to recognize the Petitioner's past and future claims for accommodation under the ADA. This legal issue is particularly relevant since the Petitioner must also take and pass USMLE Step 3 before he can be licensed in any United States jurisdiction.

[Scheibe's Response to the Court's May 10, 2005 Order] Scheibe continued to request compensatory damages. [Id.]

81.     On May 31, 2005, the Court issued an Order which in part again clarified that the allegations contained in the Complaint are cognizable under Title III of the ADA and that only injunctive relief is potentially available to Scheibe. [May 31, 2005 Order of the Court]

82.     The only Step of the USMLE remaining for Scheibe to take is Step 3. [Doane Aff. ¶ 37]

83.     To date, there is no evidence and Scheibe has not alleged that he is eligible for Step 3, has applied to an SMB or the FSMB to sit for Step 3 or has requested any accommodation for Step 3. [See Doane Aff. ¶ 38; Complaint; Scheibe's May 24, 2005 correspondence to the Court] Whether Scheibe is eligible for Step 3 will depend on his meeting the requirements of the particular SMB, if any, to which he applies for licensure as a physician.  A request for test accommodation for Step 3 cannot be considered until Scheibe is sponsored by an SMB to take Step 3 and actually requests such accommodation. [Doane Aff. ¶ 38]

84.     For purposes of this litigation, NBME has obtained current opinions from Dr. Zecker and Dr. Ortiz with respect to Scheibe's claim of reading disorder. [Zecker Aff. ¶ 3, Exh. 3; Ortiz Aff. ¶ 3, Exh. 3]

85.     Dr. Ortiz is a Clinical Psychologist and Associate Professor of Psychology in the Department of Psychology at St. John's University in New York.  He is an expert in the field of learning disabilities. [Ortiz Aff. ¶ 1, Exh. 1]

86.     Dr. Zecker is a Clinical Psychologist and Associate Professor of Communication Sciences and Disorders and Director of Doctoral Studies in the Department of Communication Sciences and Disorders, Program in Learning Disabilities, at Northwestern University in Evanston, Illinois.  Dr. Zecker is an expert in the field of learning disabilities. [Zecker Aff. ¶ 1, Exh. 1]

87.     Dr. Zecker's opinion has not changed since his January 2005 review, and Dr. Ortiz'

opinion has not changed since his 2003 review. [Zecker Aff. ¶ 3; Ortiz Aff. ¶ 4] The available

evidence does not demonstrate that Scheibe has an impairment that substantially limits his ability

to read. [Id.] All of the evidence establishes that Scheibe's performance on a broad spectrum of

cognitive and academic indicators, including reading fluency, speed and comprehension, ranges

from average to superior when compared with others of the same age from the general population.

[Id.]

88.     In the opinion of Dr. Ortiz,

> Scheibe may indeed believe that he suffers from a significant reading
> impairment.  Personal statements are often subject to an extreme form of
> confirmatory bias.  This occurs where an individual looks at data with a pre-
> conceived notion and tends to see patterns in the data that support the notion while
> simultaneously discounting, ignoring or refuting data that are contrary to the notion.
> The process is often subconscious, not a deliberate attempt to distort the facts, but
> the effect is powerful.  Confirmatory bias is clearly evident in Mr. Scheibe's
> statements in his personal statement regarding his recollection of difficulty with
> standardized tests, especially parts requiring extensive reading.  A simple review
> of the tests he took tells a very different story.

[Ortiz Aff. ¶ 5]

89.     All of the tests administered to Scheibe by Dr. Lachar and Dr. Theye, including tests

measuring reading fluency, speed and comprehension, demonstrate results that place Scheibe's

performance in the average range or higher compared to others of the same age from the general

population. [Doane Aff. ¶¶ 19, 21, 25 & 34, Exhs. 3, 5, 8 & 17; Ortiz Aff. ¶¶ 2-4, Exhs. 2 & 3;

Zecker Aff. ¶¶ 2-3, Exhs. 2 & 3]

90.     Scheibe's lowest score on any of the tests administered was on the Nelson-Denny

Reading Test. [Doane Aff. Exhs. 3 & 8]

91.     Scheibe's result on the Nelson-Denny Reading Rate portion falls within the average

range. [Zecker Aff. ¶ 3, Exh. 3, p. 3; Ortiz Aff. ¶ 3, Exh. 3, p. 3, number 6]

92.     Scheibe's score on the Reading Rate portion of the Nelson-Denny was in the 21st percentile. [Ortiz Aff. ¶ 3, Exh. 3, p. 1, number 1]  The generally accepted average range encompasses a range extending from approximately the 16th percentile to the 84th percentile. [Ortiz Aff. ¶ 3, Exh. 3, p. 6, number 15]

93.     The Reading Rate portion of the Nelson-Denny is obtained by asking the examinee to report how many words he or she has read during a single 60-second interval. [Zecker Aff. ¶ 3, Exh. 3, p. 3]

94.     The Nelson-Denny has a low reliability rating and cannot be considered a diagnostic test. [Ortiz Aff. ¶ 3, Exh. 3, p. 10, number 25]

95.     The Wechsler Individual Achievement Test-Second Addition ("WIAT-II") and Woodcock Johnson Test of Academic Achievement-Third Edition ("WJ-III") are more reliable indicators of reading ability than the Nelson-Denny. [Zecker Aff. ¶ 3, Exh. 3, p. 3; Ortiz Aff. ¶ 3, Exh. 3, p. 10, number 25]

96.     When Dr. Lachar administered the WJ-III, Scheibe's Reading Fluency score fell in the High Average range, at a standard score of 110, or higher than 75% of those of the same age from the general population.  [Doane Aff. ¶ 19, Exh. 3, p. 6; Zecker Aff. ¶ 3, Exh. 3, p. 3]  The WJ-III Reading Fluency subtest is a more technically sound measure of reading speed and fluency than is the Nelson-Denny. [Id.]

97.     When the WJ-III was administered by Dr. Theye, Scheibe's Reading Fluency score was recorded in the 54th percentile. [Doane Aff. ¶ 25, Exh. 8, p. 4]  Scheibe's other reading related scores on the WJ-III ranged from the 63rd percentile for Letter-Word Identification to the 85th percentile for Passage Comprehension. [Id.] On the WIAT-II, Dr. Theye recorded the following: Scheibe's Reading Speed score fell in the second quartile (25th to 50th percentile rank range); his

Reading Comprehension score was in the 82nd percentile; and Scheibe's test of Word Reading was in the 77th percentile. [Id.; Ortiz Aff. ¶ 3, p. 8, number 19]

Dated this _12th_ day of January, 2006.

_Thomas R. Crone_

Thomas R. Crone
State Bar No. 1017265
Michael P. Gallagher
State Bar No. 1047771
Melli, Walker, Pease & Ruhly, S.C.
Ten East Doty, Suite 900
P. O. Box 1664
Madison, WI  53701-1664
(608) 257-4812

Attorneys for Defendant
National Board of Medical Examiners