Document Number Case Number
05-C-0180-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
02/07/2006 03:08:51 PM CST

# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF WISCONSIN

---

TRENTON SCHEIBE,

    Plaintiff,

v.                                              Case No.  05-C-180-C

NATIONAL BOARD OF MEDICAL EXAMINERS,

    Defendant.

---

### AFFIDAVIT OF SAMUEL O. ORTIZ, Ph.D

---

STATE OF _NEW YORK_       )
                          )  ss.
COUNTY OF _SUFFOLK_       )


I, Samuel O. Ortiz, being first duly sworn on oath, depose and state that:

1.      I am an adult resident of the state of New York.  I am a Clinical Psychologist and Associate Professor of Psychology in the Department of Psychology at St. John's University in Jamaica, New York.  A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

2.      Attached hereto as Exhibit 2 is a true and correct copy of an evaluation I prepared in February 2003 for the National Board of Medical Examiners ("NBME") recommending that Trenton J. Scheibe ("Scheibe") should not receive the requested accommodation of double testing time on Steps 1 and 2 of the United States Medical Licensing Exam ("USMLE") for a claimed reading disorder.

3.      For purposes of the instant litigation, I have re-reviewed the documents and information I considered in forming the opinions expressed in my February 2003 evaluation and I have also reviewed my February 2003 evaluation.  Additionally, I have reviewed the following documents, which were submitted to NBME subsequent to my February 2003 evaluation: March 24, 2003 letter from NBME (Affidavit of Abram Joseph Doane ("Doane Affidavit"), Exh. 6); Scheibe's second Request for Test Accommodations for the Step 2 Clinical Knowledge portion of the USMLE (Doane Affidavit, Exh. 7);  Neuropsychology Report dated August 25, 2004 and signed by Fred W. Theye, Ph.D. (Doane Affidavit, Exh. 8); Scheibe's personal statement dated October 19, 2004 (Doane Affidavit, Exh. 9); Scheibe's academic transcripts and the results of standardized and diagnostic tests from elementary school forward (Doane Affidavit, Exh. 10); Dr. Lachar e-mail to Scheibe dated December 8, 2004 (Doane Affidavit, Exh. 14); Dr. Theye letter to Scheibe dated November 23, 2004 (Doane Affidavit, Exh. 15); Dr. Lachar letter to NBME dated December 16, 2004 (Doane Affidavit, Exh. 16); and a January 24, 2005 letter from NBME to Scheibe, which informed Scheibe that NBME was unable to give him the requested accommodation (Doane Affidavit, Exh. 18).  A true and correct copy of the report I prepared as a result of my review of the above documents is attached hereto as Exhibit 3.

4.      Based on the information provided, my opinion has not changed.  The available evidence does not support a finding that Scheibe has an impairment that substantially limits his ability to read.  Instead, all of the evidence establishes that Scheibe's performance on a broad spectrum of academic indicators including reading fluency, speed and reading comprehension range from average to superior when compared with others of the same age from the general population.

5.      To Exhibit 3, I would only add that, consistent with my opinion, Scheibe's

2

statements in his Personal Statement to the effect that he has always had problems finishing standardized tests and that he especially had difficulty with parts of exams that entailed reading long passages and answering content related questions about those passages is belied by his consistent performance on such timed exams throughout his academic career. For example, if the area of Reading Comprehension is examined, a task where Scheibe would have been required to read lengthy passages and respond to questions about content, his scores from 1st through 12th grade, where available, ranged from the 66th percentile to the 92nd percentile. To consistently score as well or better than between 66 and 92 percent of all test takers nationally while claiming that he could not finish the exams and that he had the most problems in reading passages and answering questions is, in my opinion, simply not defensible. Even in high stakes testing situations, where reading questions and lengthy passages are required (e.g., ACT, PSAT, SAT, etc.), Scheibe performed in a manner that belies his claimed recollection of difficulty. The ACT, PSAT and SAT require extensive reading of passages and questions, even on the math sections because those sections assess more than simple math computation skills. Yet Scheibe's performance on those exams ranged from slightly above average on the verbal section of the SAT to excellent. Additionally, while no scores have been given for his performance on the LSAT and MCAT, Dr. Lachar reported that Scheibe's scores were good enough to get him into law school and medical school respectively. While Scheibe's Personal Statement expresses the belief that he suffers from a significant reading impairment, such statements are often subject to an extreme form of confirmatory bias. This occurs where an individual looks at data with a pre-conceived notion and tends to see patterns in the data that support the notion while simultaneously discounting, ignoring or refuting data that are contrary to the notion. The process is often subconscious, not a deliberate attempt to distort the facts, but the effect is powerful.

3

Confirmatory bias is clearly evident in Mr. Scheibe's assertions in his Personal Statement regarding his recollection of difficulty with standardized tests, especially parts requiring extensive reading. A simple review of the tests he took tells a very different story.

I have read the above statement consisting of five (5) numbered paragraphs. The statements contained therein are true and correct to the best of my personal knowledge, and the opinions I have expressed are held to a reasonable degree of professional certainty.

Dated this _3ᴿᴰ_ day of _JANUARY_, 20_06_.

_____
Samuel O. Ortiz, Ph.D.

Subscribed and sworn to before me
this __3__ day of _January_____, 200_6_.

_____
Notary Public, State of _New York_____.

My commission [is permanent][expires _2/24/07_ ]

PAULA LOPES
Notary Public - State of New York
NO. 01LO6087794
Qualified in Suffolk County
My Commission Expires _2/24/07_

4

# CURRICULUM VITA

## SAMUEL O. ORTIZ, PH.D.

Associate Professor of Psychology
Dept. of Psychology
St. John's University
8000 Utopia Parkway
Jamaica, NY 11439
Voice: 718.990.5388
Fax: 718.990.5926
efax: 603.720.7943
email: ortizs@stjohns.edu
URL: http://facpub.stjohns.edu/~ortizs/sortiz.html

## EDUCATIONAL BACKGROUND

| INSTITUTION | DEGREE | DATES | SPECIALIZATION |
|---|---|---|---|
| **San Diego State University** *(NASP Approved)* | Post Doctorate | 1993-1995 | Bilingual School Psychology |
| **University of Southern California** *(APA Approved)* | Ph.D. | Jan 1993 | Clinical Psychology |
| **University of Southern California** | M.A. | Dec 1986 | Clinical Psychology |
| **University of Southern California** | B.A. | May 1983 | Psychology |
| **University of Southern California** | B.S. | May 1982 | Architecture |

## DISSERTATION TITLE

**BACK TO THE FUTURE OF MARRIAGE:** A restudy of the theoretical and methodological foundations of husband-wife data invariance and aggregation methods used in the evaluation and assessment of family stress theory.

## LICENSURE AND CERTIFICATION

**Pupil Personnel Services (PPS) Credential with Specialization in School Psychology,** June 1995. San Diego State University (*Program accredited by National Association of School Psychologists*)

**Cross-cultural, Academic, and Language Development Certificate,** January 1996. California Commission on Teacher Credentialing

**Certified Trainer, Special Project in Bilingual Special Education,** April 1995. University of Texas, Austin

**Exhibit No. 1**

# UNIVERSITY TEACHING POSITIONS

**Associate Professor with Tenure,** Department of Psychology, St. John's University, Queens, NY, 9/99 - Present. This is a full-time position.  Major responsibilities include teaching two courses in the . NASP accredited M.S. and Psy.D. Programs in School Psychology as well one course in the APA Accredited Ph.D. Program in Clinical Psychology, and one undergraduate course.  Duties also include graduate and undergraduate advisement and administrative tasks.  A primary requirement of this position involves the design and implementation of original research, writing and preparation of manuscripts for publication and dissemination of research findings via journals articles, books, and presentations at professional conferences.  Other duties include mentoring students in the development of bilingual-bicultural skills and competencies leading to bilingual certification in NY state.

**Associate Professor and Co-Director, School Psychology Program,** Department of Psychology, St. John's University, Queens, NY, 9/01 – 8/02. Served as co-director (with Dr. Dawn P. Flanagan) of the School Psychology Program overseeing the education and training of approximately 120 students in NASP accredited M.S. and Psy.D. programs including general and bilingual tracks. Major responsibilities included management of course scheduling and sequencing, student advisement and problem solving, maintaining currency within the curriculum in accordance with state and professional accrediting agencies, overseeing administration of comprehensive examinations, guidance and leadership in admissions and recruitment, and professional development and liaison with community agencies and other local educational bodies including public schools, private schools, community colleges, and universities.

**Visiting Professor and Research Fellow,** School of Education, Nagoya University, Nagoya, Japan, 11/99 – 4/00.  This is a full-time, visiting professorship and research position sponsored by the Educational Psychology Department.  The proposed topic of research is titled, "Defining the Role of the School Psychologist in Japan" and the purpose is to assist in the development of school psychology training standards, outcome objectives for graduates, and appropriate curricula.  School psychology is a new profession in Japan, officially begun only two years ago.  As such, there is a need to bridge the training programs used in clinical psychology into new programs that specifically develop school psychologists who possess the requisite competencies and skills necessary to serve the needs of the public educational system in Japan.  In addition to research duties, the position requires teaching of two courses in school psychology as well as presentations at various conferences and for educationally related organizations throughout the country.

**Assistant Professor,** Department of Counseling and School Psychology, San Diego State University, San Diego, CA., 9/96 - 9/99.  This was a full-time, tenure track position in the NASP accredited M.S. degree program in Counseling with Specialization in School Psychology.  Major responsibilities include teaching of four graduate level courses each semester as well as advisement and administrative duties. The position also carries demands related to designing and conducting original research, writing and preparation of manuscripts for publication, and dissemination of information via professional conferences.  Other duties include mentoring students supported through various Federally funded training projects in the development of bilingual-bicultural skills and knowledge as well as the provision of training and support to faculty in the areas of email, internet, and other applications of technology.

**Lecturer,** Department of Counseling and School Psychology, San Diego State University, San Diego, CA., 8/95 - 8/96.  This position was a full-time, non-tenure track position involving the teaching of a full-load of graduate level courses (four), general student advisement duties, and mentoring of graduate students within the NASP accredited M.S. degree program in Counseling with Specialization in School Psychology.

# RELATED PROFESSIONAL EXPERIENCE

**Vice President for Professional Affairs, APA Division 16, School Psychology,** 1/03 - present. The office of VP-PA is concerned with all aspects of school psychology as a professional discipline. In

particular, this position is responsible for developing and promulgating standards and policies for the delivery of quality school psychological services, furthering the development of school psychology as a professional specialty within American psychology, acting as liaison with state school psychology associations and encouraging constructive relations with other professional groups. This VP is also responsible for interacting with such important APA boards and committees as the Board of Professional Affairs (BPA) and its Committee on Psychological Practice and Standards (COPPS) and works closely with the Psychology in the Schools Office within the Practice Directorate as well representing the division as liaison to the Committee for the Advancement of Professional Psychology (CAPP). Other duties include: a) provide a school psychology perspective on issues under consideration by such groups through correspondence, phone contacts and attendance at meetings as necessary and feasible; b) inform the other Division Officers of activities and actions of relevant APA boards and committees and coordinate divisional response to requests for the division's position from practice-related APA groups; c) respond to requests for information from members, other professional association, media people, etc. for information about school psychology practice in general or practice-related policies of the Division; d) facilitate, coordinate and monitor the activities of committees, liaisons, and task forces reporting to this vice president including soliciting committee chairs and members, processing requests for payment, providing direction about objectives, etc.; and e) attend all business meetings of the Division 16 Executive Committee at the Annual Convention and Mid-Winter Meetings including preparing a written report for the agenda book of each meeting, preparing a proposed budget and accounting of disbursed funds, preparing written motions and informational items, etc.

**Consultant, National Board of Medical Examiners, Office of Test Accommodations,** Philadelphia, PA, 7/99 - present.   Provided oral and written reports regarding the validity of requests made to the NBME for accommodations to licensing exams requested by individuals with disabilities pursuant to ADA.  Requests are evaluated on the basis of documentation submitted in support of the existence of a qualifying disability and assessed against both clinical and psychometric standards of psychological practice as well as the qualifying criteria specified in ADA.  Opinion is rendered as to whether the evidence supports the presence of a qualifying disability, and if so, whether the accommodations are appropriate given the nature of the disability.  In addition to factors surrounding the identification and diagnosis of learning disabilities, such evaluations also often include issues related to second language acquisition and bilingual development that must be considered.

**Bilingual-Bicultural School Psychologist,** Encinitas Union School District, Encinitas, CA., 7/94 - 8/96.  Provided general, bilingual, and cross-cultural school psychology services for several schools in a K-6 district with approximately 5,000 enrolled students.  Major duties and responsibilities included consultation and liaison with general education teachers and staff, assisting in SST meetings and decision making, planning and implementation of Section 504 accommodations, initial and triennial assessments for special education, and providing individual and group counseling.  Other significant activities involved leadership positions within the district and SELPA on policy issues ranging from bilingual GATE assessment, triennial evaluation practices, bilingual special education program development, and development of guidelines for creating culturally and linguistically appropriate IEP goals and objectives.  Other projects completed for the district included the development and presentation of inservices to general and special education staff on various issues including CCR self review findings, second language acquisition process and bilingual development, pattern analysis and application of the Woodcock-Johnson Revised Tests of Cognitive Ability and Achievement, and sheltered English instructional techniques.

**Trainer and Consultant, Bilingual-Multicultural Education and Assessment**.  7/94 - present.  Provided independent bilingual, multicultural education and assessment training and consultation services and instructional presentations for various school districts and educationally related professional groups.  Focus of consultation and presentation topics include, the use of ecosystems procedures in the assessment of CLD children; bridging assessment results with the development of culturally and linguistically appropriate goals and objectives; best practices in the assessment of CLD children; use of dynamic assessment in bilingual evaluations; legal issues related to assessment of CLD students; and parental rights and responsibilities in the special education process.  Domestic clients include Nevada State Department of Education, California State Department of Education, Washington Elementary School District (Phoenix, AZ), Clark County School District (Las Vegas, NV), Fresno Unified School District, Kern County Consortium for Special Education, Long Beach Unified School District, Los Angeles Unified School District, Encinitas Union School District, North Coastal

Consortium for Special Education, California Department of Migrant Education, and San Diego County Office of Education.  International clients include University of Nagoya (Japan), University of Hokkaido (Japan), and Departamento de Educación, Estado Baja California (Mexico).

**Chief of Mental Health Services**, USAF Hospital, Patrick AFB, FL., 6/89 - 8/91.  Responsible for the organization, administration, medical readiness, supervision, and training of the mental health staff, including clinical social workers, prevention and outreach social workers, senior and junior mental health technicians, secretary, and receptionist in a hospital environment.  Major facilities included an outpatient clinic with over 7,000 visits annually.  Major programs included the Family Advocacy Program (child abuse identification and prevention), Outreach Program (primary prevention services and referral), and Health Promotions Program (stress, hypertension, diabetes, and nutritional management, smoking cessation, etc.)  General treatment services rendered included psychological evaluations, psychometric testing and interpretation, drug and alcohol evaluations, individual, group and marital therapy, pharmacotherapy, limited inpatient treatment, competency evaluations, emergency hospitalizations and involuntary commitments, 24-hour emergency consultation and treatment, and psychiatric consultation/liaison to the medical staff.  Other significant duties included membership on the Executive Committee of the Medical Staff, Base Hostage Negotiation Team, and Base Social Actions (drug and alcohol) Intervention Committee.  Patient population included active duty military, dependents, and retirees.

**Staff Psychologist**, USAF Hospital, Patrick AFB, FL., 9/88 - 5/89.  Provided direct inpatient and outpatient psychological services in a hospital setting including psychological evaluations, testing and interpretation, drug and alcohol evaluation, individual, group and marital therapy, acute inpatient care, competency evaluations, involuntary commitments, emergency consultation, and psychiatric consultation/liaison.  Other duties involved the development and presentation of Health Promotions Programs, including Stress Management Courses and seminars in Weight Management and Anger Control. Administrative duties included Quality Assurance/Risk Management Coordinator, and development and implementation of monitoring and evaluation studies.

**Psychological Assistant**, Forensic Psychology Associates, Los Angeles, CA., 9/85 - 7/87.  Provided individual and group psychotherapy to children, adolescents, and adults in court related or court referred cases in a private practice office setting.  Performed psychological evaluations, functional capacity assessments, and Supplemental Security Income evaluations for the State of California.  Special treatment foci on victims and perpetrators of sexual abuse, and repeat sex offenders.

# SPECIALIZED TRAINING AND EDUCATIONAL EXPERIENCE

**School Psychology Internship**, Encinitas Union School District, Encinitas, CA, 7/94 - 6/95. Completed a comprehensive one-year, full-time, **NASP approved** school psychology internship program required for the PPS Credential with Specialization in School Psychology. Developed experience in a wide variety of services including psychoeducational assessments and evaluations, special education referrals, ADD/ADHD referrals, requests for Section 504 accommodations, and consultation services. Other services included counseling, behavioral intervention and planning for Hughes Bill students, pre-expulsion assessments, inservices on bilingual-bicultural education and second language acquisition issues, and technological competence in school psychology and related computer applications.

**School Psychology Traineeship**, Bilingual Interdisciplinary Collaboration Project, San Diego State University, San Diego, CA,  9/93 - 6/94. Preservice training grant funded by the U.S. Department of Education, Office of Special Education Programs.  Focus of the project was on interdisciplinary collaboration and training of bilingual school psychologists with bilingual speech-language pathologists. Participated in monthly field exchanges with speech-language pathology trainees in various school and clinic settings.  Developed knowledge base regarding the roles, assessment practices, and service delivery models of speech-language specialists.  Increased shared expertise and established collaborative approaches to serving Spanish-speaking children, their families and teachers.

**School Psychology Traineeship**, Bilingual-Bicultural (Hispanic) School Psychology Project, San Diego

State University, San Diego, CA 6/93 - 5/95.  Preservice training grant funded by the U.S. Department of Education, Office of Special Education Programs.  A special education personnel services training project to prepare school psychologists who specialize in the nondiscriminatory assessment of bilingual-bicultural (Hispanic) children—a "special population."  Participated in weekly seminars focused on issues related to the psychoeducational evaluation of Hispanic children including second language acquisition factors, cultural bridging, culture learning techniques, and development of appropriate evaluation procedures.  Training was extended into summer "institutes" with weeklong seminars from practicing professionals and culminated in a two-week immersion experience in Cuernavaca, Mexico.

**School Psychology Traineeship**, Spanish-English Language Proficiency Project, San Diego State University, San Diego, CA 6/93 - 9/94.  Preservice training grant funded by the U.S. Department of Education, Office of Special Education Programs.  The grant is essentially a special education personnel services training project to assist school psychologists in the development and refinement of Spanish language skills and literacy. Participated in weekly seminars focused on the development, practice and use of Spanish language skills including reading, writing, and speaking in a Spanish immersion experience with peers and colleagues.  Additional training included participation in extended summer Spanish language "institutes" and language experiences in a variety of Mexican cities, including Tijuana, Puerto Nuevo, Rosarito Beach, Ensenada, and Mexicali.

**Clinical Psychology Internship**, USAF Medical Center, Wright Patterson AFB, OH., 9/87 - 8/88.  Completed a general, one-year, **APA approved** clinical psychology residency required for the Ph.D. degree.  Major rotations included consultation/liaison psychiatry, behavioral health (including biofeedback training), outpatient therapy, inpatient therapy, and neuropsychology.  Conducted at a large, military medical center.  Supervision by various staff members including clinical psychologists, psychiatrists, and physicians.

# PUBLICATIONS - ARTICLES

Ortiz, S. O. (in press). Multicultural Issues in School Psychology: An overview of progress and potential. *Journal of Applied School Psychology.*

Flanagan, D. P. & Ortiz, S. O. (in press). Integrating Cognitive Assessment and Response-to-Intervention: Operationalization of learning disability within the context of a modern theoretical framework. *Psychology in the Schools.*

Fletcher-Janzen, E. & Ortiz, S. O. (in press). Cultural Competence in the Use of IQ Tests with Culturally and Linguistically Diverse Children. *Journal of School Psychology.*

Braden, J., Kubiszyn, T. & Ortiz, S. O. (in press). Application of the Joint Test Standards to Response-to-Intervention: How does RTI fare? *Communiqué*

Orabona-Mantell, E., Ortiz, S. O. & Planthara, P. M. (2004). What Price Prescribing?: A commentary on the effect of prescription authority on psychological practice. *Professional Psychology: Research & Practice.* 35(3).

Ortiz, S. O. (2004). Learning Disabilities: A primer for parents about identification. *Communiqué.* 32(5), 1-3 (insert).

Ortiz, S. O. & Flanagan, D. P. (2002). Cross-Battery Assessment Revisited: Some cautions concerning "Some Cautions" (Part II). *Communiqué,* 30(8), 36-38.

Ortiz, S. O. & Flanagan, D. P. (2002). Cross-Battery Assessment Revisited: Some cautions concerning "Some Cautions" (Part I). *Communiqué,* 30(6), 32-34.

Ortiz, S. O. (2001). Assessment of Cognitive Abilities in Hispanic Children. *Seminars in Speech and Language, 22(1),* 17-37.

Ortiz, S. O., Flanagan, D. P. & McGrew, K. S. (1999).  Assessment in School Psychology: Past, present, and future. *Communiqué*.  28(2), 30-32.

Ortiz, S. O. (1999).  You'd never know how racist I was, if you met me on the street.  *Journal of Counseling and Development, 77(1)*, 9-12.

Ortiz, S. O. & Flanagan, D. P. (1998).  Enhancing cognitive assessment of culturally and linguistically diverse individuals: Application and use of selective Gf-Gc cross-battery assessment.  *The School Psychologist, 52(1)*, 6-9.

Ortiz, S. O. (1997).  This book, by any other name, would be a better book: A review of Understanding Second Language Learning Difficulties by M. E. Ehrman. *Contemporary Psychology, 42(11),* 1024-1026.

# PUBLICATIONS - BOOKS

Rhodes, R., Ochoa, S. H. & Ortiz, S. O. (2005).  *Assessment of Culturally and Linguistically Diverse Students: A practical guide*. New York: Guilford Press.

Flanagan, D. P., Keiser, S., Bernier, J. & Ortiz, S. O. (2003). *Assessment of Learning Disabilities in Adulthood.* Boston, MA: Allyn & Bacon.

Flanagan, D. P., Ortiz, S. O., Alfonso, V. & Mascolo, J. (2002*). The Achievement Test Desk Reference (ATDR): Comprehensive Assessment and Learning Disabilities.* Boston, MA: Allyn & Bacon.

Flanagan, D. P. & Ortiz, S. O. (2001).  *Essentials of Cross-Battery Assessment*.  New York: Wiley Press.

Flanagan, D. P., McGrew, K. S. & Ortiz, S. O. (2000).  *The Wechsler Intelligence Scales and Gf-Gc theory: A contemporary interpretive approach*.  Boston, MA: Allyn & Bacon.

# PUBLICATIONS – CHAPTERS

Ortiz, S. O. & Dynda, A. M. (in preparation). Parallel Processes in Development: Implications for transdisciplinary collaboration in assessment. In J. Centeno, L. Obler, and R. Anderson (Eds.), *Clinical Communication Studies In Spanish Speakers: From Research to Clinical Practice*. London: Multilingual Matters.

Ortiz, S. O. (in press). Comprehensive Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for nondiscriminatory assessment. In C. R. Reynolds and E. Fletcher-Janzen (Eds), *Special Educator's Almanac*. New York: Wiley Press.

Ortiz, S. O. (in press). Cognitive-behavioral school interventions: Multicultural issues. In Christner, R., Menutti, R., & Freeman, A. (Eds.) *Cognitive Behavioral Interventions in Educational Settings*. New York: Brunner-Routledge Publishing.

Ortiz, S. O., & Lella, S. A. (2005). Cross-cultural Assessment. In S. W. Lee (Ed.), *Encyclopedia of School Psychology* (pp. 136-139 Thousand Oaks, CA: Sage.

Ortiz, S. O. & Ochoa, S. H. (2005). Intellectual Assessment: A nondiscriminatory interpretive approach. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary Intellectual Assessment, 2nd Edition* (pp. 234-250). New York: Guilford Press.

Ortiz, S. O. & Dynda, A. M. (2005). The use of intelligence tests with culturally and linguistically diverse populations. In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary Intellectual Assessment, 2nd Edition* (pp. 545-556). New York: Guilford Press.

Ortiz, S. O. (2004). Non-Discriminatory Assessment in Schools. In C. Spielberger (Ed.), *Encyclopedia of Applied Psychology, Vol. X,* San Diego, CA: Academic Press.

Flanagan, D. P. & Ortiz, S. O. (2004). Gf-Gc Theory of Intelligence. In T. S. Watson & C. H. Skinner (Eds.), *Encyclopedia of School Psychology.* New York: Kluwer Academic/Plenum Publishers.

Ortiz, S. O. (2004). Bilingual Multicultural Assessment with the WISC-IV. In A. Kaufman & D. P. Flanagan (Eds.) (pp. 245-254). *Essentials of WISC-IV Assessment.* New York: Wiley Press.

Ortiz, S. O. (2004). Learning Disabilities: A primer for parents about identification. In A. Canter, S. Carroll, L. Paige, & I. Romero (Eds.), *Helping Children at Home and School II: Handouts for families and educators* (pp. 117-119). Washington DC: National Association of School Psychologists.

Ortiz, S. O. (2004). Trastornos del Aprendizaje: Información para padres sobre la identificación. In A. Canter, S. Carroll, L. Paige, & I. Romero (Eds.), *Helping Children at Home and School II: Handouts for families and educators* (pp. 121-124). Washington DC: National Association of School Psychologists.

Ortiz, S. O. & Lella, S. M. (2004). Intellectual Assessment and Cognitive Abilities: Basics for Parents and Educators. In A. Canter, S. Carroll, L. Paige, & I. Romero (Eds.), *Helping Children at Home and School II: Handouts for families and educators* (pp. 79-82). Washington DC: National Association of School Psychologists.

Ortiz, S. O. & Lella, S. M. (2004). Evaluación Intelectual y Habilidades Cognitivas: Fundamentos para padres y educadores. In A. Canter, S. Carroll, L. Paige, & I. Romero (Eds.), *Helping Children at Home and School II: Handouts for families and educators* (pp. 83-86). Washington DC: National Association of School Psychologists.

Ortiz, S. O. (2002). Best Practices in Nondiscriminatory Assessment. In A. Thomas & J. Grimes (Eds.) *Best Practices in School Psychology IV* (pp. 1321-1336). Washington, DC: National Association of School Psychologists.

Ortiz, S. O. & Flanagan, D. P. (2002). Best Practices in Working with Culturally Diverse Children and Families. In A. Thomas & J. Grimes (Eds.) *Best Practices in School Psychology IV* (pp. 337-351). Washington, DC: National Association of School Psychologists.

Flanagan, D. P. & Ortiz, S. O. (2002). Best Practices in Intellectual Assessment: Future directions. In A. Thomas & J. Grimes (Eds.) *Best Practices in School Psychology IV* (pp. 1351-1372). Washington, DC: National Association of School Psychologists.

Ortiz, S. O., McGrew, K. S. & Flanagan, D. P. (1998). *Gf-Gc* Cross-Battery Interpretation and Selective Cross-Battery Assessment: Referral Concerns and the Needs of Culturally and Linguistically Diverse Populations (pp. 401-444). In K. S. McGrew and D. P. Flanagan (Eds.), *The Intelligence Test Desk Reference (ITDR): Gf-Gc Cross-Battery Assessment.* Boston: Allyn & Bacon.

Ortiz, S. O. (1997). Culturally and Linguistically Appropriate Goals and Objectives. In *Guidelines for Language, Academic, and Special Education Services Required for Limited-English Proficient Students in California Public Schools, K-12* (pp. 31-32). Sacramento, CA: California Department of Education.

Ortiz, S. O. (1984). The physics of baseball. In R. S. Wurman (Ed.) *Baseball Access.* Los Angeles, California: Access Press.

# PROFESSIONAL CONFERENCE WORKSHOPS AND PRESENTATIONS

Fletcher-Janzen, E. & Ortiz, S. O. (2005, August). *Cultural Competence in the Use of IQ Tests with Culturally and Linguistically Diverse Children.* Poster presentation at American Psychological Association Annual Conference, Washington DC.

Ortiz, S. O. (2005, July). *Nondiscriminatory Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for equitable evaluation.* National Association of School Psychologists, Regional Conference, Philadelphia, PA.

Ortiz, S. O. (2005, March). *Issues in the Application of RTI Methods with Culturally and Linguistically Diverse Children.* Panel presentation at the annual meeting of Trainers in School Psychology. National Association of School Psychologists, Atlanta, GA.

Ortiz, S. O. (2005, January). "*You learned English so why can't everyone else?*" Keynote Address for the annual conference of the Minnesota School Psychology Association. Bloomington, MN.

Ortiz, S. O. (2005, January). *Comprehensive Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for nondiscriminatory assessment.* Minnesota School Psychology Association, Bloomington, MN.

Ortiz, S. O. (2004, September). *Comprehensive Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for nondiscriminatory assessment.* North Carolina School Psychology Association, Wilmington, NC.

Ortiz, S. O. (2004, July). *Education follows Maturation: Developmental, cognitive, and linguistic influences in the instruction and evaluation of English Language learners.* Bilingual Therapies Conference. Las Vegas, NV.

Ortiz, S. O. (2004, May). *Nondiscriminatory Cross-cultural Assessment: A developmental psycholinguistic approach neuropsychological practice.* New York Neuropsychological Group, New York, NY.

Ochoa, S. H. & Ortiz, S. O. (2004, April). *Psychoeducational Assessment of Children from Culturally and Linguistically Diverse Backgrounds.* National Association of School Psychologists, Dallas, Texas.

Ortiz, S. O. & Ochoa, S. H. (2004, April). Comprehensive Assessment and Nondiscriminatory Evaluation of Diverse Learners. National Association of School Psychologists, Dallas, Texas.

Flanagan, D. P. & Ortiz, S. O. (2004, April). *CHC Cross-Battery and Learning Disability Assessment: Theoretical and research-based approaches for the "post severe discrepancy" age.* National Association of School Psychologists, Dallas, Texas.

Ortiz, S. O. (2004, March). *Assessment of Culturally and Linguistically Diverse Children: A systematic, comprehensive framework for nondiscriminatory assessment.* Psychologists-In-Training (PIT) Program, New York City Department of Education, Jamaica, Queens, New York.

Ortiz, S. O. (2003, May). *Lies, Damn Lies, and Statistics: What They Didn't Tell You About Making Sense of Educational Data.* Keynote address at the New York State Association for Bilingual Education, Regional Conference, Dobbs Ferry, New York.

Ortiz, S. O. (2003, May). *Comprehensive Assessment of Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment.* New Jersey Association of School Psychologists, East Windsor, New Jersey.

Ortiz, S. O. (2003, April). *Enhancing Outcomes for All Children: Comprehensive assessment and nondiscriminatory evaluation of Culturally and Linguistically Diverse Children.* National Association of School Psychologists, Washington DC.

Ortiz, S. O. (2003, April). *Assessment of Culturally and Linguistically Diverse Children: A systematic, comprehensive framework for nondiscriminatory assessment*. Psychologists-In-Training (PIT) Program, New York City Department of Education, Jamaica, Queens, New York.

Ortiz, S. O. (2003, March). *Education follows Maturation: Developmental, cognitive, and linguistic influences in the instruction and evaluation of English Language learners*. New York State Association for Bilingual Education, Tarrytown, New York.

Ortiz, S. O. (2003, March). *Comprehensive Assessment of Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment*. Association of School Psychologists of Pennsylvania, Harrisburg, Pennsylvania.

Ortiz, S. O. (2003, March). *Education follows Maturation: Developmental, cognitive, and linguistic influences in the instruction and evaluation of English Language learners*. University of Texas Speech-Language Research Symposium, Austin, Texas.

Ortiz, S. O. (2002, December). *New Directions in Diagnosing Learning Disability: Modern theoretical and research-based definitions and procedures*. New Jersey Association of School Psychologists, East Windsor, New Jersey.

Ortiz, S. O. (2002, August). Baseball, Apple Pie, and IQ tests: Issues in defining and measuring intelligence. Panel presentation at the symposium, *Developing Cross-Cultural Assessment Measures—Implications for International Research and Practice*. American Psychological Association, Chicago, Illinois.

Ortiz, S. O. (2002, June). Language Dominance and its Impact on Linguistic, Academic, and Psychological Development. Keynote address at the New York State Association for Bilingual Education, Regional Conference. Hempstead, NY.

Ortiz, S. O. (2002, March). *Contemporary Assessment of Learning Disability: Theoretical and empirical advances in evaluation and identification*. South Carolina Association of School Psychologists. Charleston, SC.

Ortiz, S. O. (2002, February). *Assessment of Culturally and Linguistically Diverse Children: A systematic, comprehensive framework for nondiscriminatory assessment*. National Association of School Psychologists, Washington DC.

Ortiz, S. O. (2002, February). *The Case for English Only Instruction: Do English learners really catch up?* Keynote address at the New York State Association for Bilingual Education, Regional Conference on Literacy. Manhattanville, NY.

Ortiz, S. O. (2001, November). *Comprehensive Assessment of Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment*. New York Association of School Psychologists, White Plains, NY.

Ortiz, S. O. (2001, November). *Comprehensive Assessment of Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment.* Massachusetts Association of School Psychologists, Boston, MA.

Ortiz, S. O. (2001, April). *Assessment of Culturally and Linguistically Diverse Children: A systematic, comprehensive framework for nondiscriminatory assessment*. National Association of School Psychologists, Washington DC.

Pang. S., Wilkes, B., & Ortiz. S. O. (2001, April*). Linguistic Issues in Assessment: A Chinese, Ebonics, and Spanish perspective*. National Association of School Psychologists, Washington DC.

Ortiz, S. O. (2001, March). *Multicultural Assessment: Best practices and procedures.* McComb/St. Clair Psychological Association and Oakland Schools. Detroit, MI.

Ortiz, S. O. (2001, February). *A humanistic view of bilingual education: How I became the poster child for bilingual education.* Keynote address at the Annual Conference of New York State Association for Bilingual Education. Westchester, NY.

Ortiz, S. O. (1999, April). *Assessment of Culturally and Linguistically Diverse Children: A blueprint for success.* National Association of School Psychologists, Las Vegas, NV.

Flanagan, D. P., Gerner, M., & Ortiz, S. O. (1999, April). *A contemporary approach to interpreting the Wechsler Scales: A reading disability case study and application to multicultural populations.* National Association of School Psychologists, Las Vegas, NV.

Ortiz, S. O. (1999, March). *Assessment of Diverse Children: A comprehensive framework for compliance.* California Association of School Psychologists, Pasadena, CA.

Ortiz, S. O. & Esparza Brown, J. (1999, February). *From General Education to Special Education: Systematic Guidelines for Compliance in Serving English Learners.* California Association for Bilingual Education, Los Angeles, CA.

Ortiz, S. O., Esparza Brown, J. & Schmidt, S. (1999, January). *From General Education to Special Education: Guidelines for Compliance in Serving Culturally and Linguistically Diverse Children.* National Association for Bilingual Education, Denver, CO.

Ortiz, S. O. (1998, November). *Comprehensive Assessment of Culturally and Linguistically Diverse Children: A Systematic, Practical Approach to Nondiscriminatory Assessment.* Arizona Association of School Psychologists, Mesa, AZ.

Ortiz, S. O. & Valles, G. (1998, November*). Implementing an Effective Pre-Referral Process for Diverse Children.* Cross-cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1998, November). *Alternative Assessment of Culturally and Linguistically Diverse Children.* Cross-cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1998, May). *Evaluación bilingue competente: Haciendolo bien, haciendolo mal, y como saber la diferencia (Competent bilingual assessment: Doing it right, doing it wrong, and how to tell the difference).* Fiesta Educativa, University of Southern California, Los Angeles, CA.

Ortiz, S. O. (1998, April). *La educación especial en los Estados Unidos: Avances en la integración educativa (Special education in the United States: Advances in mainstreaming and integration).* Annual Bi-National Education Conference, Calexico, CA.

Ortiz, S. O. (1998, April). *Selective Gf-Gc Cross-Battery Assessment: Addressing the needs of culturally and linguistically diverse populations.* National Association of School Psychologists, Orlando, FL.

Ortiz, S. O., Adrianzen, I., Aganza, J., Iruegas, M., & Peña, L (1998, February). *Competent Bilingual Assessment: Issues in definitions, qualifications, and practices.* National Association for Bilingual Education, Dallas, TX.

Ortiz, S. O., Schmidt, S. & Esparza Brown, J. (1998, February). *Developing Culturally and Linguistically Appropriate Goals and Objectives: Issues in the education of Latino exceptional children.* California Association for Bilingual Education, San Jose, CA.

Ortiz, S. O. (1997, December). *Assessment of Diverse Children: Compliance issues and best practices.* California Department of Education, Workability I Conference, San Diego, CA.

Ortiz, S. O. (1997, November).  *Dynamic assessment-for-intervention: Practical and legal issues in special education compliance.*  Los Angeles County Department of Education, Conference for School Psychologists by School Psychologists, Long Beach, CA.

Ortiz, S. O. (1997, October).  *Bilingual, cross-cultural, nondiscriminatory assessment: Issues, answers, and guidelines.*  Cross-cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1997, October).  *Bilingual special education: Guidelines for compliance in developing culturally and linguistically appropriate goals and objectives.*  Cross-cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. & Valles, G. (1997, October).  *Bilingual Special Education: Writing culturally and linguistically appropriate goals and objectives.*  Cross-cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1997, April).  *Online Culture and Language Learning: Working well with diversity through technology.*  National Association of School Psychologists and California Association of School Psychologists Joint Conference, Anaheim, CA.

Sapien-Melchor, R., Ortiz, S. O., Bray, R., Esgate, M., Johnson, R., & Loveman, S. (1997, February).  *Bilingual General and Special Education: Models that work!*  California Association for Bilingual Education, San Diego, CA

Ortiz, S. O. (1996, November). *Bilingual special education: Guidelines for the development of culturally and linguistically appropriate IEP goals and objectives.*  Cross-Cultural Special Education Conference, San Diego, CA.

Ortiz, S. O., Valles, G., Brown-Esparza, J., & Schmidt, S. (1996, November). *Bilingual special education: Issues in assessment, service delivery and instruction.*  Cross-Cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. & Ortiz, O. G. (1996, October).  *Dynamic Assessment for Intervention: Bridging results with special education instruction and the development of culturally and linguistically appropriate goals and objectives.*  California Association for Mediated Learning, San Diego, CA.

Ortiz, S. O. (1996, September). *Pre-referral processes, interventions, and strategies for culturally and linguistically diverse children.*  Second Language Acquisition Conference, Vista, CA.

Ortiz, S. O. (1996, March).  *Navigating Legal Waters, Parts I and II: Procedures in assessment, reassessment, and cultural-linguistic considerations.*  California Association of School Psychologists, San Diego, CA.

Ortiz, S. O. & Esparza Brown, J. (1996, March).  *Bridging the Results of Dynamic Assessment with Instruction and the Development of Culturally and Linguistically Appropriate Goals and Objectives.*  California Association of School Psychologists, San Diego, CA.

Ortiz, S. O. (1996, February).  *Alternative Assessment of Culturally and Linguistically Diverse Children: Legal mandates, practical approaches, and effective techniques.* Los Angeles County Department of Education, Conference for School Psychologists by School Psychologists, Burbank, CA.

Ortiz, S. O. & Esparza Brown, J. (1996, February).  *Categorical and Inclusive Education: Bridging instructional approaches for culturally and linguistically diverse exceptional students.*  Council for Exceptional Children, Ontario, CA.

Ortiz, S. O. & Ortiz, O. G. (1996, January).  *El proceso de la educación especial: Como afecta al estudiante Hispano parlante.*  California Association for Bilingual Education, San Jose, CA.

Ortiz, S. O. & Esparza Brown, J. (1996, January).  *Categorical and Inclusive Education: Bridging instructional approaches for culturally and linguistically diverse exceptional students.*  California Association for Bilingual Education, San Jose, CA.

Ortiz, S. O. & Esparza Brown, J. (1995, November).  *Bridging Assessment and Intervention: Developing culturally and linguistically appropriate goals and objectives for LEP students.*  Cross-Cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1995, November).  *Pre-referral processes, interventions, and strategies for culturally and linguistically diverse children.*  Cross-Cultural Special Education Conference, San Diego, CA.

Ortiz, S. O. (1995, October).  *The use of Dynamic Assessment and the Primary Sources Inventory in the Diagnosis of Learning Disabilities.*  Learning Disabilities Association of California, Burbank, CA.

Ortiz, S. O. & Ortiz, O. G. (1995, October).  *Dynamic Assessment for Intervention: Bridging results with special education instruction and the development of culturally and linguistically appropriate goals and objectives*  California Association for Mediated Learning, Monterey, CA.

Ortiz, S. O. (1995, March).  *The Child in Context: Ecological foundations and best practices in the assessment of culturally and linguistically diverse children.*  California Association of School Psychologists, San Francisco, CA.

Ortiz, S. O. (1995, March).  *Myth and Misconception: Stepping out of the dark ages in the assessment of intelligence and cognitive abilities.*  California Association of School Psychologists, San Francisco, CA.

Ortiz, S. O., Blocker, P. & Esparza-Brown, J. (1995, March).  *Bilingual Special Education Services Delivery in an Inclusive Model: Successes and failures in keeping pace with the strategic plan.*  California Association of School Psychologists, San Francisco, CA.

Ortiz, S. O. & Daly, A. J. (1995, March).  *The Information Superhighway: Tomorrow's resources for today's school psychologists.*  California Association of School Psychologists, San Francisco, CA.

Cook-Morales, V. J., Robinson-Zañartu, C. A. & Ortiz, S. (1995, August).  *Systemic change toward educational equity in professional psychology programs.*  American Psychological Association, Los Angeles, CA.

Ortiz, S. O. & Hines, V. (1994, March).  *On Hallowed Ground: Demystifying and critically evaluating the sanctity and validity of the diagnosis of Attention Deficit and Attention Deficit Hyperactivity Disorder.*  California Association of School Psychologists, Long Beach, CA.

Ortiz, S. O., Alvarez, A. & Rojas, E. (1994, March).  *Beyond Evaluation: Bilingual-bicultural school psychologists as leaders for change.*  National Association of School Psychologists, Seattle, WA.

Ortiz, S. O., Alvarez, A. & Rojas, E. (1994, March). *True Bilingual-Bicultural Competency in School Psychology:  Increasing educational achievement through better definition, collaboration, and utilization.*  California Association of School Psychologists, Long Beach, CA.

Ortiz, S. O., Ortiz, O. G. & Cook-Morales, V. J. (1994, March).  *Preliminary Analysis: Survey of California school psychologists listed in CASP's Multi-Lingual Directory.*  CASP Multicultural Affairs Committee Meeting, California Association of School Psychologists, Long Beach, CA.

Margolin, G., Fernandez, V., Gorin, L., & Ortiz, S. O. (1982).  *The Conflict Inventory: A new measure for the assessment of marital conflict.*  Proceedings from the American Association of Behavior Therapy, Los Angeles, California.

# INVITED KEYNOTE ADDRESSES, SPEECHES, AND WORKSHOPS

Ortiz, S. O. (2005, October). *Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for nondiscriminatory assessment.* Harrisonburg City Schools, Harrisonburg, VA.

Ortiz, S. O. (2005, September). *English Language Learners: Developmental issues in instruction, intervention, and evaluation.* Oklahoma State Department of Education, Annual Superintendent's Conference on Special Education. Tulsa, OK.

Ortiz, S. O. (2005, August). *Nondiscriminatory Assessment of Culturally and Linguistically Diverse Students: Developmental issues in evaluation.* Louisiana State Department of Education Student Appraisal Summer Institute. Baton Rouge, LA.

Ortiz, S. O. (2005, August). *Nondiscriminatory Assessment Using the KABC-II.* Louisiana State Department of Education Student Appraisal Summer Institute. Baton Rouge, LA.

Ortiz, S. O. (2005, May). *Nondiscriminatory Assessment Using the Culture-Language Test Classifications: How does the KABC-II fare?* Workshop sponsored by AGS Publishing, Fordham University, New York, NY.

Ortiz, S. O. (2005, April). *Psychoeducational Assessment of Children from Culturally and Linguistically Diverse Backgrounds.* Workshop sponsored by Schoolhouse Educational Services, LLC. Bloomington, IL.

Ortiz, S. O. (2005, April). *Cultural Pioneers: Generational patterns on the academic frontier.* Panel presentation at the 2nd Conference on Educational, Legal, and Health Care Needs of the Latino Community in New York City. St. John's University, Queens, NY.

Ortiz, S. O. (2005, February). *Assessment of Culturally and Linguistically Diverse Students: Application and Use of the Culture-Language Extensions of the CHC Cross-Battery Approach.* SDSU Bilingual School Psychology Partnership and San Diego City Schools, San Diego, CA.

Ortiz, S. O. (2004, December). *"You made it, so why can't everyone else?"* Keynote address at the Putting the Pieces Together: Northwest Conference on ESL/SPED Interface. Lewis & Clark Collage, Pórtland, OR.

Ortiz, S. O. (2004, December). *Use of the Culture-Language Test Classifications and Interpretive Matrix: A framework for nondiscriminatory assessment.* Putting the Pieces Together: Northwest Conference on ESL/SPED Interface. Lewis & Clark Collage, Pórtland, OR.

Ortiz, S. O. (2004, December). *Psychoeducational Assessment of Children from Culturally and Linguistically Diverse Backgrounds.* Workshop sponsored by Schoolhouse Educational Services, LLC. Williamsburgh, VA.

Ortiz, S. O. (2004, November). *Comprehensive Assessment of Culturally and Linguistically Diverse Students.* Minority Recruitment Workshop sponsored by the Orange County Association of School Psychologists, the Yorba-Linda Unified School District, and the National Association of School Psychologists, Yorba Linda, CA.

Ortiz, S. O. (2004, September). *Comprehensive Assessment of Culturally and Linguistically Diverse Students: A systematic, practical approach for nondiscriminatory assessment.* Washington Elementary School District, Phoenix, AZ.

Ortiz, S. O. (2004, September). *Understanding and evaluating the culturally and linguistically diverse student: Equitable and collaborative assessment.* Alexandria City Public Schools. Alexandria, VA.

Ortiz, S. O. (2004, May). *Accuracy in Bilingual Case Development: Comprehensive Assessment of Culturally and Linguistically Diverse Students*. Workshop sponsored by the National Association of School Psychologists and Los Angeles Unified School District, Los Angeles, CA.

Ortiz, S. O. (2004, May). *Principles and Procedures in CHC Cross-Battery Assessment: Instruments and approaches in the assessment of English-Learners*. Workshop sponsored by the National Association of School Psychologists and Los Angeles Unified School District, Los Angeles, CA.

Ortiz, S. O. (2004, February). *Comprehensive Assessment of Culturally and Linguistically Diverse Students*. Minority Recruitment Workshop sponsored by National Association of School Psychologists and Newark Public Schools, New Jersey City University, NJ.

Ortiz, S. O. & Ochoa, S. H. (2004, February). *Psychoeducational Assessment of Children from Culturally and Linguistically Diverse Backgrounds*. Workshop sponsored by Schoolhouse Educational Services, LLC. Wisconsin Dells, WI.

Ortiz, S. O. (2003, December). *Native Language Instruction vs. English Immersion: When do English learners really "catch up?"* John F. Kennedy Magnet School, Port Chester, NY.

Ortiz, S. O. & Ochoa, S. H. (2003, November). *Psychoeducational Assessment of Children from Culturally and Linguistically Diverse Backgrounds*. Workshop sponsored by Schoolhouse Educational Services, LLC. Minneapolis, MN.

Ortiz, S. O. (2003, November). *Native Language Instruction vs. English Immersion: When do English learners really "catch up?"* Chicago Public Schools, Chicago, IL.

Ortiz, S. O. (2003, November). *A Case for Primary Language Instruction: Do English learners really "catch up?"* NYC Department of Education, Region 3--English Language Learners and Foreign Language Programs Winter Conference. Jamaica, NY.

Ortiz, S. O. (2003, April). *Education follows Maturation: Developmental, cognitive, and linguistic influences in the instruction and evaluation of English Language learners*. South Huntington Unified School District, Long Island, NY.

Ortiz, S. O. (2003, March). *Comprehensive Assessment of Culturally and Linguistically Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment, Part II*. Metro Regional Educational Service and Cobb County Public Schools, Atlanta, GA.

Ortiz, S. O. (2002, November). *Comprehensive Assessment of Culturally and Linguistically Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment, Part I*. Metro Regional Educational Service and Cobb County Public Schools, Atlanta, GA.

Ortiz, S. O. (2002, June). *The Relationship between Language, Cognition, and Academic Achievement: Special education is not the answer*. Panel presentation at the conference on Health Care and Educational Needs of the Latino Community in New York City: The effect of changing demographics on service delivery. St. John's University, Jamaica, NY.

Ortiz, S. O. (2002, May). *From General Education to Special Education: Practical approaches for evaluation and instruction of English learners*. Warren Consolidated Schools, Warren, MI.

Ortiz, S. O. (2002, April). *Serving English Learners Well: Practical methods for assessment and intervention*. Alexandria City Pubic Schools, Alexandria, VA.

Ortiz, S. O. (2002, March). *Developing Culturally and Linguistically Appropriate IEP Goals and Objectives: Guidelines and procedures for compliance*. Napa Valley Unified School District, Napa Valley, CA.

Ortiz, S. O. (2002, February). *Comprehensive Assessment of Culturally and Linguistically Diverse Individuals: A systematic, practical approach to nondiscriminatory assessment*. Chicago Public Schools, Chicago, IL.

Ortiz, S. O. (2001, October). *From General Education to Special Education: Culturally and Linguistically appropriate classroom instruction for English learners*. Kern County Consortium for Special Education, Bakersfield, CA.

Ortiz, S. O. (2001, August). *Understanding Patterns of Academic Achievement for English Learners: What to expect and why*. Summer Institute—District 25 Training Grant and St. John's University, Jamaica, Queens, NY.

Ortiz, S. O. (2001, January). *Application of CHC Cross-Battery Assessment in the diagnosis of Learning Disabilities*. Farmingdale Unified School District, Farmingdale, NY.

Ortiz, S. O. (2000, November). *Testing and Interpretation of Reading and Writing for Dual-Language Learners*. Clinical Impact of Literacy: Helping teachers and students meet NYS ELA standards. American Guidance Service and St. John's University, New York, NY.

Javier, R. A. (moderator), Gil, R. M., Rosas, M. Constantino, G., Rendon, M., Ortiz, S. O. & Rosa, D. (2000, October). *Health and Mental Health Issues. Immigrants from Latin America and the Caribbean: Coping in New York City*. Symposium sponsored by St. John's University's Committee on Latin American and Caribbean Studies. St. John's University, New York, NY.

Ortiz, S. O. (2000, May). Assessment of diverse children: Applying the cultural and linguistic extensions of the CHC Cross-battery approach. Washington Elementary School District, Phoenix, AZ.

Ortiz, S. O. (1999, November). *Special Education Service Delivery in the United States: Issues in the identification and education of children with learning disabilities*. Hokkaido Association for the Study of Developmental Disabilities in Children and Youth, Hokkaido University, Sapporo, Japan.

Ortiz, S. O. (1999, November). *History and Overview of Special Education: Traditional and alternative perspectives in the assessment and identification of infants and children with disabilities*. Hokkaido Association of Mental Retardation and Developmental Disabilities. Obihiro, Japan.

Ortiz, S. O. (1999, October). *Comprehensive Assessment of Culturally and Linguistically Diverse Children: A Systematic, Practical Approach to Nondiscriminatory Assessment*. Clark County School District, Las Vegas, NV.

Ortiz, S. O. (1999, August). *From General Education to Special Education: Addressing the needs of culturally and linguistically diverse populations*. Nevada State Department of Education, Reno, NV.

Ortiz, S. O. (1999, June). *Gf-Gc Cross-Battery Assessment: Addressing the needs of culturally and linguistically diverse populations*. Psychological Consultants, Flagstaff, AZ.

Kohrt, B. (moderator), Duncan, B., Leung, B., Ortiz, S., & Henry, B. (1999, March). *Assessment Practices: Straight From the Source--University Trainers and Directors of Special Education*. California Association of School Psychologists, Pasadena, CA.

Ortiz, S. O. (1999, February). *Competent Bilingual Assessment: Issues in definitions, qualifications, and practices*. Fresno Unified School District, Fresno, CA.

Flanagan, D. P. & Ortiz, S. O. (1999, February). *Selective Gf-Gc Cross-Battery Assessment: Addressing the needs of culturally and linguistically diverse populations*. Washington Elementary School District, Phoenix, AZ.

Ortiz, S. O. (1999, January). *Cambios en las leyes de educación especial: Ley pública 105-17 "IDEA '97."* Keynote address given at 3rd Annual Fiesta Educativa Conference, San Diego/Imperial Counties, San Diego Office of Education, San Diego, CA.

Ortiz, S. O. (1998, October).  *Comprehensive Assessment of Culturally and Linguistically Diverse Children: A Systematic, Practical Approach to Nondiscriminatory Assessment.*  Kern County Consortium SELPA, Bakersfield, CA.

Ortiz, S. O. (1998, May).  *Equitable Service Delivery for Culturally and Linguistically Diverse Children.*  Second Language Department, San Diego City Schools, San Diego, CA.

Ortiz, S. O. (1998, May).  *From General Education to Special Education: Guidelines for Compliance in Serving Culturally and Linguistically Diverse Children.*  Southwest SELPA, Torrance, CA.

Ortiz, S. O. (1998, April).  *Special Education Service Delivery in the United States: Issues in the identification and education of children with learning disabilities.* International Seminar on Learning Disabilities in collaboration with Nagoya University, Nagoya, Japan, Hokkaido University, Hokkaido, Japan, and California School of Professional Psychology, San Diego, CA.

Ortiz, S. O. (1998, February).  *Serving LEP Children in San Diego City Schools: Commitment to equity.*  San Diego Unified School District, San Diego, CA.

Ortiz, S. O. (1998, January).  *Bilingual Education: The importance of primary language instruction in student achievement.* Gompers Middle School, Bilingual Advisory Committee, San Diego, CA.

Ortiz, S. O. (1998, January).  *Bilingual and General Education: Issues in the education of dual language learners.* Beaumont Elementary School, Bilingual Advisory Committee, Vista, CA.

Ortiz, S. O. & Ortiz, O. G. (1997, November).  *Apoyando sus niños: estratégias é ideas para ampliar el exito de sus hijos en el aprovechamiento emociónal, sociál, y educativo (Supporting your children: strategies and ideas for increasing the emotional, social, and academic achievement of your children).* Keynote Address given at the annual Parent Involvement Conference, San Diego City Schools, San Diego, CA.

Ortiz, S. O. (1997, November).  *Serving LEP students in San Diego City Schools: Guidelines for achieving equity.*  San Diego Unified School District Bilingual Advisory Committee, San Diego, CA.

Ortiz, S. O. (1997, October).  *Bilingual special education: Compliance issues in collaboration, assessment, service delivery, and program placement.*  San Diego Unified School District, San Diego, CA.

Ortiz, S. O. (1997, September).  *Bilingual, cross-cultural, non-discriminatory assessment: Issues, answers, and guidelines.*  San Diego Unified School District, San Diego, CA.

Ortiz, S. O. (1997, September).  *Bilingual Special Education: Issues in compliance, assessment, placement, and service delivery.* Alhambra School District, Alhambra, CA.

Ortiz, S. O. (1997, August).  *Legal transformation of school psychology practice: Working smarter, not harder.* Long Beach Unified School District, Long Beach, CA.

Ortiz, S. O. (1997, August). *Education and diversity: Guidelines for the development of culturally and linguistically appropriate goals and objectives.* California Education Innovation Institute, California Department of Education, San Francisco, CA.

Ortiz, S. O. (1997, June).  *Education And Diversity: Developing Effective Instructional Programs For Culturally And Linguistically Diverse Students.* Los Angeles County Office of Education, Juvenile Court/Community Schools and Division of Alternative Education.  Los Angeles, CA.

Ortiz, S. O. (1997, May).  *Bilingual Special Education: Compliance Issues In Assessment, Placement, And Service Delivery.* Los Angeles County Association of Special Education Administrators.  Los Angeles, CA.

Ortiz, S. O. (1997, March).  *Best Practices in Bilingual Assessment: Making use of what we have.*  San Diego Unified School District, San Diego, CA.

Ortiz, S. O. (1997, February). *Cultural and linguistic diversity: issues in assessment, service delivery, and instruction of children with severe disabilities.*  California Avenue School, Vista Unified School District, Vista, CA.

Ortiz, S. O. (1996, December). *Re-evaluating the role of the Wechsler Scales in the Training of School Psychologists: Breaking up is hard to do.*  Escondido Unified School District, Escondido, CA.

Ortiz, S. O. (1996, August).  *History and Overview of Special Education: Traditional and alternative perspectives in the assessment and identification of infants and children with disabilities.*  International Seminar on Learning Disabilities in collaboration with Nagoya University, Nagoya, Japan, Hokkaido University, Hokkaido, Japan, and California School of Professional Psychology, San Diego, CA.

Ortiz, S. O. (1996, August). *Cultural and linguistic issues in the education of Hispanic/Latino students.*  California Education Innovation Institute, San Francisco, CA.

Ortiz, S. O. (1996, July). *Pre-referral processes, interventions, and strategies for culturally and linguistically diverse children.*  Vista Unified School District,  Vista, CA.

Ortiz, S. O. (1996, February).  *History and Overview of Special Education: Traditional and alternative perspectives in the assessment and education of children with disabilities.*  International Seminar on Learning Disabilities in collaboration with Nagoya University, Nagoya, Japan, Hokkaido University, Hokkaido, Japan, and California School of Professional Psychology, San Diego, CA.

Ortiz, S. O. (1996, February).  *Dynamic Assessment-for-Intervention: Alternative approaches in the assessment of intelligence and learning disabilities.*  Parents of Students in Special Education (POSSE), Torrey Pines, CA.

Ortiz, S. O. & Cassidy, M. (1995, November).  *Assessment and Interpretation: Traditional and alternative approaches in the assessment of intelligence and achievement.*  North Coastal Consortium for Special Education Parent Conference.  Oceanside, CA.

Ortiz, S. O. (1995, September).  *Alternative Psychological Assessment: An ecosystemic approach to the assessment of culturally and linguistically diverse children.*  Long Beach Unified School District, Long Beach, CA.

Ortiz, S. O. (1994, February).  *Theoretical foundations and Psychoeducational applications of the Kaufman Assessment Battery for Children (K-ABC).*  Marusen Mates, Inc., Japanese Educators Tour of Special Education programs in the United States, Encinitas, CA.

Ortiz, O. G., Ortiz, S. O. (1994, March). *El proceso de la educación especial: Como afecta al estudiante de la educacion migrante.* California Department of Education, Migrant Education Parent Conference, Garden Grove, CA.

## ELECTRONIC PUBLICATIONS AND WEB SITE DEVELOPMENT

Ortiz, S. O. (2002).  CHC Cross-Battery Online.  Available at http://www.crossbattery.com/

Ortiz, S. O. (1998).  *The SDSU School Psychology Homepage.*  No longer available online (site was changed/updated in 2001).

Ortiz, S. O. (1997).  *Online Culture and Language Learning.*  Available at http://facpub.stjohns.edu/~ortizs/ocll.html

Ortiz, S. O. (1996).  *The Student Survival Kit*.  Available at
http://edweb.sdsu.edu/CSP/sp/

Ortiz, S. O. (1994).  *The WWW School Psychology Homepage*.  Available at
http://facpub.stjohns.edu/~ortizs/

## FUNDED RESEARCH GRANTS

Ortiz, S. O. (1998).  Woodcock-Johnson Psycho-Educational Battery - Revised, Tests of Cognitive Ability
Materials Grant.  The Riverside Publishing Co.  $10,000.

Ortiz, S. O. (1998).  Enhancing cognitive assessment of culturally and linguistically diverse individuals:
Application and use of selective Gf-Gc cross-battery assessment.  Research, Scholarship and
Creative Activity Award, College of Education, San Diego State University. $2,200.

Ortiz, S. O. (1997).  Bilingual-bicultural Issues in Special Education Assessment: Establishing Professional
Standards of Competency. Research, Scholarship, and Creative Activity Award, College of Education,
San Diego State University.  $3,750

Ortiz, S. O. (1996).  Defining bilingual-bicultural competency in School Psychology: Are language and
culture enough?  Research, Scholarship, and Creative Activity Award, College of Education, San
Diego State University.  $4,000

Ortiz, S. O. (1995). On-line Culture and Language Learning: A technological approach to competency
development.  Technology Initiative Grant, College of Education, San Diego State University.  $1,500.

## OTHER PUBLICATION ACTIVITIES

**Editorial Board**
  – *School Psychology Quarterly, 2003 - present*

**Ad hoc Reviewer**
  – *School Psychology Review*
  – *Contemporary Psychology*
  – *Educational Evaluation and Policy Analysis*
  – *The School Psychologist*

## RESEARCH INTERESTS AND PROJECTS

**Enhancing cognitive assessment of culturally and linguistically diverse individuals: Application
and use of the CHC Culture-Language Matrix and selective CHC Cross-Battery Assessment
methods.**  This avenue of research is the major focus of my current investigative efforts and relates to
the classification of intelligence tests and subtests according to two primary criteria: degree of cultural
loading and degree of linguistic demand.  According to the extant literature, these two factors have been
identified as producing the true type of bias effects that influence the performance of children who are
culturally and linguistically diverse on tests of intelligence.  By classifying such tests according to a matrix
comprised of the various combinations of these two variables (high, medium, and low), it is possible to
select and administer tests to assess the broad range of cognitive abilities in diverse populations that
might prove to be less biased and discriminatory.  Application of the selective cross-battery approach
combined with careful evaluation of the degree to which tests carry such cultural loading and linguistic
demand, appears to be a promising method for controlling and reducing potential bias.  By combining

modern theory-driven assessment with logical and systematic procedures for producing more valid and equitable results, interpretation of the performance of diverse individuals on tests of cognitive ability is seen as more defensible than current methods.

**On-line Culture and Language Learning: A technological approach to competency development.** This ongoing research project focuses on three particular objectives, 1) increased expertise in technology and its applications to instruction and scholarship in multicultural education and training for students and faculty; b) the application of appropriate technology to improve or transform teaching or research in multicultural education and training for students and faculty; and 3) expanded professional preparation of students so that they may apply technologies to enhance the success of all learners, especially ethnolinguistically diverse children.

**Defining bilingual-bicultural competency in School Psychology: Are language and culture enough?** The intent of this current research program is to carefully delineate the specific skills and competencies necessary for establishing guidelines for the definition, training, and perhaps certification of bilingual-bicultural school psychologists. The fundamental question to be addressed is whether or not simple language and culture matches with students are enough to define bilingual-bicultural competency.

# DISSERTATIONS MENTORED

Student: Taryn Wallace
Title: *Assessment Practices in America: An analysis of current and future learning disability assessment practices employed by school psychologists throughout the United States.*

Student: Ana Landron
Title: *Comparison of Dual Language and ESL Instructional Programs and Relationship to Self Affirmation.*

Student: Stacey A. Lella
Title: *Validity Evidence for the CHC Culture-Language Matrix: Evaluation of diagnostic outcomes and classification of disability.*

Student: Ada Nieves-Brull
Title: *Evaluation of the Culture-Language Classification Matrix: A validation study on referred Anglo and Hispanic populations.*

Student: Jennifer Stein
Title: *Assessment and Diagnosis of Learning Disability: Comparison of consistency vs. discrepancy identification models.*

Student: Eliane Kaimeh
Title: *Evaluation of Special Education Knowledge with Arabic and Middle Eastern Populations: Do parents know their rights?*

Student: Celeste Marrero
Title: *A survey of differences in motivation for higher education in Puerto Ricans and other Hispanic groups*

Student: Michael Yoo
Title: *Validation of the CHC Culture-Language Matrix in a learning disabled ELL population.*

Student: Annie Huang
Title: *Perfectionism and Depression in Asian-American Adolescents: The role of social support as a mediating variable.*

Student: Jesurasa Subashini
Title: *Attitudes and Beliefs Regarding Educationally-based Disabilities in South Asian Cultures.*

Student:      Rosalinda Macaluso
Title:        *Orthographic Processing in Reading: A method for differentiating fluent from dyslexic readers.*

# CURRICULUM DEVELOPMENT AND TEACHING INNOVATIONS

**Technological Applications to Instruction:** I have successfully blended many aspects of technology into instruction as a way of both improving delivery of information as well as a tool that enhances learning. Examples include:

**a)** placing course materials and handouts online to allow students more convenient access to course information as needed;
**b)** use of video projection equipment that allows presentation of computer generated material, such as with Microsoft PowerPoint;
**c)** use of the Internet and online communications technology to promote and enhance competency development;
**d)** use of spreadsheets to assist students in performing assigned tasks such as statistical calculations;
**e)** use of online resources to add to students learning by taking advantage of information available via the World Wide Web;
**f)** and use of email as an adjunct to office hours and to assist in broadening and deepening class discussions or the provision of feedback to students.

**Site-based Instruction:** As part of a new philosophy and commitment by the School Psychology faculty, course instruction in critical areas such as assessment has been moved away from the university setting and into the actual school environment. By forming partnerships with local elementary and secondary schools, we have created the opportunity for students to receive closer supervision and perform activities that are rooted in the real context in which they will ultimately occur. Currently, I have developed syllabi and designed course instruction and activities for four different courses which provides students with direct, "real world" experience in the practice of school psychology in today's schools.

**The Student Survival Kit:** A collection of resources available over the World Wide Web that can be accessed as needed by students to retrieve course materials for a variety of different classes offered in the program. The entire "Kit" is available at http://edweb.sdsu.edu/CSP/sp/

**The Tool Kit:** A collection of informal assessment "tools" comprising a variety of techniques including observation, interview, checklists, and measures of achievement. Used in CSP 710A/640/642.

**School Psychology Service Delivery Organizer:** An automated spreadsheet program used to document, track and analyze service delivery in the field, including 1st year placement, 2nd year practicum, and 3rd year internship. Can also be used professionally after graduation. Used by all students in the School Psychology Program. Available on the Student Survival Kit at http://edweb.sdsu.edu/CSP/sp/

**The Assessment-for-Intervention Report:** Model report for the organization and presentation of assessment data in compliance with legal mandates and for the purposes of designing appropriate instructional programs. Used in CSP 710A/640/642 and also available on the Student Survival Kit at http://edweb.sdsu.edu/CSP/sp/

**Ecological Organizers:** Templates for assisting in the collection and organization of ecological data for improving the learning of children in the schools. Used in CSP 710A/640/642 and also available on the Student Survival Kit at http://edweb.sdsu.edu/CSP/sp/

**Computer Program for t-tests:** An automated spreadsheet program used to calculate both dependent and independent t-tests. Used for EDU 690 and also available on the Student Survival Kit at http://edweb.sdsu.edu/CSP/sp/

**Case Study Grading Rubric:** A scoring rubric designed to promote student's understanding of the components of effective case reports and provide an efficient, and more objective method of evaluating student's work.  Used for CSP 710A/640/642.

**Bilingual General Education and Bilingual Special Education:** A brief resource manual (of sorts) for educators of Hispanic (and other) ethnolinguistically diverse students: A collection of readings to supplement core issues in bilingual-bicultural school psychology study.  Used in CSP760/770.

# PROFESSIONAL ASSOCIATION MEMBERSHIP

American Psychological Association
    Division 16, School Psychology
        Vice President for Professional Affairs (2003-present)
    Committee on Psychological Tests and Assessment (2005-present)
National Association of School Psychologists
California Association of School Psychologists
National Association for Bilingual Education.
California Association for Bilingual Education
California Association for Mediated Learning, San Diego Chapter
San Diego Chapter of California Association of School Psychologists

# UNIVERSITY AND COMMUNITY SERVICE

**SERVICE FOR THE UNIVERSITY**
*Committee Assignments*

    **St. John's University**
        Middle States Technology Sub-Committee, 2004 – present.
        Committee for Latin American and Caribbean Studies (CLACS), 2000 – present.
        Online Learning Committee, 2001 – 2003.

    **St. John's University, Department of Psychology**
        Minority Student Recruitment, Admissions, and Retention Committee, 2003 – present.
        Departmental web site developer and site administrator, 2001 – present.

    **SDSU Department of Counseling & School Psychology:**
        School Psychology Program Committee, 1994-1997
        School Psychology Faculty Committee, 1994-1997
        Research Committee, 1996-1997

    **SDSU College of Education:**
        Resource Allocation Committee (Chair), 1997
        Technology Initiative Committee, 1995-1997

*Teaching Awards*

    **Outstanding Faculty Award:**
        SDSU School Psychology Program, College of Education, 1999
    **Outstanding Faculty Award:**

SDSU School Psychology Program, College of Education, 1998
**Certificate of Appreciation:**
SDSU School Psychology Student Association, 1997-98
**Certificate of Appreciation:**
SDSU School Psychology Student Association, 1996-97

*Miscellaneous Service*

**Faculty Advisor:**
Student Association of School Psychology, St. John's Chapter, 2001 – present.
**Faculty Advisor:**
Pi Lambda Theta, International Education Honor and Professional Society, Beta Beta Chapter, SDSU 1999
**Faculty Advisor:**
SDSU School Psychology Student Association, 1999
**Faculty Advisor:**
SDSU School Psychology Student Association, 1998
**School Psychology Program:**
Design, development, and maintenance of the program homepage.
Available at http://edweb.sdsu.edu/CSP/sp/
**SDSU Department of Counseling and School Psychology:**
Design, development and maintenance of the department homepage.
No longer available online (site changed/updated)

## SERVICE FOR THE COMMUNITY
*Committee Assignments*

**San Diego County Office of Education:**
Hispanic Academic Achievement Project, Evaluator, 1998-1999.

**San Diego Unified School District:**
Task Force for the Development of the Special Education Master Plan for English Learners, 1997-present.

**California Department of Education, San Diego County Office of Education, and Department of Education, Baja California, Mexico:**
The California's Project, 1997-present

**Center for Educational Advancement:**
Steering Committee, 1996-present.

**North Coastal Consortium for Special Education:**
Hispanic Academic Achievement Project, Evaluator, 1995-1997

*Other Service*

**Consultant:**
The National Board of Medical Examiners, Office of Test Accommodations, assisting in the evaluation of requests for test accommodations through review of documentation submitted to verify the presence of a qualifying disability. 1999-present.

**Webmaster and Creator:**
The WWW School Psychology Homepage, the first site published on the web (December, 1994) devoted exclusively to the needs of school psychologists and allied professionals.
Available at http://facpub.stjohns.edu/~ortizs/

**Webmaster and Creator:**

The Online Culture and Language Learning Homepage, devoted to the exploration of electronic methods for enhancing culture and language learning.  Available at http://facpub.stjohns.edu/~ortizs/ocll.html

# AWARDS, HONORS, DISTINCTIONS

Outstanding Faculty Award, SDSU College of Education, School Psychology Program, 1999

Outstanding Faculty Award, SDSU College of Education, 1998

Pi lambda Theta, International Education Honor and Professional Society, 1994

Outstanding Young Man of America, 1987

Presidential Scholar, University of Southern California, 1976

Honors at Entrance, University of Southern California, 1976

Who's Who Among America's High School Students, 1976

Valedictorian, Oceanside High School, 1976

# REFERENCES

**Salvador Hector Ochoa, Ph.D.**
Associate Professor
Dept. of Educational Psychology
Texas A&M University,
Mail Stop 4225 TAMU
College Station, TX 77843-4225
(979) 845-7423
shochoa@tamu.edu

**Kevin S. McGrew, Ph.D.**
Professor
APSY Department
St. Cloud State University
720 4th Ave. South
St. Cloud, MN 56301
(320) 255-3037
iapsych@iapsych.com

**Colette L. Ingraham, Ph.D.**
Associate Professor
Dept. of Counseling and School Psychology
San Diego State University
5500 Campanile Dr.
San Diego, CA 92182
(619) 594-6605
ingraham@mail.sdsu.edu

**Dawn P. Flanagan, Ph.D.**
Professor
Department of Psychology
St. John's University
8000 Utopia Parkway
Jamaica, NY 11439
(718) 990-6368
flanagad@stjohns.edu

**John L. Horn, Ph.D.**
Professor of Psychology
Department of Psychology, SGM 501
University of Southern California
Los Angeles, CA 90089-1061
(213) 740-2203
jhorn@usc.edu

**Timothy Z. Keith, Ph.D.**
Professor
Educational Psychology Department
The University of Texas at Austin
1 University Station Stop D5800
Austin, TX 78712
(512) 471-0287
tim.keith@mail.utexas.edu

02/04/2003  16:05    718-990-5926           SCHOOL PSYCHOLOGY                    PAGE  01

RECEIVED

FEB 0 5 2003

**National Board of Medical Examiners**
**Consultant Review Form**                                    Disability Services

Consultant:  Samuel O. Ortiz, Ph.D.          Case Review Hours    3.0
Due Date:    04-Feb-2003                     Conference Hours    _____

Examinee:    Scheibe, Trenton J.                      USMLE STEP 2- 2003
ID Number:   5-058-603-1

☐ Diagnosis is supported by documentation      ☒ Diagnosis is NOT supported by
                                                  documentation.

☐ Accommodation is supported and justified.    ☒ Accommodation is NOT supported and
                                                  justified.

Comments:

Report Case Review and Conference Hours.
Please fax to the NBME Office of Test Accommodations at
(215) 590-9422 by the Due Date shown above.

**Exhibit No. 2**

Date: 4 February 2003

To: Shelby Keiser

From: Samuel O. Ortiz

Re: Consultation Evaluation

This review concerns Trenton Scheibe, a medical student, who is requesting accommodations on Step 2 of the USMLE due to a learning disability ("Reading Disorder"). Mr. Wilson's specific request for accommodation is for extended time (double) in which to take the exam. Documentation provided in support of this request consists of a letter of application, a copy of a psychological evaluation conducted September-October, 2001 by Cynthia Gonzalez, M.A. and countersigned by David Lachar, Ph.D., and certification of prior accommodations from his medical school.  No personal statement was included.

The claim for learning disability by Mr. Scheibe rests entirely upon the diagnosis rendered by Ms. Gonzalez and Dr. Lachar in their report of evaluation. Their claim is that there is sufficient evidence to support a diagnosis of reading disorder according to the criteria specified by DSM-IV under section 315.0. Even a cursory review of the data upon which these individuals based their opinion clearly indicates a substantial lack of understanding regarding the nature, evaluation, and identification of learning disability, significant and unsupportable conceptual errors in data interpretation, and evidence for confirmatory bias. Some of the more egregious errors contained in the report are described below.

It is stated that "the disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills." Yet, an examination of all of the individual's scores on the achievement tests administered to Mr. Scheibe reveal that not a single score falls outside the normal or average range of functioning compared to other people of the same age in the general population. Indeed, his lowest score was on the Nelson-Denny reading rate where he obtained a standard score of 88 (21st percentile rank). Given that the Nelson-Denny is at best, a screening instrument not a diagnostic test (because of its inherent unreliability; coefficient = .68), a score of 88 is hardly noteworthy, let alone indicative of any type of significant interference with reading. Moreover, Mr. Scheibe's other scores, including those for all areas related to reading, ranged from a "low" 97 (48th percentile rank) to a high of 129 (97th percentile rank). This indicates functioning that is at the very least "average" to well above average and occasionally superior. There is simply no reasonable way that it could be construed that there is evidence of a significant interference with academic achievement or activities of daily living that require reading skills. Indeed, the report is clear in that Mr. Scheibe's difficulties are quite narrowly defined in that he "has difficulty with timed exams" and "he does poorly on timed standardized tests." Learning disabilities, by definition are not constrained to limited, unique, or such idiosyncratic situational problems.

The report repeatedly ignores one of the components underlying all Learning Disorders as defined in DSM-IV which is that they are disorders or learning usually first diagnosed in

infancy, childhood, or adolescence. It is also noted that "Learning Disorders may persist into adulthood." This illustrates that learning problems have an identifiable pattern beginning in childhood and often still evident in adulthood. Yet, the report notes that although Mr. Scheibe's "ACT and SAT scores were not excellent, they were good enough to get him into a university." Moreover, he obtained scores on the LSAT that "were not excellent but good enough to get him into a program of study." Clearly, without even the benefit of any accommodations, Mr. Scheibe was not only successful on tests that require significant reading and other abilities by any measure, but perhaps he was even more successful than the average person who generally does not get into college, let alone graduate school, and later on medical school. Even in his formative years, the time period where learning problems in reading should have been most evident, it is noted that he had "no history of developmental delays" and clearly stated that "his grades were well above average throughout high school and his undergraduate studies." It is also noted that reading and English were "challenging" for him, yet "he never received a grade lower than an A until he went to college." This is evidence of academic functioning of the highest order and in no way is consistent with the basic nature of what constitutes a learning disorder, particularly as defined by DSM-IV.

The report attempts to ascribe great significance to the presence of a so-called "discrepancy" as the underpinnings of the diagnosis. In fact, it is not simply a single discrepancy that is examined and put forth to this effect, but rather multiple discrepancies. In one case, it is stated that "the difference between Verbal and Performance IQs is significant at the .05 level, although it occurs in 32% of the general population." Rather than dismissing the discrepancy as commonplace (after all, it occurs in nearly 1 out of every 3 people), it is presented as suggestive of a learning problem, particularly in reading or other verbal skills. The real conceptual error in the use of discrepancy can be seen in the statement that "his Basic Reading and Oral Language scores are more than a standard deviation below Mr. Scheibe's Full Scale IQ." This statement fails to account for the fact that Full Scale IQ is not perfectly correlated with any type of achievement. If it were, they would be the same thing and only in need of measurement once. It is in fact unreasonable to expect that IQ should accurately predict achievement because it accounts for no more than 25-35% of the total variance, at best. It cannot, therefore, be used as the "standard" by which to evaluate other test scores. Schools may indeed continue to rely on such discrepancy analysis but only because it's currently encoded into law. The fact remains that the practice has been thoroughly discredited in the literature and that its use as an indicator of learning disability wholly unwarranted.

There is a tendency to look at "relative" differences rather than normative differences which leads to numerous interpretive errors. For example, it is stated that Mr. Scheibe "demonstrated a relative weakness in immediate auditory attention." This claim is based on a scaled score of 10 for Digit Span (50th percentile rank). Not only does Digit Span not measure auditory attention, it is also well within the average range. To call it a weakness, even a "relative" weakness simply because it is lower than some of his other abilities is wrong. From a normative perspective, being at the exact middle of the average range simply cannot be construed as a weakness or dysfunction of any kind. Such a characterization is counter to the very definition of average or normal. In addition, there is no scientific reason why an individual's abilities should all be equally well developed. Rather, the data indicate that 97% of the general population has some type of difference between one ability and another. It is the rare

exception who has evenly developed abilities. Such "scatter" and differences, even significant differences in abilities, is the norm, not the exception and not suggestive of dysfunction. And finally, interpretation of single subtests is psychometrically indefensible. It was noted in the report that on another measure of short-term memory (what Digit Span actually measures), Mr. Scheibe performed within the "Very Superior Range." Rather than concluding that this ability shows no evidence of impairment, the report continues to suggest that this is an abnormality, which it is not.

Another type of discrepancy highlighted in the report involves comparisons between academic abilities. It was reported that Mr. Schiebe's scores on oral language and basic reading skills were lower than his scores on math tests. Again, there is a tendency to view this as abnormal when in fact, it is quite normal that an individual may be better at math than at reading. We often call these people mathematicians, not learning disabled.

The report seems to imply that he read "very slowly" because his general abilities were higher. It should be noted that his reading rate score of 88 (21st percentile rank) places Mr. Scheibe squarely within the average range. There is no reason to believe or expect that his reading rate should be equivalent to, let alone commensurate with his "general abilities." Nonetheless, such performance is well within the average range and does not imply dysfunction of any kind. Moreover, if reading speed were indeed a problem for Mr. Scheibe, it would most likely be reflected in tests of cognitive processing speed. Yet, his Processing Speed Index from the WAIS–III, a reliable indicator of processing speed, was 119 (90th percentile rank) and in the high average range of functioning. According to the report, this indicates "superior abilities in processing and organizing perceptual information, and performing mental operations quickly." If Mr. Scheibe is indeed a slow reader, it is apparently due to factors other than his underlying cognitive skills and most assuredly not the result of any type of learning disability.

Although Mr. Scheibe states that he is a very slow reader, the data suggest that his ability to On page three of the report, there are three patterns put forth as evidence of a learning disability. The first relates to the discrepancy between reading and language scores and measured cognitive ability. I have already discussed the error in this reasoning above. The second pattern concerns the split between reading achievement scores and achievement scores in mathematics. I have likewise addressed the fallacy of such statements in the preceding paragraphs. The third pattern involves weakness in reading decoding which is tied to possible "verbal learning disability." Yet, the "weakness" that is being referenced involves standard scores of no less than 97 (48th percentile rank). Performance that is as good or better than nearly half of all people in the general population seems a poor foundation for describing it as a "weakness." Clearly, the three patterns put forth in the report as suggestive of learning disability are nothing more than errors in logic, interpretation, and conceptualization. The only reasonable conclusion that can be drawn from these data patterns is that Mr. Scheibe is a competent, normal, average reader with abilities that range from average to high average and occasionally superior.

In sum, the interpretations offered in the report are rather piecemeal, linear, unsystematic, and based on a host of errors in conceptual logic and procedural validity. When viewed from a holistic perspective there are several important findings that are evident in the submitted documentation: a) no evidence of any type of cognitive impairment or dysfunction of any kind is

seen in any of the data contained in the evaluation; b) no evidence of any type of impairment or dysfunction in academic skills or knowledge is found in the data contained in the evaluation; c) there is no clear or documented history of difficulties in the development and acquisition of academic skills in the formative and even later years of schooling; d) there is a consistent and impressive record of academic achievement and school-related success including performance on timed tests involving reading (e.g., SAT, MCAT, LSAT) even without the benefit of any type of accommodation; and e) there is no indication in the submitted documentation that Mr. Scheibe has any impairment or dysfunction (significant, mild, or otherwise) that affects his ability to adequately and successfully complete any daily activities that may involve reading.

All of Mr. Schiebe's scores (both cognitive and academic) are well within normal limits and the fact that some of his abilities are very well developed while one of them is "merely" average does not support a diagnosis of learning disability. In the final analysis, the most reasonable conclusion that can be made from the available data and documentation is that Mr. Scheibe is a competent and capable learner who is currently performing in a manner that is comparable to and sometimes better than that of his same age peers in the general population. There is simply no evidence here that his recent (within the last two years) and apparently unique and specific inability to do well on standardized tests under timed conditions is something that could be reasonably construed as a disability. It is more likely that other factors are responsible for his apparent problems in this very circumscribed area of functioning.

Therefore, based on the data available in this case, I am of the opinion that a diagnosis of learning disability cannot be supported. There is no evidence of intrinsic cognitive dysfunction and no evidence of any type of academic dysfunction. At times and under certain circumstances Mr. Scheibe may read slowly, but he is not an impaired reader. As such, in the absence of any additional evidence or data to support his claim, it is my opinion that Mr. Scheibe's request for accommodations are not justified and should therefore be denied.

Date: 30 November 2005

To: Michael P. Gallagher, Esq.
    Attorney for NBME in the matter of Scheibe v. National Board of Medical Examiners

From: Samuel O. Ortiz

Re: Review and evaluation of Scheibe documentation

    This review is being conducted at the request of the attorney for the National Board of Medical Examiners and concerns documentation submitted by Mr. Trenton J. Scheibe in his efforts to secure accommodations on the USMLE. Accordingly I would like to state at the outset that I have testified as an expert in one other case within the last four years.  I gave an oral deposition in Rush v. National Board of Medical Examiners, Case No. 2-03CV-0140J in the United States District Court for the Northern District of Texas.

    According to the documentation, Mr. Scheibe's initial request for accommodations was denied, in part on the basis of an evaluation provided by this writer. That evaluation, dated Feb. 4, 2003 was based on various documentation including a letter of application for accommodation, a copy of a psychological evaluation conducted September-October, 2001 by Cynthia Gonzalez, M.A. and countersigned by David Lachar, Ph.D., and certification of prior accommodations from his medical school.  No personal statement was included. On the basis of that documentation the following opinions and statements were provided:

    1) It is stated that "the disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills." Yet, an examination of all of the individual's scores on the achievement tests administered to Mr. Scheibe reveal that not a single score falls outside the normal or average range of functioning compared to other people of the same age in the general population. Indeed, his lowest score was on the Nelson-Denny reading rate where he obtained a standard score of 88 (21st percentile rank). Given that the Nelson-Denny is at best, a screening instrument not a diagnostic test (because of its inherent unreliability; coefficient = .68),  a score of 88 is hardly noteworthy, let alone indicative of any type of significant interference with reading. Moreover, Mr. Scheibe's other scores, including those for all areas related to reading, ranged from a "low" 97 (48th percentile rank) to a high of 129 (97th percentile rank). This indicates functioning that is at the very least "average" to well above average and occasionally superior. There is simply no reasonable way that it could be construed that there is evidence of a significant interference with academic achievement or activities of daily living that require reading skills. Indeed, the report is clear in that Mr. Scheibe's difficulties are quite narrowly defined in that he "has difficulty with timed exams" and "he does poorly on timed standardized tests." Learning disabilities, by definition are not constrained to limited, unique, or such idiosyncratic situational problems.

    2) The report repeatedly ignores one of the components underlying all Learning Disorders as defined in DSM-IV which is that they are disorders or learning usually first diagnosed in infancy, childhood, or adolescence. It is also noted that "Learning Disorders may persist into adulthood." This illustrates that learning problems have an identifiable pattern

**Exhibit No. 3**

beginning in childhood and often still evident in adulthood. Yet, the report notes that although Mr. Scheibe's "ACT and SAT scores were not excellent, they were good enough to get him into a university." Moreover, he obtained scores on the LSAT that "were not excellent but good enough to get him into a program of study." Clearly, without even the benefit of any accommodations, Mr. Scheibe was not only successful on tests that require significant reading and other abilities by any measure, but perhaps he was even more successful than the average person who generally does not get into college, let alone graduate school, and later on medical school. Even in his formative years, the time period where learning problems in reading should have been most evident, it is noted that he had "no history of developmental delays" and clearly stated that "his grades were well above average throughout high school and his undergraduate studies." It is also noted that reading and English were "challenging" for him, yet "he never received a grade lower than an A until he went to college." This is evidence of academic functioning of the highest order and in no way is consistent with the basic nature of what constitutes a learning disorder, particularly as defined by DSM-IV.

3) The report attempts to ascribe great significance to the presence of a so-called "discrepancy" as the underpinnings of the diagnosis. In fact, it is not simply a single discrepancy that is examined and put forth to this effect, but rather multiple discrepancies. In one case, it is stated that "the difference between Verbal and Performance IQs is significant at the .05 level, although it occurs in 32% of the general population." Rather than dismissing the discrepancy as commonplace (after all, it occurs in nearly 1 out of every 3 people), it is presented as suggestive of a learning problem, particularly in reading or other verbal skills. The real conceptual error in the use of discrepancy can be seen in the statement that "his Basic Reading and Oral Language scores are more than a standard deviation below Mr. Scheibe's Full Scale IQ." This statement fails to account for the fact that Full Scale IQ is not perfectly correlated with any type of achievement. If it were, they would be the same thing and only in need of measurement once. It is in fact unreasonable to expect that IQ should accurately predict achievement because it accounts for no more than 25-35% of the total variance, at best. It cannot, therefore, be used as the "standard" by which to evaluate other test scores. Schools may indeed continue to rely on such discrepancy analysis but only because it's currently encoded into law. The fact remains that the practice has been thoroughly discredited in the literature and that its use as an indicator of learning disability wholly unwarranted.

4) There is a tendency to look at "relative" differences rather than normative differences which leads to numerous interpretive errors. For example, it is stated that Mr. Scheibe "demonstrated a relative weakness in immediate auditory attention." This claim is based on a scaled score of 10 for Digit Span (50th percentile rank). Not only does Digit Span not measure auditory attention, it is also well within the average range. To call it a weakness, even a "relative" weakness simply because it is lower than some of his other abilities is wrong. From a normative perspective, being at the exact middle of the average range simply cannot be construed as a weakness or dysfunction of any kind. Such a characterization is counter to the very definition of average or normal. In addition, there is no scientific reason why an individual's abilities should all be equally well developed. Rather, the data indicate that 97% of the general population has some type of difference between one ability and another. It is the rare exception who has evenly developed abilities. Such "scatter" and differences, even significant differences in abilities, is the norm, not the exception and not suggestive of dysfunction. And

finally, interpretation of single subtests is psychometrically indefensible. It was noted in the report that on another measure of short-term memory (what Digit Span actually measures), Mr. Scheibe performed within the "Very Superior Range." Rather than concluding that this ability shows no evidence of impairment, the report continues to suggest that this is an abnormality, which it is not.

5) Another type of discrepancy highlighted in the report involves comparisons between academic abilities. It was reported that Mr. Scheibe's scores on oral language and basic reading skills were lower than his scores on math tests. Again, there appears to be a tendency to view this as abnormal when in fact, it is quite normal that an individual may be better at math than at reading. We often call these people mathematicians, not learning disabled.

6) The report seems to imply that he read "very slowly" because his general abilities were higher. It should be noted that his reading rate score of 88 (21st percentile rank) places Mr. Scheibe squarely within the average range. There is no reason to believe or expect that his reading rate should be equivalent to, let alone commensurate with his "general abilities." Nonetheless, such performance is well within the average range and does not imply dysfunction of any kind. Moreover, if reading speed were indeed a problem for Mr. Scheibe, it would most likely be reflected in tests of cognitive processing speed. Yet, his Processing Speed Index from the WAIS-III, a reliable indicator of processing speed, was 119 (90th percentile rank) and in the high average range of functioning. According to the report, this indicates "superior abilities in processing and organizing perceptual information, and performing mental operations quickly." If Mr. Scheibe is indeed a slow reader, it is apparently due to factors other than his underlying cognitive skills and most assuredly not the result of any type of learning disability.

7) On page three of the report, there are three patterns put forth as evidence of a learning disability. The first relates to the discrepancy between reading and language scores and measured cognitive ability. I have already discussed the error in this reasoning above. The second pattern concerns the split between reading achievement scores and achievement scores in mathematics. I have likewise addressed the fallacy of such statements in the preceding paragraphs. The third pattern involves weakness in reading decoding which is tied to possible "verbal learning disability." Yet, the "weakness" that is being referenced involves standard scores of no less than 97 (48th percentile rank). Performance that is as good or better than nearly half of all people in the general population seems a poor foundation for describing it as a "weakness." Clearly, the three patterns put forth in the report as suggestive of learning disability are nothing more than errors in logic, interpretation, and conceptualization. The only reasonable conclusion that can be drawn from these data patterns is that Mr. Scheibe is a competent, normal, average reader with abilities that range from average to high average and occasionally superior.

8) In sum, the interpretations offered in the report are rather piecemeal, linear, unsystematic, and based on a host of errors in conceptual logic and procedural validity. When viewed from a holistic perspective there are several important findings that are evident in the submitted documentation: a) no evidence of any type of cognitive impairment or dysfunction of any kind is seen in any of the data contained in the evaluation; b) no evidence of any type of impairment or dysfunction in academic skills or knowledge is found in the data contained in the evaluation; c) there is no clear or documented history of difficulties in the development and

acquisition of academic skills in the formative and even later years of schooling; d) there is a consistent and impressive record of academic achievement and school-related success including performance on timed tests involving reading (e.g., SAT, MCAT, LSAT) even without the benefit of any type of accommodation; and e) there is no indication in the submitted documentation that Mr. Scheibe has any impairment or dysfunction (significant, mild, or otherwise) that affects his ability to adequately and successfully complete any daily activities that may involve reading.

9) All of Mr. Scheibe's scores (both cognitive and academic) are well within normal limits and the fact that some of his abilities are very well developed while one of them is "merely" average does not support a diagnosis of learning disability. In the final analysis, the most reasonable conclusion that can be made from the available data and documentation is that Mr. Scheibe is a competent and capable learner who is currently performing in a manner that is comparable to and sometimes better than that of his same age peers in the general population. There is simply no evidence here that his recent (within the last two years) and apparently unique and specific inability to do well on standardized tests under timed conditions is something that could be reasonably construed as a disability. It is more likely that other factors are responsible for his apparent problems in this very circumscribed area of functioning.

10) Therefore, based on the data available in this case, I am of the opinion that a diagnosis of learning disability cannot be supported. There is no evidence of intrinsic cognitive dysfunction and no evidence of any type of academic dysfunction. At times and under certain circumstances Mr. Scheibe may read slowly, but he is not an impaired reader. As such, in the absence of any additional evidence or data to support his claim, it is my opinion that Mr. Scheibe's request for accommodations are not justified and should therefore be denied.

Since the date of the report in which these opinions and statements were made, Mr. Scheibe continues to assert that he is learning disabled. To this end, and presumably as part of his legal action against the NBME, Mr. Scheibe has sought out and secured an additional evaluation, conducted by Dr. Theye in August of 2004. He has also procured a letter from Dr. Lachar, who had countersigned the original evaluation in 2001, to attest to the veracity of his learning disability and the merits of his claim for accommodations. Mr. Scheibe has also submitted additional documentation consisting of elementary and high school grade records, group testing results (primarily achievement) from the same period, and transcripts of coursework taken in college, law school, and medical school. This evaluator has been asked to review these additional documents and provide a professional opinion regarding the extent to which they might alter the prior conclusion that Mr. Scheibe is not learning disabled. On the basis of the new documentation, the following statements and opinions are offered:

11) Dr. Lachar's correspondence reports percentile ranks that are derived from the raw and standard scores obtained from the Nelson-Denny Reading Test. Although the scores noted by Dr. Lachar in his letter were taken from the evaluation he and Ms. Gonzalez conducted in 2001, there are some apparent discrepancies of note. For example, the raw scores for reading rate, vocabulary, and reading comprehension are listed as 185, 74, and 54 respectively. These are exactly as reported in the original report. However, included in the letter is a raw score for "Total" which does not appear in the results section of the previous report of evaluation. In

addition, when the percentile ranks provided in the current letter that correspond to the NDRT standard scores are converted to the common deviation IQ metric (which Dr. Lachar states is the "habit" of his practice), there is a discrepancy of 4 to 5 points. That is, in the letter, the percentile ranks are listed as 14, 77, and 23 respectively. This would correspond with deviation IQ standard scores of 84, 111, and 89 respectively. However, in the original report, these standard scores are listed as 88, 115, and 94 respectively. The reason for the discrepancy in scores in not immediately apparent, however, it may have resulted from the use of different norms. Dr. Lachar, in his current letter states that the scores are based on "college graduates" which suggests the use of grade instead of age-based norms on the NDRT. Use of the age-based norms are more appropriate in this case because the standard for establishing a disability under ADA comparison against the average person in the general population. Thus, it seems likely that the original report did use age-based norms and thus, Mr. Scheibe's performance does not appear in as negative a light as it does when using grade-based norms. Irrespective of the reasons for the difference, it is important to note that Mr. Scheibe's performance on the NDRT is well within the average range and once again, belies evidence of impairment.

12) Dr. Lachar states in his letter, "what does a problem reader look like all grown-up and able to function in a medical school?" He answers his own query with the statement, "The most likely residual problem is a slow reading rate." I not only disagree with this assertion, I am also unable to find any research to support a slow reading rate as the adult sequelae for children with learning disabilities. In addition, as will be noted later, there is no compelling evidence whatsoever that Mr. Scheibe ever was a problem reader, and his average performance in all aspects of reading, including reading rate can hardly be described as "slow." Average is average. If Mr. Scheibe is able to read at a rate that is commensurate with the average person in the general population, it would be incorrect and discriminatory to suggest that he is somehow impaired in this area.

13) Dr. Lachar provides another assertion to the effect that, "the pattern of non-reading (mathematics) being one standard deviation above reading scores is consistent with a problematic residual in an otherwise bright individual." This type of claim was discussed in my previous evaluation and need not be repeated here in detail. The essential claim here that a difference in ability between math and reading is somehow the residual effects of surviving a learning disability into adulthood is simply unsupportable. Discrepancies between abilities is more the rule, not the exception. For example in the WJ III, an average of two "significant" discrepancies are found in the general norm sample. To expect that all of an individual's abilities must be equally well developed is a misguided and untenable assumption. Examination of the tables provided in the WAIS-III manual indicate that only about 3% of the entire norm sample (representative of the general population) has equally developed abilities. To expect that the standard for diagnosing learning disabilities rests upon evenly developed abilities is preposterous in that it would place at least 97% of the population within such a criterion.

14) A second evaluation on Mr. Scheibe, focusing on achievement primarily, was conducted by Dr. Theye in August of 2004. It is interesting to note that Dr. Theye seemed particularly impressed with two pieces of information, the prior report of evaluation by Dr. Lachar and the fact that Mr. Scheibe had been granted prior accommodations by his medical school. Dr. Theye appears particularly unfazed by Dr. Lachar's use of phrases such as "relatively

poor" performance on reading tasks (despite the fact that all were within the average range) and "particular difficulty" on tasks involving phonemic perception and decoding (again, despite the fact that Mr. Scheibe's performance in these areas was also well within the normal range). One wonders whether Dr. Theye took the time to actually look at the reported scores.

15) Dr. Theye examined data from Mr. Scheibe's childhood in an effort to ascertain the presence of reading difficulties in the developmental period. In this respect, he appears to evaluate the percentile ranks which is entirely appropriate. However, Dr. Theye seems not to understand the limitations in comparisons of percentile ranks and appears to base his opinions on differences that are much less meaningful than he may realize. For example, he provides a litany of percentile ranks from Mr. Scheibe's 7th grade Stanford Achievement Test (one of a variety of group tests given to students in the spring to assess academic skill development). As a point of reference, the 50th percentile rank represents the mean or average of all individuals who took the test. The generally accepted average range is about 1 standard deviation above and below the mean, and would thus encompass a range extending from about the 16th to the 84th percentile ranks. Despite the fact that not a single score listed by Dr. Theye even falls at or below the 50th percentile rank, he nonetheless concludes that "it is interesting to note that spelling scores were certainly a notable 'weakness' falling 'only' at the 60th percentile." Two things are curious here, one being that Dr. Theye puts the words "weakness" and "only" in quotation marks in his report. The reason for this is unclear but certainly seems to indicate that the use of these words in this context, given where the obtained scores actually fall relative to the general population, is somewhat dubious. The 60th percentile rank is equivalent to a standard score of 104, and can hardly be construed as weak, relative to the average person in the general population and to characterize it via the word "only" seems to serve to portray the score as being negative or deficient, when clearly, it is not.

16) Dr. Theye states in his report that "there is a 15 percentile difference between 'total reading' and 'total math'." The total reading score was at the 84th percentile rank (SS=115) and the total math score was at the 99th percentile rank (SS=133). I must state that I have never before seen comparisons made between percentile ranks. Such differences represent an inappropriate basis for comparison because percentile ranks are not equal interval and the difference between them is not consistent in meaning. Dr. Theye may feel that the "15 percentile difference" is somehow important, but given that even the lower of the two scores used in this comparison is already one standard deviation *above* the mean, all the comparison truly indicates is that both abilities are extremely well developed. Indeed, the actual difference between the two scores may have been as little as two or three correct answers at the upper end of the test.

17) Dr. Theye makes a similar interpretive error in another paragraph where he reports similar scores for Mr. Scheibe when he was in first, second, and third grade. In this case, he states that "At that time, based on estimates of general intellectual functioning, a reasonable expectation would be that abilities would be at or above the 90th percentile." This number is derived apparently from the administration of the Otis Lennon, From K, given to Mr. Scheibe in October of 1980 when he was in 6th grade. The obtained IQ was listed as a standard score of 119 which corresponds to the 90th percentile rank. However, given that the test was administered in 6th grade, 3-5 years after the achievement test scores listed, it is inappropriate to suggest that this should be the standard for what to expect from Mr. Scheibe. An individual's IQ is subject to

significant variability in childhood partly because of the wide range of average development and partly because of the inherent unreliability of many tests used on young children. Note that according to the documentation, Mr. Scheibe's IQ on the same test administered in 8th grade resulted in an IQ of 112 (79th percentile rank), or about ½ standard deviation less than what was obtained in 6th grade. Nevertheless, even were the 90th percentile rank a reliable estimate of his intellectual ability while in first through third grade, the error made by Dr. Theye is evident in his statement "Clearly, the discrepancy between expected versus achieved levels of mastery existed from primary grades and continued to be seen throughout his educational programming." Here, Dr. Theye makes a classic error in assuming that an individual's IQ is a perfect predictor of all academic skills. It is not. An individual's IQ predicts general achievement and was never designed and never shown to be the "standard" by which all other academic skills should be measured or predicted. Simply put, the fact that Mr. Scheibe's general ability might well have been around the 90th percentile does not mean that all of his abilities, academic, cognitive, or otherwise, should also all be around the 90th percentile rank. As discussed previously, people with evenly developed abilities are the exception, not the rule. Dr. Theye compounds this interpretive error by once again relying on percentile rank comparisons, noting that reading in first through third grade was at the 72nd, 82nd, and 66th percentile ranks respectively. This makes the difference between the 90th PR and the 66th PR appear rather dramatic. However, when converted to standard scores, the former becomes a 119 and the latter is equal to 107. This means that there is in fact only a 12 standard score point difference between the two scores, or significantly less than one standard deviation. This is the more appropriate method for comparison and clearly indicates that the differences is not nearly so dramatic and does not support the presence of any type of learning disability, especially since both scores are again well *above* average.

18) Dr. Theye reports results from administration of the WJ III Tests of Achievement. Unfortunately, no composite or cluster scores are provided and instead, only a listing of scores from individual subtests are included. It should be noted that interpretation of individual subtest scores is not psychometrically valid and should not be undertaken. Nevertheless, the pattern of results are again very consistent with and absolutely clear in demonstrating that not a single measured skill in reading, writing or math fell outside the average range. Indeed, the percentile ranks ranged from the 54th to the 95th, and when converted to common standard scores, ranged from 102 to 124. Despite the clarity of these findings, which once again indicate a resounding display of absolutely normal functioning, Dr. Theye attempts to dramatize their meaning by including grade equivalent scores. As noted in my prior evaluation, use of grade equivalents for comparative purposes is poor practice and psychometrically indefensible in attempts to understand performance relative to the average person in the general population. This is because grade equivalents do not retain the same meaning from test to test, they are developmental scores that are simply ordinal, not ratio, and they are so variable that it is nearly impossible to tell whether a given grade equivalent is within the average range or not. Consider that in the results presented by Dr. Theye, that the percentile rank listed for Reading Fluency is 54, and for Letter-Word Identification, it is 63. When converted to common standard scores, Reading Fluency becomes a 102, and Letter-Word Identification equals a 104. The 2 standard score point difference is obviously meaningless because performance in both areas, relative to the average person in the general population is much the same—slightly above average. But the corresponding grade equivalents only serve to distort this picture. Whereas the 104 in Letter-

Word Identification yields a grade equivalent of greater than 18.0, the 102 in Reading Fluency yields a grade equivalent of only 11.9. This occurs because the variability in each of the tests is different in terms of such factors as specificity, reliability, and age, rendering comparisons on the basis of such scores impractical, misleading, and inappropriate. It is interesting to note that Dr. Theye once again uses quotations in his report to indicate that "reading fluency was 'only' at the 54th percentile." Perhaps Dr. Theye recognizes that such a score, being slightly above average, is difficult to construe as representing deficient functioning.

19) Dr. Theye presents results from the WIAT-II in the area of reading, and as before, all scores are within the average range, indeed they are well *above* the average range (Word Reading SS=111; Reading Comprehension SS=114). Mr. Scheibe's Reading Speed is reported only as "second quartile." Use of this classification scheme is so broad as to be nearly meaningless. Consider that quartiles encompass 25% of the population each. Thus, if Mr. Scheibe's performance is within the second quartile, then his score falls within the 25th to 50th percentile rank range. When converted into common standard scores, this indicates that his score fell within 90 to 100, or essentially the average range.

20) Dr. Theye states that "the results from the Woodcock-Johnson and WIAT are concordant with those obtained from the Nelson-Denny Test administered at the University of Texas." Although I would agree with this statement, I do not agree with Dr. Theye that there is anything remarkable about this consistency in terms of supporting a learning disability. Consider that the scores to which Dr. Theye refers here include, WJ III Reading Fluency (SS=102), WIAT-II Reading Speed (SS=90-100), and NDRT Reading Rate (SS=88). Whereas, Dr. Theye (and Dr. Lachar for that matter) view these scores as being below that of his other scores and therefore indicative of "weakness" or disability, the fact remains that none of these scores are outside or below the average range and when compared to the performance of the average person in the general population, they are undeniably normal.

21) Both Dr. Lachar and Dr. Theye claim that there is evidence of childhood difficulties in the area of reading or reading rate. Such claims are easily evaluated given that Mr. Scheibe has provided a wealth of information regarding his achievement and educational attainment. It appears that Mr. Scheibe was given the Stanford Achievement Test every year from 1st grade through 12th and most of the results are available. Because of the sheer quantity of data contained in his records a complete summary would be unwieldy here and instead, it may be better to simply focus on any scores that fall outside the average range (or less than the 16th percentile rank). A review of his records indicates that not one of the several dozen scores that are listed falls below this cutoff. Indeed, none of them even fall below the 50th percentile. In the area of reading, where Mr. Scheibe is presumed to have had significant difficulty, the available percentile ranks from 1st grade onward for his Total Reading (a composite of all reading areas) were, in order, 72nd, 82nd, 66th, 92nd, 86th, 84th, 84th, 70th, 85th, 72nd, 79th (10th grade scores were not available). In addition, on other standardized (and timed) tests, Mr. Scheibe's results in areas related to reading acquisition and skill development were ACT 97th percentile, and SAT-V 490 (Reading 51). Mr. Scheibe's grades in 4th, 5th, and 6th grade were B, B+, and A- respectively. His grades in English in each year of high school he attended were A, A, and A- (he didn't take English in 12th grade). Of particular note is that Mr. Scheibe served as an editor of his high school newspaper in 10th, 11th, and 12th grade. In short, Mr. Scheibe's record of academic

progress and attainment, particularly in the early developmental period and extending throughout his academic career, is nothing less than outstanding and exceedingly impressive. I simply cannot see where any conclusions regarding evidence of childhood dysfunction in reading could be drawn from this record of astonishingly consistent and undeniably stellar achievement.

22) Mr. Scheibe's record of academic success has continued largely unabated in his college and graduate school careers. For example, he earned an Honors Bachelor of Science degree (cum laude) from Marquette University with a cumulative GPA of 3.53. He took courses in law school also at Marquette University, and later received his JD from University of Houston. Most recently he has obtained his MD from the University of Texas Health Science Center at Houston. It is also my understanding that Mr. Scheibe has passed Steps 1 and 2 of the USMLE without accommodations (as reported to me verbally by the NBME). If this is true, taken together with all the other data provided by Mr. Scheibe, it indicates that not only is he not disabled or impaired in any manner, but that he is extremely competent and able to accomplish whatever he desires.

23) The entire basis of the diagnosis of learning disability rendered by both Dr. Lachar and Dr. Theye revolve primarily around the single finding on the NDRT. There has been some confusion regarding Mr. Schiebe's actual scores on the NDRT so some clarification is necessary. First, it should be noted that standard scores, regardless of the metric (deviation IQ, Wechsler Scaled Score, T-score, Z-score, etc.) all correspond to the normal probability curve and to a particular percentile rank. When standard scores have the same percentile rank, they are equivalent--that is, they represent the same level of functioning even though the scores themselves appear to be quite disparate. Thus, a deviation IQ of 100, has exactly the same meaning relative to performance against the norm sample, as would a Wechsler Scaled Score of 10,1 a T-score of 50, and a Z-score of 0. Likewise, when standard scores are converted to a common metric, such as the deviation IQ (mean=100, sd=15), any two scores that are the same, will have the same percentile rank and the same meaning. What is confusing in this case is that Dr. Lachar's original report lists a "standard score" of 88. Assuming this score is based on the deviation IQ metric, which it appears to be (otherwise it would not make sense in the other metrics) and because Dr. Lachar states in his letter and email that his "habit" is to convert scores to this metric, then the corresponding percentile rank for a deviation IQ of 88, is 21. That is, the 88 standard score puts Mr. Scheibe's performance on the NDRT Reading Rate at the 21st percentile in the original report. Later, however, in the follow-up letter and email, Mr. Scheibe's "standard score" is now listed as "188" which is not a number that corresponds to a common standard score metric, albeit it could be a deviation IQ score but would have put Mr. Scheibe's Reading Rate at the 99.99+ percentile rank which is not in keeping with his description of performance or prior performance. Dr. Lachar's use of the term standard score seems rather inconsistent and confounded with raw scores on the NDRT. Additional confusion results from the fact that in the original report, Dr. Lachar lists the corresponding standard score for Mr. Scheibe's Reading Rate performance whereas in his letter, he lists the corresponding percentile rank for Mr. Scheibe's Reading Rate performance. Thus, in the original, the 88 converts to the 21st percentile rank, but in the letter/email, the corresponding percentile rank is listed as 14th, and converts to a standard score of 84. Thus, there is an inconsistency in what is being reported. The original percentile rank of 21, has suddenly become 14. Other than typographical error, I can only conclude that the inconsistency might be due to the possibility that the former, original

score was based on age-based norms, whereas the latter percentile rank may be based on grade-based norms. Dr. Theye's report confuses the matter a bit further by stating that Mr. Scheibe's standard score of 88 "places him below the 34th percentile." The only consistently reported score appears to be the 88, which as noted previously is at the 21st percentile and well within the average range. But perhaps the greatest area of confusion stems from the fact that in his email, Dr. Lachar mentions that Mr. Schiebe's NDRT Reading Rate raw score as 185 (which is consistent with the original report and his letter), but then provides a corresponding percentile rank of 10. Thus, Dr. Lachar, has now proffered a consistent raw score of 185, but with corresponding "standard scores" that are 88 and 188, and corresponding percentile ranks that go from the original 21st percentile rank, to the 14th in his letter, to the 10th in his email. I am inclined to believe that the inconsistency is due to either a change in the normative base used for comparison as well as typographical errors. I state this because Mr. Lachar's email (dated December 8th, 2004) is not identical to the formal letter he composed for Mr. Scheibe on December 16, 2004. Notably, the 10th percentile does not appear in the letter, and instead is reported as the 14th percentile which is still inconsistent with the 21st percentile that is equivalent to the 88 standard score that seems to be the only score upon which everyone can agree.

24) Use of grade-based norms in providing a percentile rank of 14 (SS=84) or 10 (SS=81) that are less than the originally reported 21 (SS=88), seems to be a reasonable explanation in the sense that the use of grade-based norms would be equivalent to comparing Mr. Scheibe to a select group of individuals, that is, only those individuals who went to college for as long as he did, not to the average person in the general population. In his letter and email, Dr. Lachar notes that he used norms corresponding to "end of four year college" which appears to substantiate the use of grade-based norms. Such a comparison is inappropriate given that ADA uses the standard of the average person, not a select peer group. Consider for example, that if Mr. Scheibe were compared to individuals whose lives and careers were based on the ability to read quickly and efficiently (newspaper editors), his performance would be lower than if he were compared to individuals whose lives and careers had nothing to with reading (fry cooks at McDonalds). Such select group comparisons are inappropriate because an individual's presumed level of ability changes in a chameleon-like fashion as a function of the group to which performance is being compared. There is no stability. Thus, use of age-based norms and the average person standard represents the only fair and appropriate manner in which an individual's performance can be assessed.

25) Beyond these issues, it's important to note that the NDRT has an extremely low reliability coefficient (.68) which makes it useful only as a screening tool, at best. Some might say its coefficient is so low that it represents more a research tool than even a screener. But in no way can it be considered a diagnostic test, such as the WIAT and WJ III, where the reliabilities are in the .80-.90 range, where they should be. So not only is reliance on the NDRT as a diagnostic indicator not supportable from a psychometric perspective, to use it as the sole indicator of dysfunction also violates the principle of demonstrated convergence of data. I have already noted that the WIAT Reading Speed was in the second quartile (25th to 50th percentile rank range) and the WJ III Reading Fluency performance was at the 54th percentile rank. Neither Dr. Lachar nor Dr. Theye reconcile these findings that indicate that reading rate, as measured by two highly reliable indicators of it, both show performance to be well within the average range.

This is especially apparent in Dr. Lachar's email where he describes the basis of Mr. Schiebe's reading problems as indicated by a 32 point discrepancy between his NDRT Reading Rate score (presumably an 81, 10th percentile rank) and his stated Verbal IQ of 113. As noted previously, IQ is not an indicator of aptitude for specific academic skills. Indeed, the VIQ on the WAIS-III does not even contain measures of skills that are important to reading rate with the possible exception of processing speed. Dr. Lachar does not mention that Mr. Schiebe's Processing Speed Index was 125 (96th percentile rank) and therefore belies the presence of dysfunction in the area of reading rate.

26) To ignore these findings and point to a single, isolated performance on a test that is at best a screening device, is to be blind to the facts. Even were Mr. Schiebe's actual performance on the NDRT at the 14th percentile, the inherent unreliability of the test itself and the preponderance of alternative, better quality data available would render the score rather moot, and certainly far too weak to ever stand as an indicator of disability--particularly in light of Mr. Schiebe's educational history which as noted previously, has never demonstrated any problems in the acquisition of or development of reading skills. As such, Mr. Schiebe's score on the NDRT, whatever it may truly be, is largely irrelevant to the considerations of disability when viewed within the context of other collected data and in the face of other compelling and exceedingly more reliable data. To pin a diagnosis of learning disability on this one score, which appears to be within the average range anyway, is simply untenable and indicates a tendency to discount, refute, or ignore the mountain of evidence that suggests convincingly otherwise.

Perhaps the best way of describing Mr. Scheibe's pattern of performance would be through the use of the Michael Jordan analogy. Whereas Michael Jordan was without question a uniquely superior basketball player, it is unreasonable to judge his abilities in golf or baseball as deficient, merely because he was not equally dominant in these athletic skills. Likewise, Mr. Scheibe may not be the most fluent reader and he may not be the fastest reader. But the data are clear in that he is not an impaired reader. To suggest that he has a learning disability would be to simply ignore the facts and distort their meaning. The class of disorders identified in DSM-IV as learning disorders (formerly known as academic skills disorders) falls under a category characterized by the fact that they are "usually first diagnosed in infancy, childhood, or adolescence." This presumption is clear in two ways. First, the disorders are generally evident in the early developmental period especially during the time when such academic skills are being developed and acquired; and second that it is the disruption in the development or acquisition of such skills that defines the disorders—not unexplained or sudden dysfunction at higher levels of education. These notions are reflected in the formal definition of learning disorders wherein it is stated that "the learning problems significantly interfere with academic achievement or activities of daily living that require reading, mathematical, or writing skills (DSM-IV; p. 46). There are claims throughout the newly submitted documentation that Mr. Scheibe had some educational "difficulties." However, the data do not appear to support such claims. Rather, the data indicate evidence of successful educational attainment *even* in the absence of accommodations. As presented previously, Mr. Scheibe himself has made available some of the most compelling and reliable data that speaks to this issue. Indeed, his scores from the tests given to him across his elementary and secondary education provide some of the most objective and incontrovertible evidence that his early performance in school was not only normal, but indeed exceptional.

As a final point, I think it is important to note the similarity in the manner in which a learning disability is defined in DSM-IV and in the ADA. As noted previously, DSM-IV specifies that whatever deficiencies that may be identified, they do not constitute a learning disability until and unless they "significantly interfere with academic achievement or activities of daily living" (DSM-IV; p. 46). The language of disability in ADA is similar in that it defines a disability as some type of physical or mental impairment that substantially limits activities of daily life such as learning or reading. Within the context of both definitions, the data provided by Mr. Scheibe do not offer any indication that he is substantially limited in his capacity to do anything, including reading or taking tests. On the basis of the information made available to me in this case, I can find no compelling evidence in the newly submitted (or prior) documentation that suggests that Mr. Scheibe has any impairment or dysfunction (significant, mild, or otherwise) that affects his ability to adequately and successfully complete any daily life activity including those that involve reading, such as taking tests.  He may not read very quickly, but he is not an impaired reader. The only reasonable conclusion that can be drawn from the available data and documentation is that Mr. Scheibe is a competent and capable learner who is currently performing in an "average" and often "high average" to "superior" manner as compared to his same-age peers in the general population. Therefore, based on the data available at this time, I am of the opinion that a diagnosis of learning disability cannot be supported and that accommodations are unnecessary.

Respectfully submitted,

Samuel O. Ortiz, Ph.D.
Associate Professor of Psychology
St. John's University