Document Number Case Number
05-C-0180-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
02/07/2006 03:09:22 PM CST

## UNITED STATES MEDICAL LICENSING EXAMINATION™ (USMLE™)
### Office of Test Accommodations (215) 590-9509

JAN 1 3 2003

**Questionnaire for USMLE Step 1 and 2 Applicants Requesting Test Accommodations** Disability Services

---

**You must provide supporting documentation verifying your disability. The documentation must be from a qualified professional.** Mail your completed questionnaire and documentation to:

**Students / Graduates of US & Canadian Medical Schools**
Testing Coordinator, Office of Test Accommodations, National Board of Medical Examiners,
3750 Market Street, Philadelphia, PA 19104-3190.

**Students / Graduates of Foreign Medical Schools**
Test Accommodations Coordinator, Educational Commission for Foreign Medical Graduates
3624 Market Street, Philadelphia, PA 19104 USA.

---

**Please type or print.**

1.  Accommodations are requested for the following Step examination:

    (• Step 1)    (• Step 2)    Year: _2003_

2.  Name   _SCHEIBE_          _TRENTON_                     _J._
         Last                 First                        Middle Initial

3.  Gender:  (• Male) • Female      4. Date of Birth  _12/19/68_

5.  SS# _3 9 7_ - _8 8_ - _7 2 9 3_      6. USMLE # _5 - 0 5 8 - 6 0 3 - 1_
                                                    (if known)

7.  Address  _4715 DUNLEIGH CT._
         Street
         _SUGARLAND_          _TX_              _77479_
         City                 State/Province   Zip/Postal Code

         _USA_                ( _715_ ) _387-3227_ (parents home)
         Country              Daytime Telephone Number

8.  Medical School  _UNIVERSITY OF TEXAS - HOUSTON MEDICAL SCHOOL_

9.  Nature of the Disability:

    • Hearing Disability            • Psychiatric Disability

    • Learning Disability           • Visual Disability

    • Physical Disability           • Other _READING DISORDER (DSM-IV 315.0)_

10. In order to document your need for accommodation as completely as possible, please attach, in addition to professional documentation, a personal statement describing your disability and its impact on your daily life and educational functioning. Do not confine your comments to standardized test performance; rather discuss your overall functioning.

- CONTINUED -

5/2000

**Exhibit No. 1**

11. How long ago was your disability first professionally diagnosed?

   • less than 1 year    •(1-2 years)    • 2-4 years    • 5 or more years

12. What accommodation(s) are you requesting?  Accommodation(s) must be appropriate to the disability.

   _EXTENDED TESTING TIME_

13. If you are requesting additional testing or break time, please indicate below (select one):

   • time and a half    •(double testing time)    • extra break time    • other_____

14. Do you require wheelchair access at the examination facility?

   • Yes       •(No)

   If you require an adjustable height table, please indicate the number of inches from the floor _N/A_

15. Prior classroom or test accommodations that you have received:

   A. Standardized Examinations

      • Medical College Admission Test (MCAT)       Month/Year       _____

      Accommodation received       _____

      (If extra time, note amount given _____)

      • Other       Month/Year _____

      Accommodation received       _____

      (If extra time, note amount given _____)

   B. Medical School       •(Yes)       • No

      Accommodation received  _DOUBLE TESTING TIME_

      Date approved  _3/02_

      **If yes, have an appropriate official at your medical school complete the enclosed certification form.**

   C. College       • Yes       •(No)

      If yes, accommodations received: _____

   D. Secondary or elementary school       • Yes       •(No)

      If yes, accommodations received: _____

16. Authorization:

If clarification or further information regarding the documentation provided is needed, I authorize the NBME or ECFMG to contact the professional(s) who diagnosed the disability and/or those entities which have provided me test accommodations.  I authorize such professional(s) and entities to communicate with the NBME or ECFMG in this regard to provide NBME or ECFMG with such clarification and/or further information.

Signature _[signature]_       Date _1/6/03_

5/2000

**RECEIVED**

**JAN 1 3** 2003

**Disability Services**

## UNITED STATES MEDICAL LICENSING EXAMINATION™ (USMLE™)
### Certification of Prior Test Accommodations
#### Office of Test Accommodations (215) 590-9509

To be completed by a medical school official responsible for student disability services.
Please type or print.

**Applicant Name:** ___Trenton J. Scheibe___

**USMLE ID#:** 5 - 0 5 8 - 6 0 3 - 1

1. I, ___Margaret C. McNeese___ , hold the position of ___Assoc. Dean of Student Affairs___ Professor of Pediatrics
   Name                                                    Title

2. I certify that ___UTHouston Med. School___ has officially approved and provided
   Name of Institution

   the following test accommodations for the above applicant beginning on ___March 2002___

   Date (Month/Year)

Accommodation(s) provided ___Extended time.___

Reason for provision of accommodation(s) ___DSM-IV   315.0___
   ___Reading comprehension & speed.___

Signature _____   Date _1- 6-03_

(713 ) 500 5160
Telephone Number

| Students / Graduates of US & Canadian Med. Schools | Students / Graduates of Foreign Medical Schools |
|---|---|
| **Mail or fax\* this form to:**<br>Testing Coordinator, Office of Test Accommodations<br>National Board of Medical Examiners<br>3750 Market Street<br>Philadelphia, PA  19104-3190<br><br>Fax Number: (215) 590-9422  \*(call to verify receipt)<br>Phone Number: (215) 590-9509 | **Mail or fax this form to:**<br>Test Accommodations Coordinator<br>Educational Commission for Foreign Medical Graduates<br>3624 Market Street<br>Philadelphia, PA  19104 USA<br><br>Fax Number: (215) 386-6327<br>Phone Number:  (215) 386-5900 |

5/2000

**Exhibit No. 2**

# THE UNIVERSITY OF TEXAS
## HOUSTON
### HEALTH SCIENCE CENTER

**RECEIVED**

JAN 1 3 2003

**Disability Services**

Mental Sciences Institute
Department of Psychiatry
and Behavioral Sciences

## PSYCHOLOGICAL ASSESSMENT LABORATORY

### Psychological Assessment

Name: Trenton Scheibe
DOB: 12/19/68
Referral Source: Daniel Creson, M.D., Ph.D.

Assessment: 09/21/01; 10/5/01
Ethnicity: Caucasian
Medical Record #: 201-03-84
Examiner: Cynthia Gonzalez, M.A.

Referral Question: Mr. Scheibe was referred for neuropsychological testing by Dr. Creson because of reading difficulties at U.T. Houston medical school.

Background Information: Mr. Scheibe is a thirty-two year old Caucasian male from central Wisconsin. Mr. Scheibe reported he is a slow reader and has difficulty with timed exams. He is currently in his fourth year of medical school. However, he failed his third year board exam for internal medicine. According to Mr. Scheibe he failed the first board for the internal medicine rotation and, after a month of remediation classes, was administered the exam again. Unfortunately Mr. Scheibe failed once more, by only two points. This resulted in the failure of the entire rotation.

Mr. Scheibe reported that he passed the required board exams his during his first and second years of medical school. He found these exams to be less difficult because they had fewer clinical vignettes. In general, however, Mr. Scheibe reported that he does poorly on timed standardized tests, especially those requiring much reading. For example, although his ACT and SAT scores were not excellent, they were good enough to get him into a university. On the SAT, his verbal subtest score of 490 (55th %tile) was significantly lower than his mathematics score of 620 (75th %tile). He reported similar test results for the LSAT, GMAT, and MCAT in which scores were not excellent but good enough to get him into a program of study. Again, on these standardized tests Mr. Scheibe's verbal composite or subtest scores were significantly lower than other test composite or subtest scores.

Mr. Scheibe attended public school in central Wisconsin and reportedly did very well. His grades were above average throughout high school and his undergraduate studies. Reading and English were challenging for him compared to other classes, however he never received a grade lower than an A until he went to college. He attended Marquette University in Milwaukee Wisconsin. In 1991 he graduated with a Business degree in Accounting, obtaining GPA of approximately 3.5. After receiving his undergraduate degree Mr. Scheibe was admitted to law school, and completed a year and a half at Marquette before transferring to The University of Houston School of Law, completing his degree in 1994. He then worked for an accounting firm for three years and became cynical about the law. He decided that he wanted to help people in another way and, after rethinking his objectives in life, applied to medical school.

UT-Houston • 1300 Moursund • Houston, Texas 77030 • (713) 500-2500  FAX (713) 500-2530
Located in the Texas Medical Center

Exhibit No. 3

<u>Psychological Assessment</u>                                                        Page 2
Name:  Trenton Scheibe
Medical Record #:  201-03-84

With regards to medical history, Mr. Scheibe reported that when he experiences severe pain or stress his blood pressures drops and heart rate slows causing him to pass out.  This has occurred a few times and he remembers specific occurrences at the age of twelve years of age and during his undergraduate studies.  He recalled that he passed out when he was an undergraduate and was told that he had suffered a seizure.  No other major illnesses or medical conditions were reported, and there is no history of developmental delays or complication during pregnancy or delivery.

Mr. Scheibe indicated a family history of learning disabilities and ADHD.  He reported his brother was diagnosed with ADHD when he was young.  Mr. Scheibe's family lives in Wisconsin and he gets along well with all family members.  He is the only one in his family to finish college.  He is currently single and has never been married.  There is no reported history of alcohol or drug abuse, either in this individual or his family.

<u>Behavioral Observations</u>:  Mr. Scheibe arrived for testing on time and dressed casually and appropriately.  Rapport was easily established and he appeared to put forth good effort on tasks presented to him.  He was cooperative throughout testing, which was completed in two sessions.  These results are thought to accurately represent his current level of functioning.

<u>Tests Administered</u>:
Wechsler Adult Intelligence-Third Edition
Woodcock Johnson-III Test of Achievement
California Verbal Learning Test
Wechsler Memory Scale-Revised: Logical Memory and Visual Reproduction
Nelson-Denny Reading Test
Wisconsin Card Sorting Test
Personality Assessment Inventory
Raw and standard scores for all tests are included as an addendum to this report.

RESULTS

<u>Intellectual</u>:  On the WAIS-III, Mr. Scheibe obtained a Verbal IQ of 113 (High Average Range, 81st %tile), a Performance IQ of 124 (Superior Range, 95th %tile), and a Full Scale IQ of 119 (High Average Range, 90th %tile).  The difference between Verbal and Performance IQs is significant at the .05 level, although it occurs in 32% of the general population.  The difference is in the direction in which Mr. Scheibe reports difficulty, with non-verbally based skills better than verbally based skills.  His index scores were 114 (High Average Range, 83rd %tile) on Verbal Comprehension, 125 (Superior Range, 96th %tile) on Perceptual Organization, 125 (Superior Range, 96th %tile) on Processing Speed, and 119 (High Average Range, 90th, %tile) on Working Memory.  These scores indicate superior abilities in processing and organizing perceptual information, and performing mental operations quickly.  On the Verbal Scale he demonstrated a relative weakness in immediate auditory attention.  However, his performance

**Psychological Assessment**                                            Page 3
Name: Trenton Scheibe
Medical Record #: 201-03-84

on a more complex Wechsler task which measures similar cognitive functions was in the Very Superior Range (Letter-number sequencing).  This suggests that Mr. Scheibe may perform better when he is challenged.

Memory:  Memory for prose passages was in the Average Range both immediately following presentation and after a 30-minute delay.  Scores on a rote verbal memory test, which involves rehearsal, ranged from the Average to the High Average.  His learning curve was High Average and consistent with his Verbal IQ.  His recall and recognition of the test material following a 20-minute delay were perfect.  This pattern suggests that Mr. Scheibe has more difficulty with material presented in context than with rote memorization.  Although contextual memory may improve with rehearsal, his memory for the first presentation of the rote word list was still a standard deviation above that for the prose passage.  This pattern is consistent with the patient's report of difficulty with long complicated reading passages, such as medical vignettes.  Memory for visually presented geometric figures was in the Very Superior Range both immediately and following a 30-minute delay.  Again, this is consistent with his reported and measured pattern of non-verbal skills being significantly better than verbal skills.

Executive:  On the Wisconsin Card Sorting Test Mr. Scheibe's ability to utilize feedback to form and test hypotheses was excellent and consistent with his Performance IQ.

Academic:  Mr. Scheibe was administered the Woodcock Johnson Test of Academic Achievement.  On this test Mr. Scheibe's scores on subtests that required oral language and basic reading skills were significantly lower than on his other scores on subtests that required non-verbally based analytic skills or mathematical abilities.  For example, Mr. Scheibe's standard scores in Basic Reading and Oral Language were in the Average Range, whereas his Broad Math standard score was in the Superior Range, differing by more than a standard deviation.  In addition, his Basic Reading and Oral Language scores are more than a standard deviation below Mr. Scheibe's Full Scale IQ.  Specifically, Mr. Scheibe demonstrated a weakness in phonemic (speech sound) perception and generalization, as well as recognizing and utilizing common orthographic patterns (frequently occurring letter clusters).  This was especially apparent when it pertained to phonemic decoding in reading.  The above described patterns of 1) discrepancy between reading and language scores and measured cognitive ability, 2) a split between reading achievement scores and achievement scores in mathematics, and 3) weakness in the reading decoding, are often seen in individuals with a verbal learning disability.  In fact, schools often use discrepancies between achievement and measured cognitive abilities, similar to those exhibited by Mr. Scheibe, as the diagnostic criteria for learning disability in individuals with above average intelligence.

Mr. Scheibe was also administered the Nelson Denny test of reading ability.  This test was chosen for two reasons.  One is that it has normative data for individuals with Mr. Scheibe's educational level, and secondly, the Nelson Denny has a measure of reading rate that is can also be compared to highly educated individuals.  Because reduced processing speed is often the only residual of a reading disability in adults, a measure of this individual's reading speed was crucial.  On this task his vocabulary score was in the High Average Range, his Comprehension

**Psychological Assessment**
Name:  Trenton Scheibe
Medical Record #:  201-03-84

score, however, was in the Average Range, and his Reading speed score was in the Low Average Range.  The pattern suggests Mr. Scheibe was reading very slowly given his general abilities, and as a result, had some difficulty answering questions about the material read in a timed format.  Given Mr. Scheibe's intellectual ability, scores such as these usually represent a reading disability.

Personality/Adjustment:  Mr. Scheibe was administered the Personality Assessment Inventory and the profile obtained was valid.  The clinical profile reveals no elevations, which should be considered to indicate the presence of clinical psychopathology.

SUMMARY:  Mr. Scheibe is a very intelligent man whose testing profile suggests he is significantly better at processing visual material and mathematical concepts than he is at processing verbal material.  This pattern of discrepancy runs throughout the testing profile.  For example, although rote verbal memory is at expectation, Mr. Scheibe shows a weakness in contextual memory for verbal information when compared to his memory for visually presented material.  On academic testing Mr. Scheibe did relatively poorly on tests of reading and oral language skills, when compared to his concrete and abstract mathematic abilities and his non-verbal analytic abilities.  He had particular difficulty with phonemic perception and decoding.  In addition, he has a history of discrepancy between verbal and mathematical scores on standardized timed tests.  This pattern on neuropsychological and academic testing is typical of adults with reading disorders.  Given the above testing, Mr. Scheibe meets the DSM-IV criteria for reading disorder of "A. Reading Achievement as measured by individually administered standardized tests of reading accuracy or comprehension, substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education", and "B. The disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills"  (DSM-IV diagnostic code 315.0).

Recommendations:

1.  Mr. Scheibe should be allowed extended testing time when taking timed written tests.

2.  Mr. Scheibe will probably have to work harder to remember details learned in class especially if material is presented orally.  Careful note taking will be critical, and it may be helpful for him to compare his notes to those of his peers.  Review of formal written sources should compensate for weakness in oral language processing.

David Lachar, Ph.D.
Professor
Licensed Psychologist

# COGNITIVE SUMMARY SHEET – ADULT

Name:  Trenton Scheibe  
Age:  32  
Referral:  Daniel Creson, M.D., Ph.D.

Date: 09/21/01; 10/5/01  
Med. Rec. #: 201-03-84  
Examiner: Cynthia Gonzalez, M.A.

## Intellectual

| WAIS III | RS | ACSS |
|---|---|---|
| Vocabulary | 49 | 12 |
| Similarities | 28 | 13 |
| Arithmetic | 17 | 12 |
| Digit Span | 17 | 10 |
| Information | 21 | 13 |
| Comprehen. | 27 | 13 |
| Let-num Seq. | 18 | 18 |
| Pic. Comp. | 24 | 15 |
| Dig. Sim-Cod | 99 | 14 |
| Block Design | 45 | 11 |
| Matrix Rea. | 24 | 16 |
| Picture Arr. | 17 | 11 |
| Symbol Srch | 47 | 15 |
| Object Ass | | |
| VIQ | | 113 |
| PIQ | | 124 |
| FSIQ | | 119 |

| PPVT-R | RS | SS |
|---|---|---|

## Motor

| G. Pegs | RS | SS |
|---|---|---|
| Dom. | | |
| N. Dom. | | |
| Tapping | | |
| Dom. | | |
| N. Dom. | | |
| Grip | | |
| Dom. | | |
| N. Dom. | | |

## Visual/Constructional

Beery VMI  
VFD  
Hooper  
JLO

## Language

COWA  
Boston Nam.  
Token Test  
Spch Sds Per

## Memory

| WMS-R | RS | SS |
|---|---|---|
| LM I | 30 | 109 |
| LM II | 26 | 107 |
| VR I | 34 | 126 |
| VR II | 40 | 133 |
| CVLT | | |
| A  1-5 | 65 | 117 |
| 1 | 10 | 115 |
| 5 | 15 | 115 |
| B | 8 | 100 |
| A  SD/FR | 16 | 130 |
| SD/CR | 15 | 115 |
| LD/FR | 16 | 115 |
| LD/CR | 16 | 115 |
| Disc. | 100 | 100 |
| Other: | | |

## Executive/Attention

| | RS | SS |
|---|---|---|
| TMT A | | |
| TMT B | | |
| WCST | | |
| Cats. | 6 | 106 |
| Pers. Errors | 6 | 108 |
| % Pers. | 8.5 | 105 |
| FTMS | 0 | 109 |
| Stroop | | |
| C | | |
| W | | |
| C-W | | |
| Inter. | | |
| PASAT | | |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |

## Academic

| WRAT III | | |
|---|---|---|
| Reading | | |
| Spelling | | |
| Arithmetic | | |
| Nelson/Denny | | |
| Vocabulary | 74 | 115 |
| Comprehen. | 54 | 94 |
| Read Rate | 185 | 88 |

## Other

| Academic | SS | G-E |
|---|---|---|
| WJ-III | | |
| L-W Ident. | 102 | 17.3 |
| Pass. Comp. | 111 | >18.0 |
| Calc. | 124 | >18.0 |
| App. Problem | 123 | >18.0 |
| Writing Samp | 129 | >18.0 |
| Story Recall | 105 | 13.2 |
| Story R.Dela | 105 | |
| Under. Dir. | 99 | 10.4 |
| Read. Fluen. | 110 | >18.0 |
| Spelling | 118 | >18.0 |
| Word Attack | 97 | 8.6 |
| Editing | 116 | >18.0 |
| | | |
| Spell. Sound | 102 | 15.6 |
| Oral lang. | 101 | 11.8 |
| Broad Math | 125 | >18.0 |
| Writ. Expr. | 125 | >18.0 |
| Broad Write | 123 | >18.0 |
| Broad Read | 111 | >18.0 |
| Basic Read | 100 | 13.2 |
| Acad. Skill | 117 | >18.0 |
| Acad. Apps. | 121 | >18.0 |
| Phon/Graph | 99 | 11.0 |



*Copy*



# National Board of Medical Examiners®

3750 MARKET STREET, PHILADELPHIA, PA 19104

TELEPHONE (215) 590-9500

## -Confidential-

January 14, 2003

Trenton Scheibe
4715 Dunleigh Ct.
Sugarland, TX  77479

RE: **USMLE STEP 1 - 2003 and USMLE STEP 2 - 2003**

USMLE ID #: 5-058-603-1

Dear Mr. Scheibe:

We have received your request for test accommodations for **USMLE STEP 1 - 2003 and USMLE STEP 2 - 2003**:

Once our Registration Department verifies receipt of your application, we will begin to process your request.  At that time, we will review the documentation received with your request and will contact you if any additional information is necessary.  When the review is complete, we will advise you in writing of the decision.

**To protect your confidentiality, we do not provide information concerning the decision by telephone**.  However, if you have any other questions, you may call Disability Services at (215) 590-9869 or (215) 590-9549.

Sincerely,

Shelby R. Keiser
Manager, Disability Services

SRK/CM

**Exhibit No. 4**

RECEIVED

FEB 0 5 2003

## National Board of Medical Examiners
## Consultant Review Form

Disability Services

| | | | |
|---|---|---|---|
| **Consultant:** | Samuel O. Ortiz, Ph.D. | **Case Review Hours** | 3.0 |
| **Due Date:** | 04-Feb-2003 | **Conference Hours** | |

**Examinee:**  Scheibe, Trenton J.                    USMLE STEP 2- 2003

**ID Number:**  5-058-603-1

☐ Diagnosis is supported by documentation          ☒ Diagnosis is NOT supported by documentation.

☐ Accommodation is supported and justified.         ☒ Accommodation is NOT supported and justified.

Comments:

Report Case Review and Conference Hours.
Please fax to the NBME Office of Test Accommodations at
(215) 590-9422 by the Due Date shown above.

Exhibit No. 5

Date: 4 February 2003

To: Shelby Keiser

From: Samuel O. Ortiz

Re: Consultation Evaluation

This review concerns Trenton Scheibe, a medical student, who is requesting accommodations on Step 2 of the USMLE due to a learning disability ("Reading Disorder"). Mr. Wilson's specific request for accommodation is for extended time (double) in which to take the exam. Documentation provided in support of this request consists of a letter of application, a copy of a psychological evaluation conducted September-October, 2001 by Cynthia Gonzalez, M.A. and countersigned by David Lachar, Ph.D., and certification of prior accommodations from his medical school. No personal statement was included.

The claim for learning disability by Mr. Scheibe rests entirely upon the diagnosis rendered by Ms. Gonzalez and Dr. Lachar in their report of evaluation. Their claim is that there is sufficient evidence to support a diagnosis of reading disorder according to the criteria specified by DSM-IV under section 315.0. Even a cursory review of the data upon which these individuals based their opinion clearly indicates a substantial lack of understanding regarding the nature, evaluation, and identification of learning disability, significant and unsupportable conceptual errors in data interpretation, and evidence for confirmatory bias. Some of the more egregious errors contained in the report are described below.

It is stated that "the disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills." Yet, an examination of all of the individual's scores on the achievement tests administered to Mr. Scheibe reveal that not a single score falls outside the normal or average range of functioning compared to other people of the same age in the general population. Indeed, his lowest score was on the Nelson-Denny reading rate where he obtained a standard score of 88 (21st percentile rank). Given that the Nelson-Denny is at best, a screening instrument not a diagnostic test (because of its inherent unreliability; coefficient = .68), a score of 88 is hardly noteworthy, let alone indicative of any type of significant interference with reading. Moreover, Mr. Schiebe's other scores, including those for all areas related to reading, ranged from a "low" 97 (48th percentile rank) to a high of 129 (97th percentile rank). This indicates functioning that is at the very least "average" to well above average and occasionally superior. There is simply no reasonable way that it could be construed that there is evidence of a significant interference with academic achievement or activities of daily living that require reading skills. Indeed, the report is clear in that Mr. Scheibe's difficulties are quite narrowly defined in that he "has difficulty with timed exams" and "he does poorly on timed standardized tests." Learning disabilities, by definition are not constrained to limited, unique, or such idiosyncratic situational problems.

The report repeatedly ignores one of the components underlying all Learning Disorders as defined in DSM-IV which is that they are disorders or learning usually first diagnosed in

infancy, childhood, or adolescence. It is also noted that "Learning Disorders may persist into adulthood." This illustrates that learning problems have an identifiable pattern beginning in childhood and often still evident in adulthood. Yet, the report notes that although Mr. Scheibe's "ACT and SAT scores were not excellent, they were good enough to get him into a university." Moreover, he obtained scores on the LSAT that "were not excellent but good enough to get him into a program of study." Clearly, without even the benefit of any accommodations, Mr. Scheibe was not only successful on tests that require significant reading and other abilities by any measure, but perhaps he was even more successful than the average person who generally does not get into college, let alone graduate school, and later on medical school. Even in his formative years, the time period where learning problems in reading should have been most evident, it is noted that he had "no history of developmental delays" and clearly stated that "his grades were well above average throughout high school and his undergraduate studies." It is also noted that reading and English were "challenging" for him, yet "he never received a grade lower than an A until he went to college." This is evidence of academic functioning of the highest order and in no way is consistent with the basic nature of what constitutes a learning disorder, particularly as defined by DSM-IV.

The report attempts to ascribe great significance to the presence of a so-called "discrepancy" as the underpinnings of the diagnosis. In fact, it is not simply a single discrepancy that is examined and put forth to this effect, but rather multiple discrepancies. In one case, it is stated that "the difference between Verbal and Performance IQs is significant at the .05 level, although it occurs in 32% of the general population." Rather than dismissing the discrepancy as commonplace (after all, it occurs in nearly 1 out of every 3 people), it is presented as suggestive of a learning problem, particularly in reading or other verbal skills. The real conceptual error in the use of discrepancy can be seen in the statement that "his Basic Reading and Oral Language scores are more than a standard deviation below Mr. Scheibe's Full Scale IQ." This statement fails to account for the fact that Full Scale IQ is not perfectly correlated with any type of achievement. If it were, they would be the same thing and only in need of measurement once. It is in fact unreasonable to expect that IQ should accurately predict achievement because it accounts for no more than 25-35% of the total variance, at best. It cannot, therefore, be used as the "standard" by which to evaluate other test scores. Schools may indeed continue to rely on such discrepancy analysis but only because it's currently encoded into law. The fact remains that the practice has been thoroughly discredited in the literature and that its use as an indicator of learning disability wholly unwarranted.

There is a tendency to look at "relative" differences rather than normative differences which leads to numerous interpretive errors. For example, it is stated that Mr. Scheibe "demonstrated a relative weakness in immediate auditory attention." This claim is based on a scaled score of 10 for Digit Span (50th percentile rank). Not only does Digit Span not measure auditory attention, it is also well within the average range. To call it a weakness, even a "relative" weakness simply because it is lower than some of his other abilities is wrong. From a normative perspective, being at the exact middle of the average range simply cannot be construed as a weakness or dysfunction of any kind. Such a characterization is counter to the very definition of average or normal. In addition, there is no scientific reason why an individual's abilities should all be equally well developed. Rather, the data indicate that 97% of the general population has some type of difference between one ability and another. It is the rare

exception who has evenly developed abilities. Such "scatter" and differences, even significant differences in abilities, is the norm, not the exception and not suggestive of dysfunction. And finally, interpretation of single subtests is psychometrically indefensible. It was noted in the report that on another measure of short-term memory (what Digit Span actually measures), Mr. Scheibe performed within the "Very Superior Range." Rather than concluding that this ability shows no evidence of impairment, the report continues to suggest that this is an abnormality, which it is not.

Another type of discrepancy highlighted in the report involves comparisons between academic abilities. It was reported that Mr. Schiebe's scores on oral language and basic reading skills were lower than his scores on math tests. Again, there is a tendency to view this as abnormal when in fact, it is quite normal that an individual may be better at math than at reading. We often call these people mathematicians, not learning disabled.

The report seems to imply that he read "very slowly" because his general abilities were higher. It should be noted that his reading rate score of 88 (21st percentile rank) places Mr. Scheibe squarely within the average range. There is no reason to believe or expect that his reading rate should be equivalent to, let alone commensurate with his "general abilities." Nonetheless, such performance is well within the average range and does not imply dysfunction of any kind. Moreover, if reading speed were indeed a problem for Mr. Scheibe, it would most likely be reflected in tests of cognitive processing speed. Yet, his Processing Speed Index from the WAIS-III, a reliable indicator of processing speed, was 119 (90th percentile rank) and in the high average range of functioning. According to the report, this indicates "superior abilities in processing and organizing perceptual information, and performing mental operations quickly." If Mr. Scheibe is indeed a slow reader, it is apparently due to factors other than his underlying cognitive skills and most assuredly not the result of any type of learning disability.

Although Mr. Scheibe states that he is a very slow reader, the data suggest that his ability to On page three of the report, there are three patterns put forth as evidence of a learning disability. The first relates to the discrepancy between reading and language scores and measured cognitive ability. I have already discussed the error in this reasoning above. The second pattern concerns the split between reading achievement scores and achievement scores in mathematics. I have likewise addressed the fallacy of such statements in the preceding paragraphs. The third pattern involves weakness in reading decoding which is tied to possible "verbal learning disability." Yet, the "weakness" that is being referenced involves standard scores of no less than 97 (48th percentile rank). Performance that is as good or better than nearly half of all people in the general population seems a poor foundation for describing it as a "weakness." Clearly, the three patterns put forth in the report as suggestive of learning disability are nothing more than errors in logic, interpretation, and conceptualization. The only reasonable conclusion that can be drawn from these data patterns is that Mr. Scheibe is a competent, normal, average reader with abilities that range from average to high average and occasionally superior.

In sum, the interpretations offered in the report are rather piecemeal, linear, unsystematic, and based on a host of errors in conceptual logic and procedural validity. When viewed from a holistic perspective there are several important findings that are evident in the submitted documentation: a) no evidence of any type of cognitive impairment or dysfunction of any kind is

seen in any of the data contained in the evaluation; b) no evidence of any type of impairment or dysfunction in academic skills or knowledge is found in the data contained in the evaluation; c) there is no clear or documented history of difficulties in the development and acquisition of academic skills in the formative and even later years of schooling; d) there is a consistent and impressive record of academic achievement and school-related success including performance on timed tests involving reading (e.g., SAT, MCAT, LSAT) even without the benefit of any type of accommodation; and e) there is no indication in the submitted documentation that Mr. Scheibe has any impairment or dysfunction (significant, mild, or otherwise) that affects his ability to adequately and successfully complete any daily activities that may involve reading.

All of Mr. Scheibe's scores (both cognitive and academic) are well within normal limits and the fact that some of his abilities are very well developed while one of them is "merely" average does not support a diagnosis of learning disability.  In the final analysis, the most reasonable conclusion that can be made from the available data and documentation is that Mr. Scheibe is a competent and capable learner who is currently performing in a manner that is comparable to and sometimes better than that of his same age peers in the general population. There is simply no evidence here that his recent (within the last two years) and apparently unique and specific inability to do well on standardized tests under timed conditions is something that could be reasonably construed as a disability. It is more likely that other factors are responsible for his apparent problems in this very circumscribed area of functioning.

Therefore, based on the data available in this case, I am of the opinion that a diagnosis of learning disability cannot be supported. There is no evidence of intrinsic cognitive dysfunction and no evidence of any type of academic dysfunction. At times and under certain circumstances Mr. Scheibe may read slowly, but he is not an impaired reader. As such, in the absence of any additional evidence or data to support his claim, it is my opinion that Mr. Scheibe's request for accommodations are not justified and should therefore be denied.



# National Board of Medical Examiners®

3750 MARKET STREET, PHILADELPHIA, PA 19104

TELEPHONE (215) 590-9500

Tel. (215) 590-9869 / Fax (215) 590-9422

**CONFIDENTIAL**

March 24, 2003

Trenton Scheibe
4715 Dunleigh Ct.
Sugarland, TX  77479

RE:   **USMLE STEP 1 - 2003**
      **USMLE STEP 2 - 2003**

USMLE ID #: 5-058-603-1

Dear Mr. Scheibe:

We have carefully reviewed your request for test accommodations for the **USMLE STEP 1 - 2003 and USMLE STEP 2 - 2003,** and accompanying material in accordance with USMLE guidelines for examinees with disabilities and within the framework of the Americans with Disabilities Act (ADA).  We consulted an impartial expert in the field of learning disabilities to assist us in reviewing the documentation.

Your evaluators, Ms. Cynthia Gonzalez and Dr. David Lachar, assign you a diagnosis of Reading Disorder according to your 2001 evaluation.  Dr. Lachar appears to base this diagnosis on a discrepancy between your average scores in Basic Reading and Oral Language and your superior range scores in Broad Math on the Woodcock-Johnson, Revised (WJ-R). However, analysis of the data provided in Dr. Lachar's report indicate that your performance on the WJ-R fall in the average to superior range. Similarly, your performance on the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) falls within the average to superior range. While relative differences may exist in your scores, they are well within the range of average functioning and do not rise to the level of a substantial impairment.  Indeed, our consultant points out that most people do not have evenly developed abilities and that the presence of variability among scores does not in itself indicate a disability.

Currently validated theories and research do not support using a discrepancy model as the sole basis of a diagnosis or rationale for accommodations.  Professionally recognized diagnostic standards for a learning disability presume the existence of an underlying central nervous system dysfunction which is reflected in normative deficits in cognitive functioning and in related areas of academic functioning.  The clinical data presented in your documentation do not demonstrate cognitive or academic deficits that substantially impair your ability to read and learn.  Instead, your documentation indicates your performance on a range of cognitive and academic tasks is in the range of average to well above average.

**Exhibit No. 6**

Trenton Scheibe
Page 2

Learning difficulties of sufficient severity to substantially compromise reading and learning are generally recognized as being developmental in nature. Consequently, it is expected that chronic and pervasive difficulties with learning will emerge during childhood. Individuals with learning disabilities typically present a long history of academic difficulties and poor achievement dating back to elementary school. Additionally, the DSM-IV diagnostic criteria include the requirement that the disturbance "significantly interfere with academic achievement." While your documentation states that you are a slow reader and have difficulty with timed exams, you have not provided any original school records verifying childhood learning problems and accommodations for classroom instruction or on typical standardized achievement tests or other standardized examinations. Additionally, you have not submitted a personal statement describing your academic performance difficulties and your documentation does not provide an objective description of any current academic and functional problems that would rise to the level of a disability and substantially limit your access to USMLE.

The Americans with Disabilities Act covers individuals who have established the existence of a substantial impairment in one or more major life activities as the result of a disability. Accommodations are intended to provide equal access to the USMLE testing program for individuals who are covered under the ADA. It would be contrary to the concept of fair and equal access embodied in the Americans with Disabilities Act to provide you with test accommodations since the information you provided does not demonstrate that you have a diagnosed disability that substantially impairs your ability to read and learn. Therefore, after a careful review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Registration to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call the Registration Department directly at 215-590-9700 with any questions about your scheduling permit.

Sincerely,

Carol Morrison Featherman, Ph.D
Assistant Vice President, Examinee Support Services

CMF/sc

# UNITED STATES MEDICAL LICENSING EXAMINATION™ (USMLE™)

### Step 1 and Step 2 Clinical Knowledge
### Applicant's Request for Test Accommodations

RECEIVED

OCT 2 5 2004

Disability Services

---

**You MUST provide supporting documentation verifying your functional impairment.**
**In order to document your need for accommodation as completely as possible, please attach:**

- Evaluation reports of appropriate professionals printed on letterhead and signed by the evaluator(s)
- Primary documentation (report cards, teacher notes, behavioral observations, medical records, lab reports, etc.)
- A personal statement describing your disability and it's impact on your daily life and educational functioning. Do not confine your comments to standardized test performance; rather discuss your overall functioning.

---

**Please note:** NBME will acknowledge receipt of your request and audit your request for completeness. Submission of incomplete or illegible request forms and/or insufficient supporting documentation will slow the processing of your request. You may be asked to complete your request in a timely manner by submitting additional documentation.

Information regarding the granting or denial of test accommodations will not be released via telephone. All official communications regarding your request will be made in writing. Should you wish to modify or withdraw a request for test accommodations, please contact Disability Services at 215-590-9869.

---

**Please type or print.**

Accommodations are requested for the following Step examination (Use a separate form for each exam):

☐ Step 1    ☒ Step 2 Clinical Knowledge    ☐ Step 2 Clinical Skills    Year: _2004_

## Section A: Biographical Information

1. Name: _SCHEIBE_ _TRENTON_ _T_
   Last       First       Middle Initial

2. Gender: (Male)    Female

3. Date of Birth: _12/19/68_

4. SS# _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_
   (if known)

5. USMLE # _5-058-603-1_

6. Address: _1529 N PEACH AVE._
   Street
   _MARSHFIELD_      _WI_      _54449_
   City      State/Province      Zip/Postal Code
   _UNITED STATES_
   Country
   _715-387-3227_
   Daytime Telephone Number

   Alternate Telephone Number

   E-mail address
   _trentscheibe @ hotmail.com_

7. Medical School: _UNIVERSITY OF TEXAS - HOUSTON_

**(Over)**

Exhibit No. 7

## Section B: Nature of Disability

8. Indicate the nature of the disability and the year it was first professionally diagnosed (select all that apply):

**Sensory Impairments:**

☐ Hearing Disability _____     ☐ Visual Disability _____

**Learning Impairments:**

☒ Reading Disability _2001_     ☐ Writing Disability _____

☐ Mathematics Disability _____     ☐ Other: _____

**Language Impairments:**

☐ Receptive Language Disorder _____     ☐ Expressive Language Disorder _____

☐ Mixed Receptive/Expressive Language Disorder _____     ☐ Other: _____

**Medical Impairments:**

☐ Mobility/Motor _____     ☐ Diabetes/Thyroid Dysfunction _____

☐ Epilepsy/Neurological _____     ☐ Other: _____

**Mental Health /Executive Function Impairments:**

☐ Anxiety Disorder _____     ☐ Mood Disorder/ Depression _____

☐ Attention Deficit Hyperactivity Disorder _____     ☐ Other: _____

## Section C: Accommodations Information

10. What accommodation(s) are you requesting? Accommodation(s) must be appropriate to the disability:

_ADDITIONAL   TESTING   TIME – DOUBLE   TIME_ _____

_____

_____

11. If you are requesting additional testing or break time, please indicate the amount of time requested (circle no more than one per Step).

**STEP 1:**

☐ Additional Break Time over 1 day     ☐ Additional Break Time over 2 days

☐ Additional Testing Time – Time and one-half     ☐ Additional Testing Time – Double Time

☐ Other (please specify): _____

(Continued on the next page)

2

**STEP 2:**

☐ **Additional Break Time over 2 days**          ☐ **Additional Testing Time – Time and one-half**

☒ **Additional Testing Time – Double Time**

☐ **Other (please specify):** _____

12. Do you require wheelchair access at the examination facility?

☐ **yes**                    ☒ **no**

If you require an adjustable height table, please indicate the number of inches from the floor: _____

## Section D:  Accommodation History

13. Prior classroom or test accommodations that you have received:

A.  **Standardized Examinations**                    ☐ **yes**          ☒ **no**

        **Medical College Admission Test (MCAT):**

        **Month/Year** _____

        **Accommodation received** _____

        **(If extra time, note amount given _____)**

        **Other:**

        **Month/Year** _____

        **Accommodation received** _____

        **(If extra time, note amount given _____)**

B.  **Medical School**                    ☒ **yes**          ☐ **no**

        Accommodation received *DOUBLE    TESTING   TIME*

        Date Approved *MARCH   2002*

        **If yes, have an appropriate official at your medical school complete the Certification of Prior Test Accommodations form.**

C.  **College**                    ☐ **yes**          ☒ **no**

        If yes, accommodations received _____

D.  **Secondary or elementary school**          ☐ **yes**          ☒ **no**

        If yes, accommodations received _____

**(Over)**

3

**14. Authorization:**

I authorize the National Board of Medical Examiners ( NBME) to contact the entities identified in Section D of this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain any or all of the following: confirmation, clarification, and/or further information. I authorize such entities and professionals to provide NBME with all requested confirmation, clarification and further information.

Signature: _____   Date: _10/19/04_____

---

**Mail your completed questionnaire and documents to:**

**Students / Graduates of US & Canadian Medical Schools**
**Testing Coordinator, Disability Services, National Board of Medical Examiners,**
**3750 Market Street, Philadelphia, PA 19104-3190.**
**215-590-9869**

**Students / Graduates of International Medical Schools**
**Test Accommodations Coordinator, Educational Commission for Foreign Medical Graduates**
**3624 Market Street, Philadelphia, PA 19104 USA.**

**Please keep a copy of your completed request form for your records.**

---

4

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL
COMBINED MEDICAL RECORD**
MARSHFIELD, WISCONSIN 54449

MHN: 264213                          Facility: Marshfield Center

Patient: Trenton James Scheibe                                    Printed: 10/04/04
Gender: Male    Birthdate: 12/19/1968                              At:     08:09
Clinic Correspondence (History)
Service: 08/13/2004
Fred W Theye PHD                                                    **\* COPY \***

                                                        **RECEIVED**

August 25, 2004                                         **OCT 2 5** 2004

Mr. Trenton James Scheibe                               **Disability Services**
1529 N Peach Ave
Marshfield, WI 54449

Clinic Chart #264213

Dear Mr. Scheibe:

Thank you for allowing me to participate in your care.

Please find enclosed a copy of your Neuropsychology Report.

If you have any questions concerning the report, please feel
free to contact me at the Clinic.

Sincerely yours,

Fred W. Theye, Ph.D., ABPP/CN
Neuroscience Department of Marshfield Clinic

FWT:rs

Enclosure

                Electronically signed by Fred W Theye PHD on 09/17/2004.

                                                        **Exhibit No. 8**

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL
COMBINED MEDICAL RECORD**
MARSHFIELD, WISCONSIN 54449

MHN: 264213                           Facility: Marshfield Center

Patient: Trenton James Scheibe                                           Printed: 10/04/04
Gender: Male    Birthdate: 12/19/1968                                    At:    08:09
Clinic Office Note
Service: 08/13/2004
Fred W Theye PHD                                                         **\* COPY \***

This 35-year-old physician was self-referred to evaluate his
difficulty with the USMLE (United States Medical Licensing
Examination).  It is his report that with the recent change to test
being administered on computer, and the increasing length of the
examination, he is not able to successfully complete the examination
in the allotted time because of a previously diagnosed reading
disorder.

The patient provided considerable collateral history.  Two of these
items are of significant interest:

    - An assessment by the University of Texas Health Science
Center in the fall of 2001.  He was evaluated carefully by David
Lachar, Ph.D., and felt to demonstrate clear evidence of a reading
disorder in accordance with DSM-IV diagnostic code of 315.0.  In his
summary, Dr. Lachar noted that Mr. Scheibe did "relatively poor on
tests of reading and oral language as compared to his concrete and
abstract mathematic abilities and his nonverbal analytical
abilities."  He had particular difficulty with phonemic, perception
and decoding.  In addition, he has a history of discrepancy between
verbal and mathematical scores on a standardized timed tests.

    - He provided certification of prior test accommodations by
the University of Texas-Houston Medical School of extended time.
These accommodations were noted to be in place in March of 2002.The
"double time" extension allowed for successful completion of this
exam.

Despite these reports, we reviewed a letter from the National Board
of Medical Examiners from March of 2003 denying his request for
accommodations.  This letter suggests that, "Although relative
differences may exist in your scores, they are well within the
average range of functioning and do not rise to the level of a
substantial impairment.  Indeed, our consultant points out that most
people do not have evenly developed abilities and the presence of
variability among scores does not in itself indicate a disability."

This note goes on to state the following:  "While your documentation

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL**
**COMBINED MEDICAL RECORD**
**MARSHFIELD, WISCONSIN 54449**

MHN: 264213
Patient: Trenton James Scheibe
Clinic Office Note, Page 2                                    **\* COPY \***

states you are a slow learner and had difficulty with timed exams,
you have not provided any original school records verifying
childhood learning problems and accommodations for classroom
instruction or on typical standardized achievement tests or other
standardized examinations. Additionally, you have not submitted a
personal statement describing your academic performance difficulties
and your documentation does not provide an objective description of
any current academic or functional problems that would rise to the
level of a disability and substantially limit your access to the
USMLE."

As part of this examination, we did review the "childhood"
standardized achievement tests of Mr. Scheibe. These examinations
were all done while a student at the Marshfield Public Schools in
Marshfield, Wisconsin.

    - As a seventh grader, his performance on the Stanford
Achievement Test shows reading comprehension at the 92nd percentile,
math concepts at the 92nd percentile, math computation 99th
percentile, math application 94th percentile, spelling 60th
percentile, language 90th percentile, social studies 89th
percentile, science 80th percentile. Total reading was at the 84th
percentile, while total math was at the 99th percentile. From our
perspective, it is interesting to note that spelling scores were
certainly a notable "weakness" falling "only" at the 60th
percentile. Additionally, there is a 15 percentile difference
between "total reading" and "total math."

    - In fact, we reviewed standardized achievement tests from
first, second, and third grades. At that time, based on estimates
of general intellectual functioning, a reasonable expectation would
be that abilities would be at or above the 90th percentile. In
first grade, reading was at the 72nd percentile, second grade 82nd
percentile, and third grade at the 66th percentile. Clearly, the
discrepancy between expected versus achieved levels of mastery
existed from primary grades, and continued to be seen throughout his
educational programming.

Review of the high school records also revealed that this was a
gentleman who had a remarkable work ethic. He remained involved in
many extracurricular activities. He was a productive high school
student despite his difficulties with reading, and graduated sixth
in his class of 261.

MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL
COMBINED MEDICAL RECORD
MARSHFIELD, WISCONSIN 54449

MHN: 264213
Patient: Trenton James Scheibe
Clinic Office Note, Page 3                                    **\* COPY \***

He matriculated to Marquette University where he completed an
undergraduate degree in Business Administration. He was then
admitted to the law school at Marquette where he completed that
program. He did not, however, successfully complete the bar exam
despite three attempts. He then desired a career change, and entered
School of Medicine at the University of Houston, Texas, in 1977.

At UT, he did well in basic science curriculum except for histology,
neuroscience and pharmacology where he earned marginal performance
grades. These were remediated to a passing level. He then entered
his clinical medicine rotation, and he earned a high pass in this
program. We reviewed notes from his clinical clerkships, and all
noted outstanding work ethic, described him as attentive, reliable,
competent, and well organized.

As a result of failing to pass the standardized board exam for the
Internal Medicine Clerkship, he was asked to repeat his third year of
clerkship in its entirety. He was the granted double testing time on
the final examination- per a note from Dr. Mercer dated 12/19/01-and
with this accomodation successfully passed the examination.

The patient reports that throughout his educational career, he has
developed a number of compensatory strategies to accommodate his
self-reported "slow reading rate." For example, with pencil and
paper tasks he was able to read, underline and make notes in
margins, which allowed him to complete the examination. He is not
able to use these adaptive strategies, of course, now that the test
is computer-based. He notes significant eye strain when looking at
a computer for eight hours. He notes the vignettes have increased
in length with no corresponding increase in additional time to
complete the examination.

The patient also reports a family history of language-based learning
disabilities as well as ADHD. Per his report, his brother has been
identified as having an exceptional educational need.

NEUROPSYCHOLOGICAL EXAM: This is a pleasant gentleman who presented
on time. His speech is clear and linear. He is well-oriented. It
is felt that he was able to provide us with a very reliable and
valid neuropsychologic profile.

We did not readminister tests of general intellectual functioning.
The patient's history has a number of instances where his general
intellectual skills have been measured, and they have consistently

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL**
**COMBINED MEDICAL RECORD**
**MARSHFIELD, WISCONSIN 54449**

MHN: 264213
Patient: Trenton James Scheibe
Clinic Office Note, Page 4                                          **\* COPY \***

demonstrated overall abilities near the 90th percentile.

We did an examination of his reading skills on several measures.

On the Woodcock-Johnson Achievement Test-III, his scores were as follows:

| TEST | PERCENTILE | GRADE EQUIVALENT |
|---|---|---|
| Letter-Word Identification | 63 | >18.0 |
| Reading Fluency | 54 | 11.9 |
| Math Fluency | 80 | >18.0 |
| Spelling | 84 | >18.0 |
| Writing Fluency | 95 | >18.0 |
| Passage Comprehension | 85 | >18.0 |

This profile is remarkable for a measure of difficulties with reading fluency - relative to his other domains. As can be seen, reading fluency was "only" at the 54th percentile, which would translate into a grade equivalent performance of a high school junior. In sharp contrast, all other measures were at or above the 80th percentile, and consistent with estimates of general intellectual functioning.

He was also given the WIAT-II to measure single word recognition, reading comprehension and reading speed.

| TEST | STANDARD SCORE | PERCENTILE |
|---|---|---|
| Word Reading | 111 | 77 |
| Reading Comprehension | 114 | 82 |
| Reading Speed | 2nd quartile | |

The results from the Woodcock-Johnson and WIAT are concordant with those obtained from the Nelson-Denny Test administered at the University of Texas. His reading rate, on that instrument, yields a standard score of 88, which would place him below the 34th percentile.

We also attempted to assess the eidetic versus the phonetic components to the reading process utilizing the Boder Test of Reading-Spelling Patterns. Unfortunately, we were not able to establish enough words outside of his single word recognition skills to provide a valid assessment.

IMPRESSIONS: This is a 35-year-old gentleman who has completed

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL**
**COMBINED MEDICAL RECORD**
MARSHFIELD, WISCONSIN 54449

MHN: 264213
Patient: Trenton James Scheibe
Clinic Office Note, Page 5                                                  **\* COPY \***

medical school. He was self-referred to evaluate prior history of a
reading disorder. We conducted an extensive review of his academic
history and results of neuropsychologic evaluation conducted in
2001. Today's findings are consistent with previous findings that
he does meet full diagnostic criteria for a reading disorder (315.0)
in that his reading achievement, specifically speed, reflected by
individually administered tests, falls substantially below that
expected for his measured intelligence and age appropriate
education. This disorder did interfere with academic achievements;
in fact, he was accommodated by additional time on testing for the
last two years of medical school training. A careful review of his
achievement tests while in elementary school continued to show the
discrepancy between skills in reading as reflected by group
achievement tests and between skills and measures of general
intellectual functioning.

RECOMMENDATIONS: Results were reviewed with Mr. Scheibe. I
indicated to him that I felt, to a reasonable degree of
neuropsychological certainty, his reading disorder should be
accommodated under the Americans with Disabilities Act. It is
reasonable to conclude, based on all the test results and review of
his academic history, that his reading disorder has significantly
interfered with both his academic and professional achievement.

His reading disorder is a significant impairment and will likely have
a profound impact on his successful completion of time exams. This
is especially true for exams entailing significant amount of reading
like that found in the USMLE. Therefore, it is my professional
opinion that in light of the fact that the USMLE is given on
computer, and therefore does not allow for the use of adaptive
strategies he has developed over the course of his academic life
( e.g. underlining, notetaking, outlining), that double time to take
the test is a reasonable accomodation request as per the Americans
with Disabilities Act.

The patient asked for a copy of this report, and will submit it for
consideration to the National Board of Medical Examiners.

TOTAL TIME: Includes time reviewing the chart and histories,
neurobehavioral questionnaires, testing and scoring, exit interview,
dictation and collateral contacts: 3 hours.

DIAGNOSIS:
    1. Reading disorder.

**MARSHFIELD CLINIC/SAINT JOSEPH'S HOSPITAL**
**COMBINED MEDICAL RECORD**
MARSHFIELD, WISCONSIN 54449

MHN: 264213
Patient: Trenton James Scheibe
Clinic Office Note, Page 6

**\* COPY \***

Fred W. Theye, Ph.D./rs
Department of Clinical Neuropsychology

CC:  Mr. Trenton James Scheibe
     1529 N Peach Ave
     Marshfield, WI 54449

Dictated 8/23/2004

Created 8/25/2004

          Electronically signed by Fred W Theye PHD on 09/17/2004.

October 19, 2004

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RECEIVED

OCT 2 5 2004

Disability Services

RE:     USMLE STEP 2 Clinical Knowledge – 2004
        Request for Accommodation

Dear National Board of Medical Examiners,

I am writing this letter in support of my request for accommodation on the United States
Medical Licensing Examination (USMLE) Step 2 Clinical Knowledge exam.   Based on
the enclosed documentation and in accordance with the Americans with Disabilities Act,
I believe my professionally diagnosed "reading disorder" supports an accommodation of
"double time" on the exam.

In addition to childhood test results, transcripts, and two independent sets of
professionally administered testing results, this letter is submitted as a personal testament
of my disorder and its effects on my academic and professional achievement and
advancement.

First and foremost, I have always been aware that I was a very slow reader.  I was never
"professionally" diagnosed until much later in life, but from an early age I easily
recognized that it took me longer to read passages in the classroom than other students.
In elementary school the teacher would have the class read silently to ourselves, and then
would ask, "Who needs more time?"  I was undoubtedly one to always raise my hand for
more time.  Consequently, because I am an individual who always strives to do my best, I
attempted to push myself to read faster, but I found that the faster I read, the less I
remembered.  When called on in class to answer questions about a reading passage, I
would get many of the questions wrong.  As a result, I tended to avoid answering
questions about reading passages while in class.  Also, I tried to circumvent the problem
by working harder and reading ahead in workbooks at home so that I would be familiar
with the material when we would read it in the classroom.

When I started taking standardized tests in grade school at the end of the academic year, I
vividly remember not completing the tests.  I especially had difficulty with parts of the
exam which entailed reading long passages and answering content related questions
about the passage, for example, deciding what an appropriate title of the passage would
be.  Often I had to read passages several times.  With my frustrations of not finishing
these exams, especially in light of comments by my classmates that they had no problems
finishing the exams, I quickly made adaptations to my reading and test taking skills to try
and improve my reading speed and comprehension in testing situations.

Exhibit No. 9

I first started by using my finger or pencil to track sentences as I read. Then I incorporated underlining, circling, note taking and outlining into my strategies. With these adaptive strategies I could review the passage before answering a question. This saved me the time of having to reread the entire paragraph word for word. Of course, as I progressed in school, I learned about other test taking strategies from books and teachers such as reading the first and last sentence of a paragraph first to get an idea of the paragraph's content, reading the question stem and answers to direct my attention to key concepts, etc. When I was a freshman in high school I even attempted a speed reading course at the local Technical College to help me with my reading speed and comprehension. As my homework load increased and my spare time decreased due to my involvement in many extracurricular activities, I was hoping the speed reading course would help me to more efficiently use my time. However, the course only served to frustrate me more due to my inability to actually increase my reading speed, and it made me more aware and self conscious of my slow reading speed.

Through hard work and determination to succeed, I developed these strategies on my own. No one ever knew about my reading disorder and for the most part, I kept it a secret, aside from an occasional stray comment from myself that I did not have enough time to finish a test or that I was not finished reading a passage or text when others were simultaneously reading the same text. For the most part, the combination of my hard work and my adaptive strategies worked to my benefit throughout grade school, middle school, high school and college and through my career right into medical school. I was able to compensate for my reading disorder, that is, as long as I had enough time and the right resources to implement them.

However, now I find myself in a situation were all of my adaptive skills and strategies to overcome my reading disorder have been removed and other obstacles have been added to complicate matters. First, the USMLE is now on computer, so my ability to underline, circle, note take and outline is no longer possible. Second, the exam is at least eight hours long, and I find my eyes become very fatigued staring at the computer screen for this length of time. This fatigue compounds my problems because my reading speed slows even more and my comprehension declines. Additionally, with the test's approach of using longer and longer clinical vignettes, it is generally not possible for me to read a passage just once to answer a question. I almost always have to read every passage and question twice, and even then, by not being able to underline or circle, my comprehension is still limited by the time I attempt to answer the question. This, of course, adds to the amount of time I need to answer each question, time which the USMLE, as it is currently administered, does not allow for.

Throughout my education and work experience, I have generally been able to adapt my strategies to compensate for my reading disorder to an extent that allowed me to continue my success and to advance in my education and career. That is, however, until I graduated from law school and was faced with the insurmountable task of passing the Texas bar exam.

As with the USMLE, I believe my difficulties with the Texas bar exam are directly correlated to my reading disorder. Like the USMLE, the Texas bar exam is a standardized exam with questions presented in lengthy vignette format. Also, similar to my success in medical school, yet failure with the USMLE, I was very well prepared for the bar exam, yet was unable to pass the exam on three separate occasions. The similarities with my success with law school courses as well as with medical school courses in conjunction with my inability to pass either vignette style exam are obviously directly correlated to my reading disorder.

I believe my educational and test taking history in conjunction with the professional testing I have undertaken, clearly show that I suffer from a significant impairment when confronted with standardized exams with severe time constraints and information presented in a vignette format requiring significant amounts of reading. Though I am intelligent and well educated, my disorder is clearly exposed when confronted by the USMLE, and therefore, is a major limitation in my professional advancement. Currently, my disorder has prevented me from becoming licensed as an attorney, and has now delayed my medical training by at least three years. Additionally, due to state requirements for licensure and limitations regarding the number of attempts an individual can make on each step, I am now no longer eligible to practice medicine in several states. And, without the appropriate accommodation, future unsuccessful attempts will add more states to the list of places I am not eligible to practice medicine.

Although not as evident early on in my academic history, my disorder became a very evident problem in medical school as I reached my clinical rotation years. At the end of each rotation, a Board of Medical Examiners produced standardized test was given. These tests had two hour time constraints. My scores on the tests were consistently at the bottom of the class. Yet, my clinical skills assessments, which included an assessment of my medical knowledge base, where consistently near the top of the class. Thus, though I performed poorly on these standardized tests, I generally met the minimum requirements necessary to advance to the next level in medical school. That is, however, until my Internal Medicine rotation.

During my three months of Internal Medicine, I performed very well and received high marks. On the board exam, however, I scored below passing. Upon completing a remedial month of Internal Medicine, I retook the two hour standardized exam and again scored below passing. As a result of failing the exam a second time, I received a failing grade in the course, and I had to repeat all three months of the clerkship. At that time, I informed my Dean and Professors of my difficulty with successfully finishing the tests due to my slow reading and lack of enough time to properly finish the exam. After reviewing the big discrepancy in my test scores and clinical assessments, the Dean suggested professional testing, and a "reading disorder" was professionally diagnosed for the first time. As a result, the medical school granted me "double time" accommodation to take the Internal Medicine exam, and I finished the exam and scored a passing mark.

Without accommodation, the time constraints and individual question length on the USMLE Step 2 is an impossible hurdle for me to overcome. In light of this exam format

**4**

and in conjunction with my reading disorder, I contend that I meet the ADA definition of "significant impairment." The current time allotments of the exam and media on which it is administered are just simply too extreme an obstacle for me to overcome given my reading disorder.  All I am asking for is "equal" access to the exam.  I am simply requesting an opportunity to fairly prove I have the qualifications to move forward with my training.  The enclosed documentation supports my request.  As a result, I request accommodation of "double time" on the USMLE Step 2 Clinical Knowledge exam under the Americans with Disabilities Act.

Sincerely,

Trenton J. Scheibe