Case: 3:05-cv-00180-bbc   Document #: 27   Filed: 03/20/06   Page 1 of 8

Document Number  Case Number
05-C-0180-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
03/20/2006 04:37:41 PM CST

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

---

TRENTON SCHEIBE,

    Plaintiff,

v.              Case No. 05-C-180-C

NATIONAL BOARD OF MEDICAL EXAMINERS,

    Defendant.

---

### DEFENDANT NATIONAL BOARD OF MEDICAL EXAMINERS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Submitted by:

Thomas R. Crone
State Bar No. 1017265
Michael P. Gallagher
State Bar No. 1047771
Melli, Walker, Pease & Ruhly, S.C.
Ten East Doty, Suite 900
P.O. Box 1664
Madison, WI  53701-1664
(608) 257-5812

Attorneys for Defendant
National Board of Medical Examiners

March 20, 2006

INTRODUCTION

The National Board of Medical Examiners ("NBME") submits this reply brief in support of its Motion for Summary Judgment. For the reasons stated, *infra*, and in its January 12, 2006 Brief and supporting affidavits, the complaint should be dismissed in its entirety.

ARGUMENT

I. ASSERTED DISCREPANCIES BETWEEN SCHEIBE'S READING ABILITY AND HIS GENERAL OVERALL INTELLECTUAL ABILITIES DO NOT ESTABLISH THAT HE HAS A DISABILITY WITHIN THE MEANING OF THE ADA.

The sole basis advanced by Scheibe's experts for claiming Scheibe has a disability is the discrepancy between his reading scores and his other test scores or academic achievement. [Affidavit of Frederick W. Theye, ¶2 ("his reading achievement, specifically speed, *reflected by individually administered tests*, falls substantially below that *expected for his measured intelligence and age appropriate education*.") (emphasis added)][1] That, of course, is not the proper standard for purposes of determining if Scheibe has a disability within the meaning of the Americans with Disabilities Act ("ADA").

The issue in determining disability under the ADA is whether Scheibe is substantially limited in a major life activity – not whether he is somewhat better at math than he is at reading. The relevant comparison is not to Scheibe's other academic proficiencies, but to Scheibe's reading ability compared to the reading abilities of most people or the average person in the general population. *See Gonzales v. National Board of Medical Examiners,* 225

---

[1] Scheibe did not include proposed Findings of Fact in his submission as required by the Court's rules. As such, Defendant's references to Scheibe's submissions are to the two affidavits he submitted with his brief.

F. 3d 620, 629-30 (6th Cir 2000); *Price v. National Board of Medical Examiners,* 966 F. Supp. 419, 427-28 (S.D.W.Va. 1997); [see also Defendant's Brief at 6-11]

It is undisputed that all of Scheibe's reading test scores place him in the "Average range or higher" in comparison to the general population. [FOF ¶¶38, 64, 74 & 89-97; see also Defendant's Brief at 11-16][2] Whether or not Scheibe's reading scores are significantly below those of his math scores or overall measured intelligence (the sole criterion used by both of Scheibe's experts) is, for purposes of an ADA analysis, irrelevant. *Gonzales,* 225 F. 3d at 629-30; *Price,* 966 F. Supp. at 427-28. In any case, as Scheibe's own expert admits, the discrepancy model "has been called into question, and as a definitional model it is incomplete." [Theye Affidavit, Exhibit 3, p. 2] The fact that a discredited test may have been in use for two decades and is still used by many practitioners does not make it reliable or appropriate.

In his brief, Scheibe simply ignores the authorities cited by the NBME (*Gonzales, Price, Wong v. Regents of the University of California,* 410 F. 3d 1052 (9th Cir 2005)), relying instead on the Second Circuit's decision in *Bartlett v. New York State Board of Law Examiners,* 226 F. 3d 69, (2d Cir 2000), a case this Court has previously refused to follow on the issue of the availability of compensatory damages. [Court's May 31, 2005 Order; Plaintiff's Brief at 4, 5, 7-8] Scheibe's reliance on *Bartlett* is misplaced.

Contrary to the reading that Scheibe attempts to give to *Bartlett*, the Second Circuit did not find that a discrepancy in test scores gave rise to a finding of a disability. In *Bartlett,* in remanding the case to the district court, the Second Circuit explained that the trial court had:

---

[2] While Scheibe purports to dispute the findings of fact listed above, he does so in a manner which does not provide a factual basis for disputing that his reading test scores are in fact average or above. Rather Scheibe merely relies on Dr. Theye's conclusion that Scheibe's reading scores are "in sharp contrast" to his other test scores and "general intellectual functioning". [Theye's Affidavit, Exh. 2, p. 5, ¶ 4] Nowhere does Dr. Theye find that Scheibe's reading test scores are below average. [FOF ¶¶ 64 & 89; Theye Affidavit, Exs. 2 & 3]

3

> ...applied the wrong legal standard when it found that Bartlett was not substantially limited with respect to reading because she has "roughly average reading skills (on some measures) when compared to the general population." *Bartlett I,* 970 F. Supp. at 1120. *It is not enough that Bartlett has average skills on "some" measures if her skills are below average on other measures to an extent that her ability to read is substantially limited.*

226 F 3d at 74 (emphasis added). Only when the person's skills are <u>below average</u> as compared to the general population does the court get to the next stage of analysis. Scheibe's reading scores are not below average when compared to the general population.

That Scheibe's experts are utilizing an incorrect standard is amply demonstrated by Theye's observation that Scheibe's test score on the Woodcock-Johnson Achievement Test-III (one of the lowest of any of Scheibe's reading tests) placed him "'only' at the 54th percentile, which would translate into a grade equivalent performance of a high school junior." [Theye Affidavit, Exhibit 2, p. 5, ¶ 4][3] As the Second Circuit observed in *Bartlett*:

> Bartlett's DRT test results, which show a reading rate in the fourth percentile or below as compared to college freshmen, are of limited value, because the proper reference group is "most people," not college freshmen.

226 F. 3d at 81-82. As Scheibe's own experts concede, even one of Scheibe's lowest reading scores still puts him in the 54th percentile – which is not below average. Psychological tests, like many other scientific tests are designed so that results exhibit a "normal distribution," which can be mapped on a "bell curve." Using a standard bell curve methodology, scores that fall between the 16th and 84th percentile fall within one standard deviation of the mean and are within the average range. [See FOF ¶ 92]

---

[3] The lowest reading score Scheibe had was on the Nelson-Denny Reading Test. [FOF ¶ 90] Nevertheless, Dr. Lachnar, one of Scheibe's experts, placed Scheibe's reading rate score on that test within the "Low Average" range, his comprehension score within the "Average" range, and his vocabulary score within the "High Average" range. [FOF ¶ 37] A "Low Average" score still falls within the average range. [FOF ¶ 91, 92; See also Defendant's Brief at page 12, note 12]

4

II.  **SCHEIBE'S EXPERT REPORTS DO NOT DEMONSTRATE ANY CLINICAL JUDGMENT.**

Scheibe attempts to discredit the expert opinions of Drs. Ortiz and Zecker by claiming that, in contrast to his expert report, Defendant's expert reports lack any clinical judgment. [Plaintiff's Brief at 5]  Scheibe misstates the undisputed facts.

Dr. Theye's opinions are based upon "an extensive review of [Mr. Scheibe's] academic history and results of neurological evaluation conducted in 2001". [Plaintiff's Brief at 5]  Dr. Theye's report contains nothing which suggests that he observed the manner in which Scheibe reads. [See Theye Affidavit, Exhibits 2 & 3]  Unlike the plaintiff's experts in *Bartlett*, who described her reading as "slow and halting" based upon their personal observations, *Bartlett v. New York State Board of Medical Examiners*, 156 F 3d 321, 326 (2nd Cir 1998), Dr. Theye made no such observation.  Rather, he simply reviewed the same information as was reviewed by Defendant's experts. [See Theye Affidavit, Exhibits 2 & 3; FOF ¶¶39, 71, 84 & 87]

III.  **THE FACT THAT USMLE IS A COMPUTER BASED TEST DOES NOT PREVENT SCHEIBE FROM USING HIS SELF-ACCOMMODATIONS.**

Unlike the plaintiff in *Bartlett*, Scheibe has passed each step of the USMLE for which he has registered. [FOF ¶ 45, 77][4]  Scheibe claims that he did so by modifying the techniques he uses to take (and excel on) "paper and pencil" tests to conform to the environment of a "computer based test" ("CBT"). [Affidavit of Trenton J. Scheibe ¶¶17-18]

Scheibe claims he has developed "strategies to overcome or at least minimize my reading disorder" when taking pencil and paper exams but claims those techniques are not

---

[4] In *Bartlett*, the plaintiff had taken the State Bar exam four (4) times without any accommodation, and once with certain, limited accommodations, but had failed the exam each time. *Bartlett* 226 F. 3d at 75-76.  In contrast, Scheibe did pass both Steps 1 and 2 of the USMLE without any accommodation.

5

available to him when taking the computer-based USMLE. [Scheibe Affidavit, ¶¶12, 15, 18; See also Theye Affidavit, Exhibit 3, p. 1, ¶4]  Neither Scheibe nor Dr. Theye, however, describes in any detail what those techniques are or why they cannot be used on the USMLE. The techniques which Scheibe does identify consist of the following:

- underlining, circling, note taking and outlining
- taking speed reading courses
- using his finger to trace the sentence; and
- simply avoiding reading

[Scheibe Affidavit, ¶¶12, 13; Exhibit No. 1, p. 2, ¶ 1]

Except for "avoiding reading", all of these techniques are fully available to examinees taking USMLE. [See Affidavit of Gerard F. Dillon, Ph.D., ¶¶2-5, and Exhibit 1 to that Affidavit]  In that regard, the examination delivery software, known as FRED,

> ...allows examinees to highlight and strike out item text as well as to annotate items on the computer-based multiple choice sections of USMLE.  The annotation feature allows examinees to type brief notes electronically about individual items while taking the exam.

[Dillon Affidavit ¶ 3]  Moreover, examinees who want to practice with the new software before taking the test can do so by going to USMLE's website. [Id. ¶ 6]

There is nothing in USMLE to prevent Scheibe from utilizing the same techniques he has employed to succeed throughout college, law school and medical school without the added benefit of extended test times.[5]

---

[5] There is also no evidence that Schiebe is substantially limited with respect to reading, absent his alleged self-accommodating measures.  Scheibe has made no claim that such measures were employed, much less favorably influenced his reading scores on tests administered by Drs. Lachar and Theye, all of which placed Scheibe's reading ability in the average range or better.  Even assuming, *arguendo*, that Scheibe were substantially limited absent self-accommodating measures, the proper test under the ADA requires that any determination of a

6

## CONCLUSION

Scheibe does not have a disability within the meaning of the ADA. It is undisputed that while Scheibe's reading test scores are lower than his math test scores, his reading ability is never below that of the average person in the general population and is apparently better. On that point there is simply no dispute, even from Scheibe's own experts.

Scheibe's experts' opinions are all based on an incorrect standard, i.e., that Scheibe has a disability because his reading skills lag behind his other intellectual skills. Scheibe is obviously a very bright individual to have earned both a law degree and a medical degree without receiving any accommodations. As such, the fact that Scheibe is not as proficient in his reading as he is in his other intellectual pursuits may indeed be a source of frustration and disappointment for him. But the ADA standard is not about how Scheibe's reading skills compare to his other skills. A finding that an individual is disabled under the ADA is based on the person being substantially limited in a major life activity as compared with the general population. *See Baer v. National Board of Medical Examiners*, 392 F. Supp. 2d 42, 46-48 (D. Mass. 2005) (holding there was no reasonable likelihood of success in establishing a substantial limitation with respect to reading or learning where there was "an apparent gap between the plaintiff's very high IQ scores and her actual performance on certain tasks", but her performance on such tasks was still generally in the average range); *see also Price, supra*, 966 F. Supp. at 427 (discrepancy in abilities does not establish a substantial limitation under the ADA).

---

disability take into account such measures. *Sutton v. United Air Lines*, 527 U.S. 471, 487 (1999) ("...the ADA's coverage is restricted to only those whose impairments are not mitigated by corrective measures.").

While Scheibe has attempted to show miscellaneous irrelevant disputes as to the facts, pitting the conclusions of his experts against those of the NBME, the record, including his expert's report, is clear that Scheibe is not substantially limited in a major life activity. Therefore, whatever differences or disagreements may exist do not go to the threshold issue of whether Scheibe's "reading disorder," as he labels it, rises to the level of disability under the ADA. For the reasons stated, *supra*, and in Defendant's earlier Brief, the NBME respectfully requests the Court to dismiss Scheibe's complaint in its entirety.

Dated this 20th of March, 2006

_____
Thomas R. Crone
State Bar No. 1017265
Michael P. Gallagher
State Bar No. 1047771
Melli, Walker, Pease & Ruhly, S.C.
Ten East Doty
P.O. Box 1664
Madison, WI 53701-1664

Attorneys for Defendant
National Board of Medical Examiners